IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| OLGA DELACRUZ AND MARCO | § | |
| DELACRUZ, INDIVIDUALLY, AND | § | |
| AS RERPESENTATIVES OF THE | § | |
| ESTATE OF MANUEL DELACRUZ, | § | CIVIL ACTION NO. 1:18-CV-11 |
|     Plaintiff | § | |
| | § | |
| VS. | § | |
| | § | |
| THE CITY OF PORT ARTHUR, PORT | § | |
| ARTHUR POLICE DEPARTMENT, | § | |
| OFFICER LANE CHERRY, IN HIS | § | |
| INDIVIDUAL AND OFFICIAL | § | |
| CAPACITY, UNKNOWN OFFICERS, | § | |
| THE MEDICAL CENTER OF | § | |
| SOUTHEAST TEXAS, L.P. D/B/A | § | |
| THE MEDICAL CENTER OF | § | |
| SOUTHEAST TEXAS L.P., | § | |
|     Defendants | § | |

## MOTIONS FOR SUMARY JUDGMENT OF DEFENDANTS LANE CHERRY, TERRY CATER, REID ROWE, SHANNON MEAUX, AND SHELBY HARPER

TO THE HONORABLE JUDGE OF SAID COURT:

    COMES NOW, LANE CHERRY ("Cherry" or "Defendant(s)"), TERRY CATER ("Cater" or "Defendant(s)"), REID ROWE ("Rowe" or "Defendant(s)"), SHANNON MEAUX ("Meaux" or "Defendant(s)"), and SHELBY HARPER ("Harper" or "Defendant(s)"), Defendants in the above-referenced cause, and file this their FRCP 56 Motions[1] for Summary Judgment, and in support thereof, would respectfully show unto this Honorable Court as follows:

### NATURE AND STAGE OF THE PROCEEDING

    1.    On January 9, 2018, Plaintiffs, Olga and Marco Delacruz, (hereinafter referred to as "Plaintiffs"), filed their Original Complaint against some of the Defendants and others, arising out of the death of Manuel Delacruz (hereinafter "Manuel"). *See* Doc. 1.

---

[1] This comprehensive pleading is filed by Defendants, Lane Cherry, Terry Cater, Reid Rowe, Shannon Meaux and Shelby Harper. Defendants are filing their FRCP 56 Motions for Summary Judgment as against all the claims alleged against them in Plaintiffs' current Second Amended Complaint (Doc. 32).

2.      Plaintiffs' Original Complaint alleged a civil rights claim against some of the Defendants under 42 U.S.C. § 1983 based upon alleged violations of the Fourth Amendment (excessive force), as well as related pendent state law claims, also constituting excessive force. *See* Doc. 1, ¶¶ 2, 14-16, generally. These claims allegedly arose on August 1, 2016, at the Medical Center of Southeast Texas where Manuel, who suffered from schizophrenia, was to be checked in pursuant to warrant, and where there was a subsequent scuffle between Manuel, the Officers that had been requested, and the Medical Center personnel, which allegedly led to Manuel's death. *Id.*, ¶¶ 11-13.

3.      Defendants City, PAPD and Cherry filed their 12(b)(6) Motions to Dismiss, and Plaintiffs filed their Response and Defendants filed their Replies. *See* Docs. 9, 13 and 15-18.

4.      On May 8, 2018, this Court dismissed all claims against the PAPD, the official capacity claims against Cherry and all state claims against Cherry and the City. The Court also conditionally dismissed the § 1983 claims, but gave Plaintiffs 14 days to amend the Original Complaint. *See* Doc. 21.

5.      On May 22, 2018, Plaintiffs filed a First Amended Complaint, deleting the dismissed claims and adding a Fourteenth Amendment claim; and on June 5, 2018, Defendants City and Cherry filed their Motions to Dismiss; Plaintiffs responded and Defendants replied. *See* Docs. 25, 27, 29 and 30.

6.      After receiving Defendants' Initial/Supplemental Disclosures, on June 28, 2018, Plaintiffs filed their Second Amended Complaint, adding Defendant PAPD Officers Cater, Rowe, Meaux and Harper and Security Guard Na'Shaun Taylor and making additional allegations. In light of Plaintiffs' filed Second Amended Complaint, on June 29, 2018, this Court denied, without prejudice to re-filing, Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint. *See* Docs. 32 and 34.

7.      On July 12, 2018, Defendants City and Cherry filed their Motions to Dismiss Plaintiffs' Second Amended Complaint and on July 20, 2018, Defendants Cater, Rowe, Meaux, and Harper filed their Motions to Dismiss Plaintiff's Second Amended Complaint. *See* Docs. 37 and 41, respectively.

8.      From July 26 - August 9, 2018, Responses of Plaintiff and Replies of Defendants were also filed. *See* Docs. 43 44, 45 and 47.

9.    On March 14, 2019, this Court issued its Memorandum and Order with respect to Defendants' Rule 12(b)(6) Motions to Dismiss Plaintiffs' Second Amended Complaint, within which the Court "DISMISSED with prejudice" the following: "Plaintiffs' § 1983 claims against the City and § 1983 failure to train and supervise claims against the Officers." *See* Doc. 63, p. 43. The Court also dismissed with prejudice "any so-called 'Fourteenth Amendment excessive force claims.'" *Id.* The Court deferred ruling on the *remaining* "Fourth Amendment excessive force claims" alleged against the Officers "and their corresponding assertions of qualified immunity as to those claims, pending limited discovery and later reconsideration on summary judgment." *Id.*

10.    Currently, the discovery deadline of May 3, 2019 has past, and the deadline for filing dispositive motions is May 17, 2019. *See* Doc. 54. Accordingly, Defendant Officers now file their Motions for Summary Judgment.

## UNDISPUTED MATERIAL FACTS[2]

11.    On or about 4:51 p.m., on, August 1, 2016, the City of Port Arthur Police Department (PAPD) dispatch received a phone call from a Mr. Burch, the fiancé-in-law to Manuel Delacruz (Manuel), who requested that an officer be sent out to the Emergency Room area of the Medical Center to assist in admitting Manuel, as he was a schizophrenic, who had tried to jump out of a truck, and was not taking his pills, and had not slept in 4-5 days.[3] Mr. Burch gave a description of their vehicle and a description of Manuel. He also indicated they had recently tried to get a mental warrant from a judge, but were told they could not issue one after 4:00 p.m. Burch had also previously sought advice from PAPD Officer Josh Abshire about how to get Manuel health care. *See* Ex. "A," Dispatch Recording and Ex. "F," attached deposition exhibit 2, Call for Service printout, Officer Cherry's Deposition Excerpts and Exhibits; Ex. "N," p. 5:20-23, 6:15-8:7 and 29:6-17, Excerpts from Charles Burch's deposition; Ex. "R," p. 4:12-14, 9:19-10:23 and 11:8-13:18, Excerpts from Ruth Delacruz's deposition; Ex. "S," p. 4:6-18 and 8:20-13:12, Excerpts from Marco Antonio Delacruz Torres, Sr.'s deposition; and Ex. "T," p. 4:12-14 and 7:12-9:2, Excerpts from Marco Antonio Delacruz Torres, Jr.'s deposition..

12.    Patrol Officer Lane Cherry, an officer with extensive prior experience dealing with persons with mental health disorders and their emergency detentions (i.e., around 50-100), was the first Officer to respond to the Medical Center (The Medical Center of Southeast Texas) around 5:00 p.m.

---

[2] The undisputed material facts, for purposes of this MSJ only, are contained within the Exhibits "A" – "V," which are incorporated herein by reference the same as if set forth at length herein.

[3] Olga Delacruz, Manuel's Mom also testified Manuel started showing signs of mental problems around 2008, she took him to Spindletop, was referred to a doctor/psychiatrist and started on medication, he had an appointment about every three months and there were times where he was really sad, had fears of police stemming from an arrest, would get out and start walking, worried about his Dad going to work, would not eat, and would sometimes refuse to take his medication. *See* Ex. "Q," p. 4:16-18, 7:16-21, 12:1-13:25, 18:2-4, 22:8-19, 24:15-22 and 27:4-23, Excerpts from Olga Delacruz's deposition of.

Officer Cherry initially met with, and/or shook hands with, and/or spoke with, approximately 4 family members (including Manuel's sister Ruth, his father and his brother), outside the emergency room entrance concerning the situation, as Manuel (in the red shirt and black pants) walked away, across a field, and toward a nearby apartment/hotel complex. Officer Cherry was advised that they were trying to get Manuel admitted on a warrant, and that he needs help bad, as he is a schizophrenic who leaves the house, and walks around, and last night he opened the car door and tried to jump out at 80 mph. Cherry was further advised, Manuel won't take his medication/pills and spits them out, he has not slept in five days, he won't shower, and he defecates on himself, and they have to follow him everywhere and he is just not right and is afraid of police. *See Ex. "B,"* 5:00:00 – 5:02:40, Dash Cam Video from Officer Cherry's Patrol Vehicle; Ex. "C," 0:00:58 – 0:03:00, Audio Recording of Officer Cherry; Ex. "F," p. 6:18-7:6, 10:18-11:6, 12:5-6, 17:24-18:10, 19:17-20:1, 22:7-24:22, 25:18-26:21, 122:9-15, 143:20-144:11 and deposition Ex. 6; Ex. "N," p. 8:8-9:21; and Ex. "R," p. 13:19-14:17, 23:11-24:1 and 25:3-5.

13.     Officer Cherry got back in his patrol car, allowed some of the family members to follow at a distance in their vehicle, and Cherry drove toward the apartment/hotel complex to meet up with, and further evaluate Manuel's mental condition and bring Manuel back to the hospital for mental treatment. Officer Cherry made contact with Manuel Delacruz on the left side of Port Plaza road headed toward the apartment/hotel complex, and Officer Cherry stepped out of his patrol vehicle and spoke with Manuel. In summary, Cherry told Manuel that he and/or Manuel's family were worried about him not taking his medicine and his attempt at jumping out of the vehicle, and Cherry repeatedly told Manuel he was there to help him, and repeatedly asked Manuel to stop, sit down, and just talk. Manuel repeatedly responded with: leave me alone and go away; I don't want to go to the E.R.; I don't want to go to jail; and assertions that Cherry was trying to kill, and/or rape, him. Cherry felt Manuel was possibly hallucinating, and was alarmed, fearful/scared, unstable, not thinking clearly, could not make rational decisions, nervous, and moving around a lot, and Manuel stayed this way throughout the entire incident. Accordingly, Cherry felt Manuel (around 280-300 pounds) might put up a struggle if Cherry tried to take him into custody by himself; so, Cherry took his time, walked with Manuel, and talked with him, until other officers could arrive and any potential struggle could be minimized. Manuel continued to walk away. *See Ex. "B,"* 5:02:40-5:07:00; Ex. "C," 0:03:00-0:10:00; Ex. "F," p. 26:14-21, 26:22-29:24, 31:17-32:3 and 33:24-35:17; Ex. "N," p. 9:16-21 and 45:4-12; and Ex. "T," p. 9:4-18.

14.     Officer Cherry finally insisted that Manuel sit down as Manuel continued to walk away, and due to Manuel's mental health, Cherry, along with requested assistance of arriving Officers Cater (a veteran patrolman also with extensive experience in dealing with emergency mental health detention/warrant situations) and Green, as well as with the assistance of a family member, were able to stop and secure Manuel in 4 sets of handcuffs, with a minor, or small, struggle from Manuel, but, basically, without incident. Then, Officer Cater walked Manuel back to the hospital, with a patrol unit(s) following/escorting (i.e., Officers Cherry and Green). *See Ex. "B,"* 5:07:00-5:17:00; Ex. "C," 0:09:55-0:11:40; Ex. "D," 5:10:25-5:11:29 and 5:13:54-5:17:33, Dash Cam Video of Officer J. Green's Patrol Vehicle; Ex. "E," 0:00:45-0:01:54, 0:02:07-0:02:12, 0:03:14-0:06:40, Front Dash cam video of Officer Cater's Patrol Vehicle; Ex. "F," p. 33:9-13, 35:24-36:6, 41:13-18 and 43:5-44:2; Ex. "G," p. 5:10-14, 7:9-8:20, 9:23-11:4, 11:20-12:7, 13:8-12, 14:11-25, 16:24-18:3, 19:12-20:5, 24:16-26:5, 37:12-23, 58:3-11 and 66:3-67:23, Officer Cater Deposition Excerpts; and "N," p. 9:16-10:4.

15.     During this time frame, someone, possibly Chuck Burch, advised the officers several times that he appreciated their assistance, and he further stated Manuel was a schizophrenic, with everything wrong with him and that he is better when he is on his medication, and that this was a shame as Manuel was a former potential Olympic boxer. Officer Cherry responded that they would take him to the hospital and try to get a mental hold on him and that he wanted to talk to someone that witnessed his

attempt to jump out of the car. Cherry was told, Manuel's sister, who was back at the hospital, witnessed this event. The officers also discussed letting Manuel walk, as Manuel did not want to get in the patrol car, and one officer also offered to get Manuel a water from his car. Chuck Burch testified that the officers, including Cherry, were, "very, very, very nice" and "they walked him all the way back. Everybody was very professional" and "[t]hey were very good getting him back to the hospital" and Cherry "assisted us in getting him back to the hospital, in the doors –very—he was very polite and handled it all very excellent." *See* Ex. "C," 0:11:40-0:14:06; Ex. "G," p. 24:13-15; Ex. "N," p. 9:16-10:1 and 29:24-30:4; and Ex. "Q," p. 4:16-18 and 15:7-15, Olga Delacruz deposition excerpts.

16.     Cherry advised Manuel they are going to walk to the hospital and talked to Manuel briefly about his boxing when he was 18 years old. Cater also believes Manuel was patted down, as this was standard. *See* Ex. "C," 0:14:00-0:14:25 and Ex. "G," p. 39:20-24.

17.     Officer Cater, who walked back with Manuel holding his arm or elbow, noted Manuel was irrational, had a fear of being raped by them and was afraid of going to jail, and he had also heard the previous Olympic champion boxer type statements from the assisting family members, and Cherry had also briefed him on the situation. Cater estimated Manuel weighed about 260-290 pounds. During their walk, Cater talked to Manuel about his boxing career, and stuff like that, in an attempt to build up a rapport with Manuel and try to gain his trust and convince Manuel that they were not going to hurt him. Upon arrival at the Emergency Room entrance, Cherry and other officers (i.e., Cater and Green) walked Manuel into the hospital. Once they were inside the Emergency Room of the Medical Center, Cater asked Manuel if he was thirsty, Manuel said he wanted a coke, they walked over to a refrigerator with patient refreshments, and Manuel selected, and drank, a coke. Officer Green later brought Manuel some ice water, which Manuel poured out and filled back up with tap water. After approximately five to ten minutes, Officer Cater left and went back on patrol. Manuel still seemed scared of them, and in Cater's opinion, it was about 50/50 whether Manuel would be admitted peacefully, or resist, at the hospital. Officer Cater did not talk to any nurses. *See* Ex. "G," p. 23:22-24:5, 25:25-28:23, 29:4-30:3, 32:25-34:3, 36:8-37:8, 38:7-11 and 42:15-17, Cater Deposition Excerpts; Ex. "F," p.33:11-15; Ex. "N," p. 10:5-6 and 45:3-12; and Ex. "R" p. 15:17-16:3.

18.     Soon thereafter, Cherry entered the hospital, and initially talked with another Officer who stated he talked to a buddy who informed him that Manuel's family had tried to get a warrant earlier, but they would not issue one after 4:00 p.m. Next, Cherry, asked for a warrant, or alternatively a warrant form, that he could complete. *See* Ex. "C," 20:20-23:10.

19.     Hospital personnel then asked Cherry if they could stay and Cherry agreed to do so. Cherry also testified they generally will stay to keep the peace if there is a chance the patient may become combative, and Manuel being very alarmed and on edge, as well as his body language, all indicated he might either try to flee, or become combative with medical staff. *See* Ex. "C," 22:30-23:30 and Ex. "F," p. 36:16-37:3.

20.     Cherry next talked to Manuel's sister, Ruth Delacruz, and his fiancé-in-law, to acquire information for the mental health warrant, and they re-confirmed, Manuel's attempt to jump out of the vehicle the day before, as well as his schizophrenia, not taking meds, not sleeping for five days, being afraid of everything including cops, not showering, defecating on himself and his prior Junior Olympic boxing. Ruth later testified she felt Manuel needed help and needed to be admitted to the hospital. Marco Delacruz, Sr. also testified he wanted the hospital to take care of Manuel and treat him for his episode. Marco Delacruz, Jr. also testified he felt Manuel needed professional help. *See* Ex. "C," 24:10-26:45 and 29:00-31:10; Ex. "F," p. 41:24-42:6; Ex. "R," p. 16:10-16; Ex. "S," p. 20:21-21:1; and

Ex. "T," p. 20:8-17.

21.     Cherry then went back to check up on Manuel, and he talked to Manuel about his prior boxing and where he went to school, in an attempt to try and gain a rapport with him, and get him to relax a bit. *See* Ex. "C," 32:25-33:30; Ex. "F," p. 41:8-42:6; and Ex. "S," p. 13:14-18.

22.     Cherry completed, signed and dated (August 1, 2016 around 5:15 p.m.) the mental health warrant relying on information provided by Ruth Delacruz (primarily – Manuel was a danger to himself and others for trying to jump out of a vehicle traveling at 80 mph), and handed the paperwork to the nurses, and waited for them to admit Manuel. *See* Ex. "H," Reid Rowe's Deposition excerpts and exhibits – attached Ex. 8, p. Delacruz 0002, Application to Facility for Emergency Detention Without A Warrant and Acceptance for Preliminary Examination and Ex. "F," p. 36:9-14; 122:24-123:3, and attached Exhibit 1.

23.     Cherry and other officers took Manuel to Room 19, a small room with a bed in the center, and Manuel sat on the bed, with Cherry just outside the sliding glass door speaking to him. Cherry waited for a long period of time, because there was a back and forth between the police and the hospital, as the hospital was requiring vitals be taken, blood to be drawn and stuff like that prior to Manuel's admittance, and Manuel was refusing same and did not want to be there and wanted to go home. Marco Delacruz, Jr. testified that Manuel remarked that they were trying to rape him, and Marco made a joke about it like, "come on brother, you're not that good looking." Cherry stayed with Manuel because he felt he was legally bound and obligated to make sure Manuel received the treatment he needed, as Cherry had obtained enough information to place Manuel under a mental health warrant, and thus, there was a danger to Manuel and the people around him. At some point, it was evident the hospital was not going to admit Manuel (Cherry approximates about 30-45 minutes); so, Cherry, called his supervisor, Sergeant Rowe. Cherry called Rowe because he felt Rowe had more experience and training, and would be of assistance in going up the hospital's chain of command to resolve this issue, and get Manuel admitted for treatment. *See* Ex. "F," p. 37:4-25, 47:22-49:25, 51:17-20, 52:10-20 and 62:14-63:3; Ex. "N," p. 10:8-11:12 and 13:16-14:22; Ex. "R," p. 16:21-17:8 and 22:2-17; "S," p. 19:4-25; and "T," p. 10:3-25.

24.     Sergeant Rowe acknowledged receiving a call from Cherry, and was informed Cherry had been trying to get Manuel admitted on an emergency mental detention order/warrant, and although Manuel qualified for help (i.e., he was a schizophrenic, and a danger to himself and others and the family was scared of him), the hospital would not admit him to the fifth-floor psych ward because of other criteria. Rowe drove to the hospital, spoke with Cherry again, and spoke to the family members who confirmed these previously reported problems. *See* Ex. "H," p. 4:10-11, 10:9-11 and 24:16-26:19 and Ex. "F," p. 62:1-5.

25.     Sergeant Rowe testified that getting mental patients the treatment they need is a little different, as the mental patients have not always committed a crime; so, the officer(s) have to use an emergency mental health committal to get them the help they need. In that regard, they have to take them to the hospital, complete an emergency detention order and try to get them admitted. He also stated that they had sometimes in the past encountered admission problems due to hospital standards, and they had previously had a meeting, and they had been told to speak with the charge nurse to attempt to resolve any of these type problems. As a result, Rowe drove to the hospital to have a face-to-face meeting with the charge nurse. *See* Ex. "H," p. 26:17-27:10 and 27:25-28:25.

26.     Sergeant Rowe also testified that they typically assist until the mental patient is sent up to the fifth floor. Generally, the officer will stay there, and try to do everything he or she can to

accommodate the hospital. They do not like to just drop off a person with a mental issue in an emergency room, and just leave without providing some security. This is especially true when other patients and people are around, and further, the nurses do not like them to do that. *See* Ex. "H," p. 34:19-36:12.

27.    Sergeant Rowe explained that he had taken, and that there were, several areas of police training, which would apply to a broad range of different incidents, including mentally ill, or uncooperative, subjects during the time frame before a patient's admittance to the fifth floor. He identified: CIT training (Crisis Intervention Training) and verbal judo class, both of which he had already taken at the time of the incident, and further stated, they now offer de-escalation training. Rowe has also had use of force training, which can apply here as well. *See* Ex. "H," p 38:22-41:3, 41:23-43:18, 106:25-107:2 and 111:9-112:2 and Ex. "F," p. 97:18-23.

28.    Cherry remained outside the room with Manuel, and Rowe, after speaking with the family members, began moving up the hospital's chain of command, asking to speak with the charge nurse, and was eventually met by two women, Michelle Johnson (the charge nurse) and Nancy Hester (with the Jefferson County' Sprint Team assigned to the hospital – which had training in dealing with mental health persons and their issues). Ms. Hester wanted Rowe to arrest Manuel, but Sergeant Rowe did not feel he could make an arrest yet, as there had been no penal code violation. Ms. Johnson just wanted them to stay there until they were able to get everything they needed to get Manuel admitted. Ms. Johnson, and others, then started working with Manuel, and trying to make a little more headway with him on what they needed, but Manuel was not cooperative. *See* Ex. "H," p. 43:23-44:5 and 44:20-47:8 and Ex. "F," p. 62:6-63:3.

29.    Sergeant Rowe recounted a number of things that he was told about Manuel including: he tried to commit suicide jumping out of a truck traveling at highway speeds, he had defecated upon himself several times and had refused to clean himself up, he wasn't bathing or sleeping, he was not taking his prescribed narcotics, he would wonder around at night, one family member stated they didn't feel safe at night and were scared he was going to wind up killing someone in the middle of the night. *See* Ex. "H," p. 48:2-20.

30.    Sergeant Rowe testified they had the right, under the law, to do an Emergency Mental Health Warrant to essentially make a person, such as Manuel (who had tried to commit suicide by jumping out of a truck, etc.), get the mental health treatment or help he needed. *See* Ex. "H," p. 50:4-11, 51:4-11 and 51:21-52:4; *see also Tex. Health & Safety Code* § 573.001.

31.    One of the hospital requirements was to draw Manuel's blood. However, when they attempted to draw Manuel's blood after he initially appeared to consent, Manuel suddenly tried to take the needle, or did take the needle, away from the nurse and started fighting with her over the needle. At that moment, Rowe and/or Cherry had to physically touch Manuel, as Rowe and/or Cherry tried to get the needle from him, to make sure Manuel did not have complete control of the needle. *See* Ex. "H," p. 23:13-20; Ex. "F," p. 30:2-25 and Ex. "O," p. 27:16-28:5.

32.    Sergeant Rowe and Cherry were generally positioned outside of Manuel's room, as nurses, and family members went in and out (until Manuel stated he wanted family out, and they went to the hallway or waiting room), and after several hours, they remained at a standstill, as the hospital still wanted not just mental information, but all sorts of pre-admission physical information (blood draw/tests, blood pressure, vitals, etc.) which Manuel would not allow. In that regard, a charge nurse who testified, stated Manuel had rights, and they could not force this type of medical care upon him and she informed

her ER staff of same. She also indicated they could not even hold these potential mental patients down, or do anything these mental patients did not want you to do, even with an Emergency Detention Order in place. That being said, she subsequently admitted she did not mention this to the officers, and further admitted she was not a trained psychiatric nurse and does not have any legal or law enforcement training, and she listed a number of exceptions regarding when they could touch or handcuff a person subject to such order. She also testified Manuel was not thinking rationally and needed to be admitted for psychiatric evaluation based upon her observations and the information provided by family members. Regardless, they finally got to the point where the nurses or hospital would not admit Manuel to the fifth floor without this physical information, and it was as if they expected the officers to just wait as long as it took for Manuel to consent to same. The officers got to the point where they said something like, "Look, eventually we are going to have to leave." Marco Delacruz, Jr. estimated the officers were involved with Marco for about 4 hours from the beginning to the end. Then, a nurse, possibly Ms. Johnson, mentioned bringing a "sitter" down from the fifth floor, who Rowe surmised would watch Manuel until he allowed them to draw his blood, etc., and if Manuel did something bad, they would call back the police. Although Rowe did not know exactly who the "sitter" would be, the "sitter" option made Rowe scared and nervous, as he did not feel comfortable leaving, for example, a 120-pound "sitter" nurse from the fifth floor in charge of a 300-pound mental patient in an open environment or public place, when Manuel could lose his mind at any moment, endangering people from children to the elderly, as well as medical staff. Nurse Buller similarly testified, "psych patients can turn one way or another quickly, [a]nd in the time it takes [police] to get there, you know, we can get hurt." Sergeant Rowe was frustrated with the hospital, not Manuel, because Manuel needed help. *See* Ex. "H," p. 52:11-54:6 and 56:3-57:22; Ex. "F," p. 63:14-64:17; Ex. "O," p. 10:25-11:12, 17:14-20, 18:3-19:24, 23:7-24:5, 62:18-25, 65:17-67:20, 69:10-23, 80:3-81:11, 84:7-85:10 and 89:10-21, Deposition of Ana Ruth Buller; and Ex. "T," p. 10:8-12.

33. Around this time-frame, Cherry took the cuffs off of Manuel, and the hospital nurse(s) asked them to stay a little longer, and Rowe and Cherry agreed to do so. At some point, Cherry got Manuel a drink, opened it for him and Manuel selected the other unopened can, and made the irrational statement that he thought Cherry was going to poison him. *See* Ex. "H," p. 54:19-56:2, 59:3-11 and 60:1-4 and Ex. "F," p. 39:14-40:7 and 86:15-24.

34. After the officers stayed for a while, the nurses were able to get some of his vitals, but not the blood draw, and then, the nurses wanted to get Manuel dressed out into a hospital gown. It was Rowe's understanding, that once Manuel got dressed out into a gown, he would be admitted to the fifth floor for treatment. Chuck Burch also remembers the nurse behind the front desk stating that as well. Nurse Ana Buller also confirmed that the remaining required Medical Clearance tests were eventually waived, but Manuel needed to remove his clothes and put on a gown before going to the Fifth Floor. She also explained why this was important – so that Manuel could not harm himself or others with his clothing (such as with a belt or shoelaces), and because he had to be dressed similar to the other mental patients, or they might become upset and then, everybody is fighting. She did not recall if Manuel had a belt, but she testified that a belt is "definitely, why the shorts have to come off." The nurses got his gown on and his shoes off, and the last thing remaining to remove before they would let him go up to the fifth floor was his shorts. Cherry had been informed they were also concerned about a synch style gray belt (i.e., like a motorcycle helmet with two D-rings that you weave through and pull tight) attached to his shorts. They were making progress toward getting Manuel care. However, even though the nurses tried to explain why Manuel needed to remove his shorts, Manuel refused to do so, and his uncooperative demeanor never changed much, and he kept stating he wanted to leave. Chuck Burch testified that during the estimated two to three hours the officers were assisting with Manuel, the officers were both "very professional" and "everything was handled good" and they were "very much"

patient. Ruth Delacruz also testified that during her presence, she never saw any police officer behave in an inappropriate way, she did not have any complaints, and it was her impression Officer Cherry, the only officer she talked to, was concerned about Manuel. Marco Delacruz, Jr. testified that up until this point, he had no complaints regarding Cherry's or Rowe's conduct. *See* Ex. "H," p. 60:5-25 and 61:14-62:1; Ex. "F," p. 67:9-68:13, 69:4-71:19, 105:12-17, 106:6-17 and 107:4-10; Ex. "N," p. 11:20-12:11, 13:7-14:22 and 30:5-9; Ex. "O," p. 29:13-33:16, 45:2-46:16, 70:18-71:7, 74:22-75:16 and attached deposition Ex. "2," p. 1 of 3, Ana Buller's (Platero's) D.A. Statement; Ex. "R," p. 21:17-22:1 and 25:14-21; and Ex. "T," p.12:3-17.

35.    They continued to ask Manuel to take off his shorts/belt, and eventually, offered to hold up a blanket in front of him, and the nurses explained no one would see him while he removed his shorts, and then, they held up the blanket and again, explained that no one could see him, and asked him to remove his shorts, but Manuel again refused. Nurse Buller believed that Manuel did not want to remove his shorts, because he smelled of urine and was embarrassed that he peed on himself. *See* Ex. "H," p. 69:7-70:3 and Ex. "O," p. 34:18-21, 43:22-44:7 and attached deposition Ex. "2," p. 2 of 3.

36.    Chuck Burch testified the nurse at the front desk finally told Rowe and Cherry to "put him in a robe." Rowe advised Cherry they were going to try and remove the belt and/or pants/shorts. The officers asked the nurses (all female) to just step out of the room, and the curtains and door were closed for privacy, and the officers asked Manuel to remove his pants. It appears that both the nurses and the officers closed the curtains for Manuel's privacy. Nurse Buller stepped away for a couple of minutes to tend to other matters in the E.R., and had no concerns, as she had seen how well Officer Cherry had dealt with patients in the past. She did not know, one way or the other, whether the officers continued to try to talk to Manuel. Rowe does not recall if he had latex gloves on, but he definitely did not have leather tactical type gloves on, as he never owned, nor liked, wearing them, primarily because he could not feel what he is touching. Cherry testified, to the best of his knowledge, he and Rowe had hospital latex gloves on. Manuel backed up against the wall, and Rowe and possibly Cherry asked him again to take off his pants, or belt, or both, and Manuel refused. Rowe stated they were going to remove them. As they got closer and Rowe grabbed Manuel's right hand and Cherry grabbed Manuel's left hand, Manuel started "flaying" around, he grabbed Rowe's left arm/wrist and pushed and inadvertently hit Rowe on the head a couple of times with his elbow or forearm, and as Rowe reached down to pull at his shorts or belt, Officer Cherry, who Manuel had already been struggling with, said "he has got your pepper spray." Rowe looked down and noted he still had his own pepper spray, but when he looked back up, he noticed Manuel had Cherry's pepper spray canister with his finger on the safety cap spray button trying to spray Rowe in the face, at which time Rowe told Manuel, that's enough, you are under arrest. Rowe made this statement, because Manuel was now trying to hurt them and had committed a felony crime by taking an officer's weapon. Rowe also told him to stop it, or calm down. Cherry estimated that Manuel, a former boxer was about 5 and 1/2 feet tall and weighed over 300 pounds. Chuck Burch testified when they entered the room not much happened, and then all of a sudden, he heard stuff against the wall, and everyone screaming, and thereafter, he left to call the sister to tell her what was going on, as she had left because of her kids. He further testified he could not see how the struggle began. He also testified that up until the time of the struggle the officers were trying to help Manuel get admitted to the hospital. Nurse Buller testified that when she returned, she could see through the bottom of the door as the curtain was about one foot off the floor and noted, "Patient appears to be against the wall with combative behavior and screaming and struggling with PAPD officers ..." and Manuel was "in the corner" "[o]n the floor" as were the Officers, with one of their legs stretched out where they couldn't fully open the door and Manuel was "trying to fight them" and "it just happened so fast." She also testified she did not know who started the struggle, and she did not know if Manuel punched one of the officers, tried to pepper spray an officer, tried to take an officer's gun from his holster or whether he was placed under arrest

during same. Marco Delacruz, Sr, testified he could not see what was going on in the room and Marco Delacruz, Jr, was with Marco Delacruz, Sr. down the hall at the other emergency room entrance. *See* Ex. "H," p. 70:3-72:21, 74:3-7 and 121:4-22; Ex. "F," p. 65:18-66:8, 71:16-72:9, 73:10-12, 73:24-74:3 and 74:23-77:23; Ex. "N," p. 13:17-14:11, 15:9-16:22, 30:10-15, 33:19-22, 35:15-18 and 41:9-18; Ex. "O," p. 35:9-13, 36:1-9, 37:2-41:22, 57:6-8, 60:4-13, 71:19-24, 73:10-74:16, 76:13-77:9, 86:2-8, 90:21-91:14 and attached deposition Ex."2," p. 2 of 3; Ex. "S," p. 15:6-9 and 23:3-9; and Ex. "T," p. 11:9-23.

37.    From the point in time when Rowe stated Manuel was under arrest, Rowe and Cherry were trying to handcuff Manuel, and were not worried about Manuel's shorts, as that could be addressed after Manuel was handcuffed. *See* Ex. "H," p. 73:4-74:2.

38.    Next, Cherry grabbed the pepper spray from Manuel and threw same across the room, at which time Manuel got back on Cherry as they are trying to get Manuel's arms behind his back and then, Cherry said something indicating to Rowe that Manuel was now trying to remove Cherry's weapon from his holster. So, Rowe separated from them, and Cherry let go, spun away, and sat down on his gun, and Rowe was preparing to possibly use deadly force (but never got his gun out of his holster), when Rowe saw Manuel did not have anything in his hands. Cherry described this part of the incident as follows – Manuel came toward me, wrapped both arms around my waist, with Manuel's hands near the right side of my waist, trying to remove the previously locked down weapon from my holster, and, with the gun about half way out, I took my hands and shoved the gun back into my holster to lock it down, and then, I just spun away to remove myself from Manuel's grip long enough to make sure the gun was secured inside my holster. Rowe went back toward Manuel, and Manuel hit Rowe a couple of times in the face, and Rowe punched back, Cherry pulled out his handcuffs, but Manuel grabbed them and threw them across the room, and Cherry punched once and said we need to get him to the ground, and Rowe went down, grabbed both legs and stood, and pulled, up, and Manuel spun and fell to the ground on his back. *See* Ex. "H," p. 74:3-76:1 and 124:8-125:9 and Ex. "F," p. 79:21-80:4, 133:22-134:4 and 146:25-148:2 and Ex. "P," p. 6-7, Supplemental Report of Cherry.

39.    Once Manuel went to the ground on his back, he continued to resist, but because of the small size of the room and because Manuel was too big and strong, they were not able to get enough leverage to roll him over onto his stomach to handcuff him, despite Cherry also using the taser once (dry stun – 1 cycle approximately 5 seconds). Although Manuel initially responded "Okay. Okay. Okay.," and pretended he was going to stop after the taser was used, as soon as the taser was removed, he went right back to fighting again. At that point, they were all breathing heavy and the officers were just trying to hold Manuel down, but no one was on top of him. Reception in the hospital was bad, but around 8:24 p.m., Cherry, and then Rowe, radioed to get more units over there, and Rowe clarified the sense of urgency as they had Manuel halfway under control, but he had already tried to take one of their guns. They were never able to get Manuel over onto his stomach inside the room, nor did Manuel ever get on his feet again.[4] As Manuel grabbed for, and started pulling on, the door, one of the Officers (Rowe or

---

[4] Almost every witness testified Manuel was on his back when Manuel came out of the room, and even Plaintiffs' Complaint states: "The door of the hospital room then slammed open, bystanders observed Cherry and Sergeant Rowe pulling Manuel into the hallway just outside of room 19. At this point, Manuel was on his back;" however, one witness, Chuck Burch, testified that as he returned he noticed Manuel on his feet and being ridden down to the ground by officers onto his back; however, in his attempts at describing what he saw when Manuel first came out the door he initially testified, "he was forced out," "he came *straight out on his back* with them two on top of him," and it wasn't until he responded to one or more leading questions that he stated "he slammed hard on the floor" and "they were riding him down." Another witness, Marco Delacruz, Sr., from about 30 feet away, gave a confusing rendition, during which he admitted, "I did not see what was going on inside the room before they came out the door" and in response to questions regarding whether two or more officers were involved he stated, "I went blank" and "I didn't see anything else;" but nevertheless stated, "when Manuel fell to the ground, they were "grabbing [him] …, handcuffed" "[t]hey were strangling him," "[t]hey were killing

Cherry) suggested that they just pull him out into the hall where it is more open and maybe they can roll him over. The door was opened by them, or the security guard, and then, Cherry and Rowe slid or forced Manuel out into the hall on his back. The security guard asked if they needed some help and they said, "yes," and until the other officers arrived, they just tried to hold him down[5] out in the hall, as the three of them were not able to handcuff him.[6] *See* Ex. "H," p. 76:2-77:13, 116:18-121:2 and 135:1-10 and Ex. "F," p. 78:20-79:2, 80:8-81:9, 82:6-18, 83:16-18, 84:22-85:21, and attached deposition exhibit 2 (Computer Aided Dispatch report).

40. More specifically, once out in the hall, Manuel was rolled over onto his stomach and Cherry, Rowe and the security guard were all on the ground trying to hold him down, and as Manuel tried to push up his upper body, or torso, off the ground, they would pull his arms out away from his body, and he would go back down and tuck his arms back under his body again, and they would pull them out again. Rowe was on one side of Manuel, Cherry was on the other side, and the security guard

---

him," and "one had him like this …, and the other one was on the other side, on the back," and "they fell on top of him," "when I saw him, he fell dead out of the door, and the policemen were on top of him," "he fell death," "[o]n his stomach." *See* Doc. 32, ¶31 and Ex. "N," p. 18:10-19:7 and Ex. "S," p. 14:5-15:22, 17:2-18:6, 22:9-12, and 23:3-9. The video deposition of Marco Delacruz Sr. shows his "strangling" gestures, which are consistent with a headlock or what might appear to be a chokehold by one officer. *See* Ex. "U," Video Deposition of Marco Delacruz, Sr. Marco Delacruz, Sr. also repeatedly stated, as soon as Manuel hit the ground in the hallway, they immediately started taking his handcuffs off. *See* Ex. "S," p. 17:16-18:3 and 22:9-12. Accordingly, Marco Sr.'s story, which was given through a translater, appears to be out of sequence, as it does not match up with any other witnesses' version, and is more consistent with the end of the incident when Manuel was in a headlock and they were trying to handcuff him, and then, unhandcuffed him, rather than observing from the point in time when he was first moved out into the hallway. It just makes no sense that anyone would be strangling him, or have him in a headlock/chokehold and grabbing him *after* he "fell dead to the ground." Also, if he fell dead out of the room, there is no evidence indicating any officer's actions inside the room caused his death when he fell from inside the room to the outside of the room. Further, Marco Jr., who was standing with Marco Sr. down the hall on the other end, when they both *simultaneously* turned around, stated Manuel was *already on the ground*. *See* Ex. "T," p. 11:12-23,16:24-17:2 and 19:8-22. There is also no evidence the two officers that came out of the room had four sets of handcuffs between them, which the evidence establishes were eventually used to secure him. Further, the autopsy report does not reveal any evidence of strangulation, or asphyxiation (positional or otherwise), nor a cause of death; although a heart attack was subsequently determined to be medically probable. *See* Ex. "K" and "W." Regardless, it is clear these individuals did not see the entire incident, cannot possibly know, from 30 feet away, whether Rowe's hold affected Manuel's breathing, or whether Manuel was dead, and regardless, whether Manuel was slid outside the door on his back, or ridden down to the ground onto his back, or in a chokehold or headlock is not a material factual distinction, as the undisputed evidence referenced herein is that Manuel was fighting and struggling with the officers until handcuffed in the hall and they noticed he was not responding, and the use of their weight, and/or a headlock /chokehold was brief and not shown to cause injury.

[5] Although Chuck Burch testified that when Manuel came out of the room on his back, the officers were on Manuel and he did not move or struggle, he also admitted he walked away down to the end of the hall to call Manuel's sister (Ruth), at which time other arriving officers ran past him, and that when he returned back, the officers were all on, or around, him, and then, they "all just started peeling off of him" and "Manuel was not moving" and Rowe called for medical help which was initiated. He also stated, "whenever they came out of the room, nobody could tell what was going on because it wasn't – it wasn't like- I mean, you had three grown men coming out of the room straight on his back." *See* Ex. "N," p. 20:16-23, 36:10-14 and 41:9-42:10. So, Mr. Burch did not actually see how Manuel interacted with the officers for much of the time they were in the hallway. He also could not testify as to how long it was between the time he saw the officers until they all peeled off. *Id.* at 42:24-43:11. Finally, when Ruth Delacruz talked to Chuck Burch later when she returned to the hospital, Chuck told her he thought Manuel "had a heart attack." *See* Ex. "R," p. 18:3-13.

[6] Although it "was [Chuck Burch's] impression" that Manuel was handcuffed when he came out of the room because his hands were allegedly behind his back, upon further questioning Mr. Burch further clarified he "didn't actually see the handcuffs," and therefore, he "d[id]n't know" and "did not see" if he was actually handcuffed in such a way "with one arm up [in front] and one behind his back" nor did he mention multiple sets of handcuffs, which is the positioning and the way he was handcuffed according to the undisputed testimony and evidence herein, and ultimately he stated, "whenever they came out of the room, nobody could tell what was going on because it wasn't – it wasn't like- I mean, you had three grown men coming out of the room straight on his back." *See* Ex. "N," p. 20:1-15, 35:19-37:14 and 44:25-45:2.

was told to hold Manuel's legs down. Nobody was sitting on Manuel, or his back, or laying on his back. Ultimately, around the time the officers arrived, and because Manuel kept trying to get up and they did not want him to get up and have to chase him, Rowe decided to put Manuel in a headlock to hold the upper part of Manuel's body down until they got the cuffs on Manuel. During the headlock, Manuel was on his belly, or a little bit on his side, and the right side of Rowe's upper body was up against Manuel's upper body, with their heads right beside each other. Although Rowe was holding onto part of Manuel's neck, Rowe testified he was not applying a choke hold (i.e., arms around the neck and you are cinching it down so they can't breathe and are coughing, etc.). Cater described a hold they are taught, and trained on, where you hold them on the ground with your arm around their neck, but you do not apply pressure to their throat, and you do not cut off their circulation or breathing. Rowe further testified that because of the close proximity of their heads, he could tell, Manuel was having no trouble breathing, he was having no respiratory distress, he was grunting, and he would mumble every once in a while. Cherry also did not notice any breathing problems, as Manuel was panting and breathing heavy like all of them, and Cherry also heard Manuel make what sounded like pretty regular loud snoring sounds, even after Manuel was handcuffed and Cherry was out of breath to the side. Rowe also testified he did not put Manuel in a head lock inside the room. *See* Ex. "G," p. 30:19-31:20; "H," p. 129:19-135:17, 84:16-22 and 158:11-21; and Ex. "F," p. 118:23-120:1.

41.     Marco Delacruz, Jr. was with his Dad (Marco Sr.), down the hall on the opposite end from Manuel's room near the other ER entrance talking to the Doctor when they heard a commotion, bagging and shuffling in the room, and when they both turned around at the same time to look down the hall, Marco Jr. saw Manuel already on the ground, and saw about six officers, one of whom allegedly had a chokehold (the hold was under his chin) on Manuel, and several officers were holding his back with their knees and a few of them holding his legs, and within a "few seconds, maybe a minute or two" or a "little minute" a nurse asked them to leave, and he pretty much drug his father, who looked a little longer, out of the ER. A little later, Officer Cherry walked up to him and said that he's sorry and that his brother is in and out, and a few minutes later Rowe walked up and said the same thing. *See* Ex. "T," p. 11:12-23, 12:18-15:17, 16:24-17:18 and 19:8-20:3.

42.     Rowe testified that he does not think a handcuffed person under control needs to remain lying on his stomach. Regarding a person laying on their stomach while physically resisting arrest, Rowe testified he did not know of a certain time limit one could remain on his stomach, but during an arrest with a combative suspect, and for the officer's safety and the safety of everyone around, you cannot just let the person up until you get him handcuffed and under control. If, however, during this process, you see signs of breathing problems you need to take appropriate measures to remedy that. However, as stated above, Rowe and Cherry did not notice any breathing problems while they were trying to handcuff him. *See* Ex. "H," p. 126:10-128:15 and 129:19-131:9.

43.     Three other Officers soon arrived at various points in time during this event. Officer Meaux (a veteran patrol officer, who had extensive experience dealing with involuntary commitments) had heard, over the radio, a struggle, and that Manuel had tried to take one of their guns; so, he turned around, and he arrived from 3 blocks away in about 20-30 seconds by his estimation (his video indicates Meaux arrived around 8:24:30 p.m. about 1-1.5 minutes after receiving assistance requests), punched in the ER door code, and located them in the ER in about 10 seconds. Officer Meaux, initially noted that Manuel was on his left side, Sergeant Rowe was on his knees on the left side of Manuel above the shoulder/arm area, and Cherry was on his knees on the right side of Manuel trying to control his right arm, and they were attempting to flip him onto his stomach for handcuffing, which Manuel was trying to prevent, and stay on his back. Meaux went over to the same side as Rowe, and after a few seconds they rolled Manuel onto his stomach. Meaux next grabbed Manuel's left arm,

which was tucked underneath Manuel, in the crook of the elbow, and with the assistance of arriving Officer Cater, tried to pull his left arm out from underneath him, which they were able to do in about 15-20 seconds. Cater confirmed, around 8:24 p.m., he also heard a scuffle on the radio and about taking an officer's gun and responded to the hospital and arrived about the same time as Officer Harper, and they both ran into the ER and Cherry stated he first saw Manuel on his stomach with Meaux on Manuel's left side, having problems trying to bring Manuel's left hand behind his back, Sergeant Rowe on Manuel's left side and Cherry on the right side controlling Manuel's right hand. Cater confirmed he assisted Meaux in trying to bring Manuel's left hand behind his back for cuffing. Cater testified the handcuffing took seconds and stated that no one was on top of Manuel and that Manuel kept trying to pull his left wrist toward himself. Harper was assisting Cherry who was attempting to control Manuel's right arm and get a handcuff on his right wrist. Cherry confirmed he was on Manuel's right side trying to bring his right arm behind his back, other officers had his legs/other arm and no one was placing their weight on his core or back, and further, that would have been counterproductive to what they were trying to do – handcuff him behind his back. Because of Manuel's strength and continued resistance, all five Officers and one security guard, could not get both of Manuel's hands behind his back to handcuff him in the customary manner. Instead, and also because they were running out of energy, they handcuffed his left hand behind his back and linked additional cuffs together up behind his back and over his right shoulder to reach the cuffed right hand still being held by Cherry. His right hand was positioned in front of his chest, bent at the elbow, with his right hand above, and to the inside of, his right shoulder. Four sets of handcuffs were used. Nurse Buller also confirmed this configuration. The medical notes also confirm Manuel was still combative with police officers and a security guard out in the hall and he was fighting until restrained by the PAPD in the prone position. *See* Ex. "G," p. 43:23-45:4, 46:10-49:9, 50:17-20, 51:8-52:8, 53:3-54:6, 54:7-20, 54:21-55:3 and 57:1-4; Ex. "I," p. 5:8-9, 5:25-6:2, 7:2-6, 8:14-9:3, 10:1-11, 12:6-13:25, 16:19-17:3, 19:19-25, 21:15-22:16, 29:17-34:24, and 36:18-37:4, Meaux Deposition Excerpts; Ex. "F," p. 85:22-86:14 and 117:2-118:17; Ex. "J," p. 1-4, Police Report of Officer Harper; Ex. "M," 8:23:00-8:24:30, Officer Meaux's in car video; and Ex. "O," p. 48:3-49:1, 50:11-50:17, 78:8-23 and 77:10-78:23.

44.     Rowe did not notice any breathing problems until after the arriving officers told Rowe Manuel was handcuffed, and he was set up as directed by Rowe, Rowe asked a nurse if Rowe was bleeding, she said "no," and at that point in time, Rowe turned around, and for the first time, he could tell Manuel was not breathing. This was within a matter of seconds, it was very quick. Cherry estimated that from the time Manuel was rolled over on his chest, until he was handcuffed, was about 20-45 seconds. Cherry testified he could not recall if he, or just the other arriving officers, helped roll Manuel over and sit him up, but confirmed Rowe's instructions to do so, confirmed Rowe was the first to verbally express noticing Manuel not breathing, and stated that Rowe advised them to take off the handcuffs and yelled for medical personnel to come over and advised that Manuel was in medical distress. Meaux, who could not hear whether or not Manuel was breathing, but stated after the handcuffs were on, everyone disengaged and Rowe told them to turn him over and sit him up; and, as they were turning Manuel over Rowe asked, if it looked like Manuel was breathing, at which time Rowe administered a sternum rub and yelled for a doctor, and told them to get the cuffs off; a nurse then stated he is turning blue, and the officers put Manuel on a stretcher. Cater stated after the cuffs were connected, he helped roll Manuel over, Manuel appeared to be unresponsive, and almost immediately Rowe began saying that Manuel was having issues with being unresponsive, and Rowe said uncuff him and called for medical help from the staff already present, Manuel was uncuffed, Carter helped lift Manuel on to a bed, and emergency medical personnel immediately took over. The medical notes and testimony and exhibit referenced in Nurse Buller's deposition indicate that within a minute of being restrained from fighting with officers he was seen unresponsive, and nurses and a Dr. Foutz already present came in and started resuscitation efforts on Manuel. Officer Meaux's in car

video shows officers exiting the Emergency room around 8:31:40 p.m. *See* Ex. "G," p. 55:4-56:21; "H," p. 128:16-129:6; Ex. "F," p. 116:15-117:1 and 120:14-122:1; Ex. "I," p. 35:7-36:17; Ex. "M," 8:31:40; and Ex. "O," p. 46:18-47:4, 50:19-52:20, 60:22-61:20, 77:10-79:8, 86:11-24, and attached deposition Ex. "1," p. Delacruz 0182 (Nurse's notes - 20:28-20:29) and attached deposition Ex. "2," p. 3 of 3.

45.    Rowe testified that Manuel was an immediate threat from the point in time when he had tried to take two officer weapons (the pepper spray and the pistol) and there was no telling what else he would have used in that room as a weapon, and the threat continued to the end. He also testified that before he committed the felony crime above; although not having committed a crime, he was subject to a mental health warrant and accordingly, had reportedly posed a threat to himself or others, because his state of mind was not like that of a clear-thinking person. *See* Ex. "H," p. 78:24-79:10 and 80:11-81:5.

46.    Rowe testified that they did not ever yell at Manuel, they did not ever place him in a choke hold, and Rowe thinks he only struck Manuel once. *See* Ex. "H," p. 83:2-6 and 84:16-85:4.

47.    Rowe estimated that from the time he made the decision to arrest Manuel, until the time Manuel was non-responsive, was about "a minute, maybe a minute and a half. It wasn't very long." Rowe later conceded that it may have been longer, and his time perspective can be skewed, but he disagreed it was 10-20 minutes as indicated in the medical notes. Cherry estimated the altercation lasted a few minutes altogether, or a few minutes less than ten minutes. The medical notes by nurse Buller indicate up to 20 minutes, but Buller also indicated it did not seem that long ("[i]t seemed like it was a lot shorter than that.") and she was constantly stepping away to tend to other duties, including during most of the entire time frame of the struggle, as she got called away for a pediatric arrest "from the time the struggle happened" until "a bunch of officers coming in, like running in the hallway where I'm pushing a stretcher," and when she "ran around the corner into the hallway, she saw Manuel was on the floor unresponsive .. while CPR efforts were in progress on Manuel." Regardless, all the testimony, and evidence herein, establishes that Manuel was resisting arrest and fighting with the all of officers up through the very end, when he was handcuffed/restrained, about one minute before they noticed he was unresponsive. *See* Ex. "H," p. 77:14-78:1, 152:15-153:22 and 155:20-25 and Ex. "F," p. 78:14-20 and Ex. "O," p. 22:3-15, 26:9-27:15, 39:8-10, 42:18-43:8, 47:5- 49:9, 77:10-79:5 and 86:11-24.

48.    Rowe testified that he would not do anything different today then he did that day, and that he did the best he could. Rowe also testified Cherry did an excellent job, from getting Manuel to the hospital, to staying with him at the hospital as long as he did, and trying to get Manuel help. Rowe testified it was his intention to help Manuel, as well. *See* Ex. "H," p. 87:4-23.

49.    Rowe testified that CIT training teaches you not to be confrontational with anybody you deal with, not just those persons going through a crisis. Rowe testified he tried to calm Manuel down and gain his trust with small talk, and tried to convince him the nurses were there to help him, and he also told Manuel's Dad to leave the room when he noticed that Manuel was upset and agitated when Manuel's Dad tried to hold him down for the nurses. *See* Ex. "H," p. 93:1-5; 94:4-95:14.

50.    Rowe also testified that CIT training teaches you to try to empathize with the person who is going through mental distress, and Rowe felt they had done so with Manuel, as prior to reaching for his shorts, as established above, they had, over a long period of time, tried empathy, sympathy, logic, and none of this was working, and removing his shorts was the last step. Cherry also testified that every situation is different, and no singular written policy can cover every situation or outcome. *See* Ex. "H," p. 156:16-158:21 and Ex. "F," p. 101:2-7.

51.     Rowe testified he used no, or minimal force, when he reached out to pull on Manuel's shorts as Manuel backed up, and they were acting, at the time, under the authority of an emergency mental health warrant pertaining to Manuel. Rowe also stated they could not wait for weeks, they had taken their time and done everything they could at that point to get him the help he needed, his mental state was not changing as he continued to refuse removing his shorts, and getting his shorts off was the very last step the hospital required toward Manuel getting the mental treatment he needed, and this last step was typically required of admitted mental health patients (removal of shorts, belts, etc. all of which can present a danger). When they attempted to remove his shorts, they were trying to accomplish a law enforcement objective by completing/executing the mental health warrant and getting Manuel where he needed to be (acceptance into the hospital - the fifth floor). Rowe explained they cannot just drop Manuel off at the hospital and leave the warrant on the table; they have to get Manuel where he needed to be. Cherry also confirmed that they were authorized to assist in the removal of potentially harmful clothing (belt could be harmful to Manuel or other psychiatric patients), so that person can be transferred to receive the mental treatment he needed on the fifth floor, and this was a legitimate law enforcement objective, and they could not just wait forever for Manuel to comply, nor would leaving the room and giving him more time necessarily make a better result, and they were also there to assist with a potentially combative patient. Cater also felt circumstances warrant the removal of clothing if the mental patient was suicidal, such as Manuel (based upon family reports of his trying to jump from a car). Cherry felt the psychiatric facility is not necessarily equipped to handle combative patients, as they get calls to subdue out of control patients at the Medical center and on the Fifth Floor. Although there was a nurse that Manuel was more receptive to, she did not have any more luck calming Manuel down than anyone else. Ex. "G," p. 59:6-19, 61:24-62:9 and 64:3-21; "H," p. 97:24-98:3, 100:3-18, 101:7-104:4, 108:25-109:9 and 112:8-113:12 and Ex. "F," p. 46:3-10, 47:12-17, 90:10-92:3, 92:25-94:25, 96:6-9, 113:3-115:9 and 116:4-14.

52.     Rowe testified that he was frustrated with the hospital and the situation. *See* Ex. "H," p. 122:23-123:15.

53.     Although Plaintiffs tried to imply that the hospital records/notes stated that Manuel could refuse any kind of medical treatment, or refuse to do stuff, or things, while under an EDO (Emergency Detention Order), the hospital notes do not state Manuel could refuse *mental* treatment, or requirements such as removing his clothes and putting on a gown, or any other "stuff," or "things," and the records only speak toward forcefully obtaining, over Manuel's refusals, certain forms of physical treatment/testing/procedures, such as obtaining blood or urine samples. Rowe correctly testified that they had a completed Emergency Mental Health Warrant pertaining to Manuel, and they were there to get him where he needed to be, to get the mental care, and help, he needed, and if the hospital required removal of his shorts and belt to get that care, and that was the only thing holding up that care, they were there to assist with that. Otherwise, an Emergency Mental Health Warrant would have no purpose, and they could not get anybody mental help, if the prospective mental health care recipient, who is not making good decisions, could simply refuse any mental health care. Cherry also distinguished between their helping to remove clothing to get mental health care, which they are allowed to do under a mental health warrant, as compared with forcing Manuel to have his blood drawn, which Cherry would not do and was unrelated to mental health care. *See* Ex. "H," p. 138:2-20, 141:4-14, 142:3-17, 143:8-145:22 and 146:25-147:15 and Ex. "F," p. 46:3-10 and 57:25-59:16.

54.     Cherry, Rowe and Meaux were exonerated of excessive force by Internal Affairs. The Jefferson County Grand Jury also no billed them. *See* Ex. "F," p. 142:12-21 and attached Ex. 5 and Ex. "V," Memos/Correspondence of Exonerations and No Bill of Officers Cherry, Rowe and Meaux.

55.     The Police Reports of Rowe, Cherry, Cater, Meaux and Harper, all materially support the undisputed factual testimony and evidence above (i.e., although there may be minor differences in these reports, there is no material factual dispute). *See* Ex. "P," Supplemental Incident Reports of Officers Cherry, Rowe, Cater, Meaux, and Harper.

56.     The autopsy report pertaining to Manuel Delacruz does not indicate a cause of death relating to any action by any officer, nor is there any indication of asphyxiation, of any kind, etc. *See* Ex. "K," Autopsy Report pertaining to Manuel Delacruz.  Dr. Robert C. Bux, M.D. confirmed no evidence of positional asphyxia or compression of the neck structures, or conjunctival, scleral or petechial hemorrhages of the skin on the neck or head, and no evidence of bruising to the neck, neck organs, or the back or shoulders, nor evidence of an improper head lock, nor that any head lock caused any trauma to the head or obstruction to the mouth or nose, and opined that death was due to a sudden cardiac arrhythmia or cardio pulmonary arrest due to high levels of adrenaline during a prolonged struggle, that the officers in no way could have recognized or determined Manuel was about to have. *See* Ex. "W," p. 4-5, Report of Dr. Robert C. Bux.

57.     The report of former Texas Department of Public Safety Commander 16-year training expert Albert Rodriguez establishes the objective reasonableness of the officers' actions in trying to get Manuel the mental care he immediately required and that his family was requesting, based upon their law enforcement training and state and federal law. *See* Ex. "X," p. 6-13, 17-44, Report of Albert Rodriguez.

58.     The TCOLE Reports of Rowe, Cherry, Cater, Meaux and Harper all demonstrate they had CIT and use of force, and other police training prior to this incident.  *See* Exs. "L," Officer's TCOLE Reports.

## STATEMENT OF ISSUES TO BE RULED UPON

I.      Plaintiffs' Fourth Amendment excessive force claims brought against Officers Cherry, Cater, Rowe, Meaux, or Harper through 42 U.S.C. § 1983 should be dismissed as there is no factual pleading nor evidence tending to demonstrate excessive force, nor do Plaintiffs' factual pleadings, nor evidence, overcome their qualified immunity.

## MOTION FOR SUMMARY JUDGMENT STANDARD

58.     A party may move a court to enter summary judgment before trial. FED. R. CIV. PROC. 56(a) and (b).  Summary Judgment is appropriate if the moving party identifies pleadings, depositions, answers to interrogatories, and admissions on file, which establish there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  Only disputes about those facts preclude the granting of summary judgment. *Id.* "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

59.     Once the movant meets its burden under Rule 56, the non-movant must designate specific facts showing there is a genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). Conclusory assertions or denials in pleadings, unsupported by specific facts presented in affidavits opposing the motion for summary judgment are insufficient to defeat a proper motion for summary judgment. *Lejaun v. Nat'l Wildlife Federation*, 497 U.S. 871, 888 (1990); *Celotex Corp.*, 477 U.S. at 322 n.3. A court should view all evidence and the reasonable inferences to be drawn therefrom "in the light most favorable to the party opposing the motion." *United States v. Diebold*, 369 U.S. 654, 655, (1962). But, "[u]nsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment." *Brown v. City of Houston*, 337 F.3d 539, 541 (5th Cir. 2003). Similarly, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

60.     "[W]here the nonmoving party fails to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, no genuine issue of material fact can exist," and summary judgment must be granted. *Apache Corp. v. W&T Offshore, Inc.*, 626 F.3d 789, 793 (5th Cir. 2010).

## SUMMARY OF THE ARGUMENT

61.     Plaintiffs bring Fourth Amendment 42 U.S.C. § 1983 claims alleging an excessive force incident involving Manuel and Defendants herein. Summary Judgment is appropriate here because Plaintiffs fail to plead facts, and produce any material evidence, which tends to support all the elements of a Fourth Amendment excessive force claim against Defendants Cherry, Cater, Rowe, Meaux, or Harper, or which would overcome their individual qualified immunity from suit. In fact, the undisputed evidence refutes said excessive force claims and establishes their qualified immunity.

## ARGUMENT AND AUTHORITIES

### I.

**Plaintiffs' Fourth Amendment excessive force claims brought against Officers Cherry, Cater, Rowe, Meaux, or Harper through 42 U.S.C. § 1983, should be dismissed, as there is no factual pleading, nor any evidence, tending to demonstrate excessive force nor do Plaintiffs' factual pleadings, nor evidence, overcome their qualified immunity.**

62.     Title 42 U.S.C. § 1983 allows civil liability upon one "who, under color of any statute, ordinance, regulation, custom, or usage, of any state or territory, subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities, secured by the Constitution and laws..." *See* Title 42 U.S.C. § 1983; *Orr v. Copeland*, 844 F.3d 484, 491-92 (5th Cir. 2016).

63.     Vicarious liability is not allowed under 42 U.S.C. § 1983; so, Plaintiffs must plead personal involvement caused a constitutional violation. *See Thompson v. Steele*, 709 F.2d 381, 382 (5th Cir. 1983) (In evaluating potential individual liability under 42 U.S.C. § 1983, "*personal involvement* [in the alleged unconstitutional action] is an essential element of a civil rights cause of action," and "§ 1983 does not give a cause of action based upon the conduct of subordinates.")(emphasis added), *citing, Rizzo v. Goode*, 423 U.S. 362, 371-72, 377, 96 S. Ct. 598, 604-05, 607, 46 L. Ed. 2d 561 (1976)(affirmative link needed between unconstitutional injury and conduct of defendant); and *Reimer v. Smith*, 663 F.2d 1316, 1322 n. 4 (5th Cir. 1981)("It is axiomatic that a plaintiff cannot succeed in a § 1983 action if he fails to demonstrate a causal connection between the state official's alleged wrongful action and his deprivation of life, liberty, or property.").

64.     To the extent Plaintiffs' constitutional claims are based upon negligence, they are *not* actionable under 42 U.S.C. § 1983. *Oliva v. Rupert*, 555 Fed. Appx. 287, *2-3 (5th Cir. 2014)(emphasis added)(citing *Daniels v. Williams*, 474 U.S. 327, 332-36, 106 S. Ct. 662, 88 L. Ed. 2d 662 (1986). Stated another way, Plaintiffs must establish the constitutional deprivation was intentional, or due to deliberate indifference – not the result of mere negligence. *Farmer v. Brennan*, 511 U.S. 825, 835 (1994); *Woodard v. Andrus*, 419 F.3d 348, 353 (5th Cir. 2005).

65.     Although 42 U.S.C. §1983 authorizes redress for constitutional and statutory rights, "that section is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Baker v. McCollan*, 443 U.S. 137, 145, 61 L.Ed.2d 433, 99 S. Ct. 2689 (1979). Therefore, the first inquiry in any §1983 suit is to identify the constitutional right and determine whether plaintiff has been deprived of a right "secured by the Constitution." *Graham v. Connor*, 490 U.S. 386, 394, 109 S. Ct. 1865, 1980, 104, L.Ed.2d 443 (1989); *Baker*, 443 U.S. at 140; *Albright v. Oliver*, 510 U.S. 266, 271, 114 S. Ct. 807, 127 L.Ed.2d 114 (1994).

66.     Plaintiffs collectively assert 42 U.S.C. §1983 claims against a number of Defendants, including Cherry, Cater, Rowe, Meaux and Harper based upon alleged excessive force, all under the Fourth Amendment. *See* Doc. 32, generally. These Officer Defendants are entitled to assert, and do assert, their qualified immunity with respect to said claims, and because the qualified immunity analysis includes determining whether a Fourth Amendment constitutional deprivation has been pled and proved against them, Defendants proceed with the qualified immunity analysis.

67.     "When a defendant invokes qualified immunity, the burden is on the plaintiff to demonstrate the inapplicability of the defense." *McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002)(en banc)(per curiam). "Because qualified immunity constitutes an immunity from suit rather than a mere defense to liability, the defense is intended to give government officials a right not merely to avoid standing trial, but also to avoid the burdens of such pretrial matters as discovery ... as [i]nquiries of this kind can be particularly disruptive of effective government." *Id.* (citations omitted). Importantly, "qualified immunity claims should be addressed separately for each individual defendant." *Darden v. City of Fort Worth*, 880 F.3d 722, 731 (5th Cir. 2018)(quoting *Kitchen v. Dall. Cty.*, 759 F.3d 468, 480 (5th Cir. 2014)); *Pratt v. Harris Cty.*, 822 F.3d 174, 181 (5th Cir. 2016)(citing *Meadours v. Ermel*, 483 F.3d 417, 421-22 (5th Cir. 2007)).

68.     Initially, as pled, and as the undisputed evidence above demonstrates, Cherry, Cater,

Rowe, Meaux and Harper were, at all relevant times pertaining hereto, exercising their duties and discretion while employed by the City as police officers in its police department (¶¶ 18-35). Key to the qualified immunity analysis, "[a] public official [such as a police officer] is entitled to qualified immunity unless the plaintiff demonstrates that (1) the defendant violated the plaintiff's constitutional rights and (2) the defendant's actions were objectively unreasonable in light of clearly established law at the time of the violation." *See Porter v. Epps*, 659 F.3d 440, 445 (5th Cir. 2011)(citations omitted). These required factors may be analyzed in any order. *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011).

69.     With respect to Plaintiffs' first requirement (a constitutional violation), Defendants note, as established more fully below, that Plaintiffs have not pled any facts, nor produced any evidence, indicating Cherry, Cater, Rowe, Meaux or Harper were present *and* caused a violation of Plaintiff's Fourth Amendment rights by way of excessive force, or otherwise. *See* Doc. 32, generally. In fact, the undisputed evidence referenced above refutes same.

70.     However, even if Plaintiffs have technically pled, and produced some evidence tending to prove, an individual Defendant violated the Fourth Amendment (prong one), which all Defendants deny, that individual Defendant is still entitled to qualified immunity under the second prong, "unless it is shown that the official violated a statutory or constitutional right that was 'clearly established' at the time of the challenged conduct." *Plumhoff*, 134 S. Ct. at 2023 (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 131 S. Ct. 2074, 2077 (2011); *see also Lincoln v. Turner,* 874 F.3d 833, 847-51 (5th Cir. 2017) (Although Plaintiff may have adequately pled an unconstitutional detention/seizure and excessive force, officer was nevertheless entitled to qualified immunity). Further, "[A] defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff*, 134 S. Ct. at 2023 (*citing Ashcroft*, 131 S. Ct. at 2083). "In other words, 'existing precedent must have placed the statutory or constitutional question' confronted by the official 'beyond debate.'" *Id.* (*quoting Ashcroft*, 131 S. Ct. at 2083). "[T]he salient question …is whether the state of the law" at

the time of the incident provided "fair warning" to the defendants "that their alleged [conduct] was unconstitutional." *Hope v. Pelzer*, 536 U.S. 730,741, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002).

71.    In that regard, Plaintiffs' pleadings fail to identify any then existing case law which would have put Cherry, Cater, Rowe, Meaux and Harper on notice that what they did, based upon the undisputed facts, violated then existing clearly established law. *See* Doc. 32, generally. Stated another way, there is no evidence tending to indicate, any one of these Defendants committed any unconstitutional excessive force act, and certainly no then existing law has been identified, relating to any evidenced act, which demonstrates any excessive force on their part.

72.    Further, in relation to the "objectively unreasonable" requirement of the second prong necessary to overcome the qualified immunity defense, Plaintiffs have not produced any evidence, which tends to establish that *no* objectively reasonable person in the individual's position would have acted as Defendants did under the same or similar circumstances. Plaintiffs are required to initially allege facts, and ultimately produce evidence, to show that *no reasonable government official could have believed* the officer's alleged misconduct was lawful in light of the information they possessed and clearly established law. *See Babb* v. *Dorman,* 33 F.3d 472, 477 (5th Cir. 1994). If officials of reasonable competence could disagree as to whether the alleged conduct violated a plaintiff's rights, their immunity remains intact. *See Malley v. Briggs,* 475 U.S. 335, 341, 106 S. Ct. 1092, 1096 (1986); *Blackwell v. Barton,* 34 F.3d 298, 303 (5th Cir. 1994). Similarly, "[i]n the Fifth Circuit, a governmental official is entitled to qualified immunity unless *all reasonable officials* would have realized that the challenged conduct was proscribed by law." *Cooper v. Morales*, 535 Fed. App'x. 425, 429 (5th Cir. 2013)(emphasis added)(citing *Dudley v. Angel,* 209 F.3d 460, 462 (5th Cir. 2000); *Felton v. Polles,* 315 F.3d 470, 478 (5th Cir. 2002). "[Q]ualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Mullenix v. Luna*, __ U.S. __, 136 S. Ct. 305, 308 (2015) (quoting *Malley*, 475 U.S. at 341). Thus, even if each Defendant's conduct, is determined to be imperfect, each one of them is still entitled to the protections of qualified immunity if officers could

reasonably have believed their actions were proper under the circumstances they faced at the time. *See Montoute* v. *Carr,* 114 F.3d 181, 184 (11th Cir. 1997). Similarly, "if their decision was reasonable, albeit mistaken," they are still entitled to qualified immunity. *Lampkin v. City of Nacogdoches*, 7 F.3d 430, 435 (5th Cir. 1993), *cert. denied*, 511 U.S. 1019 (1994). Further, an "officer could make a constitutionally reasonable judgment based on a factual misperception." *Snyder v. Trepagnier*, 142 F.3d 791, 800 (5th Cir. 1998), *cert. dismissed*, 526 U.S. 1083 (1999). A Defendant is entitled to qualified immunity even if only an *arguable* basis for his, or her, actions exists. *See Vance* v. *Nunnery,* 137 F.3d 270, 274 (5th Cir. 1998). "In sum, QI 'represents the norm, and courts should deny a defendant immunity only in rare circumstances.' *Rich v. Palko*, 920 F.3d 288, 293 (5th Cir. 2019)(quoted citation omitted).

73.     The law requires factual pleadings *and* at least some evidence indicating their individual use of force, was objectively unreasonable and excessive to the need under existing clearly established law, and caused more than a de minimis injury to Manuel; and, other than conclusory allegations, there is no factual evidence indicating same, and at worst, objectively reasonable Officers might merely only disagree on whether their conduct was unconstitutional. In short, there is at least an arguable basis their proven actions/reactions were constitutional, necessary, objectively reasonable, and not excessive to the need.

74.     Plaintiffs' Complaint alleges Fourth Amendment excessive force claims against Cherry, Cater, Rowe, Meaux and Harper. *See* Doc. 32, ¶¶ 36-42, and generally. Therefore, qualified immunity analysis in this case requires that Plaintiffs put forth material evidence which tends to prove each element of an excessive force claim against each individual officer Defendant herein.

75.     For Plaintiffs to prove a Fourth Amendment excessive force claim, Plaintiffs, as to each Defendant, "must establish [Defendant caused]: (1) an injury (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness was clearly unreasonable." *Harris v. Serpas*, 745 F.3d 767, 722 (quoting *Ramirez v. Knoulton*, 542 F.3d 124, 128 (5th Cir. 2008); *see also Lincoln,* 874 F.3d at 846 ("'[to] succeed on an excessive force claim a plaintiff bears the burden of showing (1) an injury (2) which resulted directly and only from the use of force that was excessive to

the need and (3) the force used was objectively unreasonable.'")(quoted citations omitted)); *Brothers v. Zoss*, 837 F.3d 513, 518 (5th Cir. 2016), *cert. denied*, 137 S. Ct. 1229 (2017); *Cass v. City of Abilene*, 814 F.3d 721, 731 (5th Cir. 2016); *Hogan v. Cunningham*, 722 F.3d 725, 734 (5th Cir. 2013); *Ramirez v. Martinez,* 716 F.3d 369, 377 (5th Cir. 2013). If Plaintiffs fail to produce material evidence tending to prove any one of these three elements, the Plaintiffs' claim of excessive force will not succeed. *Huong v. City of Port Arthur*, 961 F. Supp. 1003, 1006 (E.D. Tex. 1997).

76.     Considering the first excessive force element, the "injury" must *be more than* de minimis and de minimis injuries include, but are not limited to: abrasions, bruises, contusions, back and neck pain, bloody urine, high blood pressure and heart rate. *See Westfall v. Luna*, 903 F.3d 534, 549-550 (5th Cir. 2018); *Brooks v. City of W. Point, Miss.*, 639 F. App'x 986, 990 (5th Cir. 2016). Further, where officers piling on with their body weight (one weighing 250 pounds and the other weighing 175 pounds), or pinning or holding a much smaller suspect down on the ground (described as a "small build"), for five minutes, has not been shown to be a reasonable cause of more than a de minimis "injury," no excessive force claim can be maintained against those officers. *Westfall*, 903 F.3d at 541 and 549-550. "In evaluating excessive force claims, courts may look to the seriousness of injury to determine whether the use of force could plausibly have been thought necessary, or instead evinced such wantonness with respect to the unjustified infliction as is tantamount to a knowing willingness that it occur." *Westfall*, 903 F.3d at 549 (citing *Deville v. Marcantel*, 567 F.3d 156, 168 (5th Cir. 2009)(quoting *Brown v. Lippard*, 472 F.3d 384, 386-87 (5th Cir. 2006)).

77.     Defendants also note that in excessive force cases, courts are not to analyze a use of force "with the 20/20 vision of hindsight," but rather "from the perspective of a reasonable officer on the scene," and appellate courts have cautioned judges against "second-guessing a police officer's assessment, made on the scene, of the danger presented by a particular situation," as "police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Mendez v.*

*Poitevent*, 823 F.3d 326, 331 (5th Cir. 2016)(quoted citations omitted). In determining the objective reasonableness of a use of force, courts consider, "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 331-32. "Even if [an individual is] not under arrest, '[o]fficers may consider a suspect's refusal to comply with instructions ... in assessing whether physical force is needed to effectuate the suspect's compliance.'" *Westfall*, 903 F.3d at 548 (quoting *Darden*, 880 F.3d at 729 (5th Cir. 2018)(quoting *Deville*, 567 F.3d at 167). "'[O]fficers must assess not only the need for force, but also the relationship between the need and the amount of force used.'" *Id.* (quoting *Darden*, 880 F.3d at 729 and *Deville*, 567 F.3d at 167). In balancing the need for force against the amount of force used, it should be noted that, "a constitutional violation does not occur every time an officer touches someone." *Ikerd v. Blair*, 101 F.3d 430, 434 (5th Cir. 1996). "'Not every push or shove, even if it may later seem unnecessary in the peace of the judge's chambers,' violates the Fourth Amendment." *Graham,* 490 U.S. at 396 (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2nd Cir.), *cert. denied*, 414 U.S. 1033 (1973)). The "[o]bjective reasonableness is a matter of law for the courts to decide, not a matter for the jury." *Kipps v. Callier*, 197 F.3d 765, 769 (5th Cir. 1999)(citation omitted). "[T]he 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397. Finally, whereas here, individually officers are alleged to have acted in different ways, each officer's alleged conduct must be analyzed separately. *Pena v. City of Rio Grande City*, 879 F.3d 613, 619 (5th Cir. 2018); *Stewart v. Murphy*, 174 F.3d 530, 537 (5th Cir. 1999) (in a section 1983 action, the conduct of "each defendant" sued "must be examined separately.")

78. Although Plaintiffs do not contest the seizure in this case, it is important to show the reasonableness and purpose of the officers' actions, and to put the circumstances in their proper context. Texas state statutory law allows a peace officer, without a warrant, to take a person into

custody and immediately transport him or her to the nearest mental health care facility, if the officer has reason to believe (based upon the person's conduct or information from a credible person) the person has a mental illness and there is a substantial risk of serious harm to that person, or others, and believes there is no time to obtain a warrant. *See Tex. Health & Safety Code* § 573.001; *Rodriguez-Escobar v. Goss*, 392 S.W.3d 109, 111 (Tex. 2013); *Palko*, 920 F.3d at 294. The Fifth Circuit has held that if officers have probable cause to believe a person presents a suicide risk, under this statute, he or she may be constitutionally detained/seized and taken into custody for transport and mental treatment, and the officer is entitled to qualified immunity. *Cantrell v. City of Murphy*, 666 F.3d. 911, 922-24 (5th Cir. 2012)(citing *Sullivan v. Cnty. of Hunt, Tex.*, 106 F. Appx. 215 (5th Cir. 2004); *Martinez v. Smith*, 200 F.3d 816 (5th Cir. 1999)); *Palko*, 920 F.3d at 294-96. As established, at a minimum, there was probable cause to believe Manuel was an imminent suicide risk, as he had tried to jump out of a vehicle at highway speeds the night before, and the courthouses were closed; so, no warrant could be obtained from a judge. Also, "Fourth Amendment jurisprudence has long recognized that the right to make an arrest, or investigatory stop [seizures] necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *See Graham v. Connor*, 490 U.S. 386, 396 (1989).

79. Considering the above, we analyze the first prong of the qualified immunity analysis, which necessarily encompasses the elements of an excessive force claim. In that regard, Plaintiffs have not presented any factual evidence, involving either Cherry, Cater, Rowe, Meaux and/or Harper, that would satisfy any one of the three excessive force elements listed above. First, the undisputed evidence referenced hereinabove establishes that Manuel had significant mental health issues (including a recent suicide attempt) and was therefore, at a minimum, a danger to himself. Second, everyone, including the officers, family members and nurses, were trying to get him the mental health care he immediately needed and he was reasonably taken into custody, without incident, to get that mental health care. The undisputed facts further demonstrate that considerable time (over two hours) was dedicated by several officers (including Cherry, Cater and Rowe), nurses and family members in

trying to get Manuel admitted per hospital admittance requirements, and despite Manuel's failure to cooperate with same, no unreasonable officer use of force is alleged, and in fact, Chuck Burch, and others, testified the officers acted professionally and/or they had no complaints. Then, at some later point in time, the hospital decided to waive some of its admission requirements, but still insisted (for admission safety purposes) that Manuel remove all of his clothing and put on a hospital gown, which Manuel eventually partially did (i.e., the gown was on, and most of his clothing was removed), but would not fully cooperate with the female nurses' repeated requests that he remove his shorts/belt. At the request of at least one nurse, officers Cherry and Rowe reasonably entered Manuel's room, and they reasonably shut the door, closed the drapes, and asked the nurses to leave, all for more privacy, in an attempt to convince Manuel to remove his shorts. Rowe and/or Cherry reasonably began by verbally telling Manuel to remove his shorts, and when Manuel again refused, knowing this was the last step necessary to get him the mental health care he needed, they reasonably reached forward, and each grabbed an arm, and Rowe attempted to reach forward to tug on Manuel's shorts. In turn, Manuel's response consisted of grabbing Rowe's left arm/wrist and pushing and hitting Rowe on the head a couple of times and struggling with Cherry and grabbing Officer Cherry's O.C. spray and placing his finger on the safety cap in an attempt to spray Rowe in the face, at which time Rowe told Manuel, "that is enough" and "you are under arrest," and Manuel resisted and failed to comply. Up until Manuel's assault, there is no evidence that any officers, including Cherry or Manuel, had injured Manuel in any way, and their use of verbal command(s) and then each grabbing an arm was reasonable and necessary to gain Manuel's admittance for mental care pursuant to the mental health warrant. While there is evidence of officers Cherry and/or Rowe hitting, wrestling, dragging/sliding, riding, a headlock (alleged chokehold), and or using force and possibly some of their weight to hold, or pin, Manuel down to handcuff him after he was told he was under arrest for taking, and attempting to use, an officer Cherry's O.C. spray, the evidence also establishes that during that same time frame Manuel also went for officer Cherry's gun and removed it halfway out of its holster, hit both officers

Cherry and Rowe, and was non-compliant and struggled with and resisted arresting officers Cherry and Rowe, despite being tased once by Cherry, and he continued to struggle and resist arrest and handcuffing as against a hospital security officer and Cherry, Rowe, Cater, Meaux, Harper up until the point in time he was handcuffed with multiple cuffs with his left hand behind his back and his right hand in front, and then, everyone got away from him, he was rolled over and set up when it was noticed he was unresponsive, and emergency medical care was immediately requested and given. According to the medical records, Manuel continued to struggle within about one minute, or less, of their noticing him being unresponsive. There is also no evidence of an unreasonable length of time he was being pinned or held down, or in a chokehold/headlock, nor any evidence that this action caused any injury; and accordingly, there are not any factual pleadings or evidence indicating any Officer Defendant's particular use of force was excessive to the need, or objectively unreasonable or caused any particular injury under the circumstances. The Autopsy Report also lists the cause of death as unknown, and reveals no evidence of choking or asphyxiation. *See* Ex. "K" and "W." There is simply a total absence of any pled facts, or evidence, indicating any *excessive* use of force by Cherry, Cater, Rowe, Meaux and Harper *and* which caused any particular injury[7] to Manuel, much less his death, as he was allegedly a "physically healthy, 26-year-old man." *See* Doc. 32, ¶14. There is simply no evidence by Plaintiffs herein tending to indicate excessive force by Cherry, Cater, Rowe, Meaux and/or Harper, nor, as established above, is there any evidence tending to support same. Certainly, after Manuel repeatedly refused verbal requests to remove his shorts, the officer action of reaching forward to try to remove Manuel's shorts and/or belt, so that he could receive admittance and the mental health care he needed, was a reasonable use of force (which did not cause any injury), as was every use of force action in evidence to arrest Manuel, after he took an Officer's O.C. spray, tried to take an officer's gun, took handcuffs, and continued to resist arrest until he was finally handcuffed.

---

[7] Although Plaintiff alleges Manuel was pinned, rode down to the ground and drug by Rowe, and Cherry used a chokehold, and Rowe and others piled on, there are no injuries listed in the portion of the autopsy quoted in Plaintiff's Complaint, or within the Autopsy itself, that are related to those particular uses of force. *See* Doc. 32, ¶¶ 31-33 and Ex. "K."

80.     With respect to the second prong of the qualified immunity analysis, Plaintiffs have

failed to plead, or prove, facts tending to indicate Cherry's, Cater's, Rowe's, Meaux's or Harper's

acts/omissions were objectively unreasonable in light of clearly established law at the time of the

incident (i.e., based upon alleged Fourth Amendment excessive force), so as to overcome their qualified

immunity defense.    To date, Plaintiffs have simply failed to produce evidence, and identify existing

precedent that has placed the constitutional question confronted by any one of these Defendant

Officers beyond debate.  *Palko*, 920 F.3d at 297.   In fact, *"piling on"* or positional asphyxia is not in

and of itself legally impermissible under various circumstances, including the one at issue here. [8]

---

[8] In cases involving officers and others *piling on top of a suspect's back* while securing a resisting suspect in a prone position and/or his appendages (hands in handcuffs and legs in flex cuffs) for four to ten minutes while waiting for backup where the suspect died of asphyxiation, the courts have found no excessive force, as the officers acted reasonably in attempting to secure the suspect who was actively resisting arrest. *Castillo v. City of Round Rock, Texas*, 177 F.3d 977, 1999 U.S. App. LEXIS 41148 at *2-4, 7-11 (5th Cir. March 15, 1999), *cert. denied*, 528 U.S. 1019, 120 S. Ct. 526, 145 L. Ed. 2d 407 (1999)(citing *Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 593-97 (7th Cir. 1997)(same), *cert. denied*, 522 U.S. 1116, 118 S. Ct. 1052, 140 L. Ed. 2d 115 (1998)); *Deshotels v. Marshall*, 454 F. App'x 262, 268-69 (5th Cir. 2011)(same).  To the extent Plaintiffs allege positional asphyxia, most Fourth Amendment cases involving law enforcement officers have evaluated claims based upon "hog-tying," which did not exist here, but in any event, the Fifth Circuit has "never held that hog-tying is a per se unconstitutional technique for controlling a resisting arrestee," and although one "limited" case found a constitutional violation were the officers hog tying the suspect knew he was on cocaine (he told them he had used bad cocaine) and he was placed face down in a prone position for an extended period of time while being transported to jail, the other Fifth Circuit cases found qualified immunity. *Pratt v. Harris Cnty., Tex.*, 2016 U.S. App. LEXIS 8049 at * 14- 21 (5th Cir. May 3, 2016)(hog-tying is not per se unconstitutional, and qualified immunity was upheld where the officers did not know he was on cocaine and alcohol, and he was only restrained for a brief period of time – until EMS arrived); *Hill v. Carrol Cnty., Miss.*, 587 F.3d 230, 232-37 (5th Cir, 2009)(defendants' summary judgment upheld, as hog-tying is not per se unconstitutionally excessive use of force; and, since the continuously resisting arrestee was not under the influence of drugs or alcohol during the arrest, even though he was hog-tied and placed face down in the patrol car and transported for 30 minutes, there was no objective reason not to use a four point restraint –"deputies cannot be held responsible for the unexpected, albeit tragic result, of their use of necessary force"); *Khan v. Normand*, 683 F.3d 192, 195-96 (5th Cir. 2012)(qualified immunity upheld as the Court determined that an officer's decision to hog-tie a drug-affected arrestee did not violate a clearly established constitutional right, because the restraint was used only briefly and the arresting officers did not know the arrestee was under the influence of drugs.); *Wagner v. Bay City*, 227 F.3d 316, 319-24 (5th Cir. 2000)(In this case, no hog-tying was involved, but positional asphyxia was alleged with respect to Plaintiff being handcuffed face down on the pavement for a period of time, then carried to a patrol car and placed in the back seat on his stomach facing the front of the vehicle, and driven to the county jail, where they carried him into the jail placing him face down, at which time they discovered he was not breathing.  The court upheld qualified immunity based upon the objective reasonableness of their actions, as plaintiff was not hog-tied, there was no evidence he was a drug user, much less a user of cocaine at risk of cocaine psychosis, he was somewhat monitored, and there were no observable physical signs indicating he was substantially at risk (i.e., obesity), the use of chemical spray and a chokehold were reasonable because he physically resisted arrest and created a dangerous situation, and all the officers' actions were consistent with trying to restrain a violent individual); *Gutierrez v. City of San Antonio*, 139 F.3d 441, 443-451 (5th Cir. 1998)(factual issues were present preventing qualified immunity summary judgment, as hog-tying may present a substantial risk of death or serious bodily harm only in a limited set of circumstances – i.e., when a known drug-affected person (cocaine user) in a state of excited delirium is hog-tied, against policy, and placed down in a face down prone position and transported to the hospital more than 10 minutes away without being monitored); *See also, Sanders-Burns v. City of Plano*, 594 F.3d 366, 381-82 (5th Cir. 2010)(although pertaining to claims against the governmental entity discussed more fully below and not qualified immunity, inadequate positional asphyxia training claim was dismissed where officers had Texas state mandated training and there was no pattern alleged indicating deliberate indifference via another similar asphyxia related death involving the Plano Police

Similarly, case law also permits "*chokeholds*," and presumably headlocks, under various circumstances, including the one at issue here.[9] Plaintiffs also admit to not witnessing most of the struggle (i.e., they only witnessed seconds and/or at most a minute or two in the hallway during which time the alleged piling on and/or chokehold occurred, followed by the officers immediately getting off of him), and the alleged 20-minute struggle from beginning to end refutes any allegation of cooperation or compliance by Manuel. Further, again, the evidence establishes that Manuel, an approximate 285-300 pound male former Olympic boxer, was uncooperative, refused several verbal requests to remove his shorts, and when an officer reached out to remove his shorts so that Manuel could gain admittance and the mental health care treatment he needed, Manuel hit, pushed, and grabbed officer(s), and took an officer's O.C. Spray and tried to discharge same at another officer, and

---

Department). Under our set of facts, qualified immunity is appropriate, as there is no pleading indicating what Manuel was doing during this incident, the evidence establishes he took an officer's O.C. Spray, tried to take an officer's gun and he resisted arrest the entire time, and there was no hog-tying of Manuel alleged, there is no evidence Manuel was on cocaine or drugs, and the Courts have not held that holding someone on the ground to secure/arrest the suspect is per se unconstitutional, and there is no indication he was held down for an extended period of time, and they immediately released him to the medical staff present to initiate life saving measures, once they noticed his condition was dire.

[9] Although Defendant Rowe disputes a chokehold was used, as alleged, and the testimony by Rowe establishes he did not apply pressure to Manuel's neck which cut off his breathing, and he heard Manuel breathing, he was having no respiratory distress, he was grunting, and he would mumble every once in a while, and Cherry confirmed same, and the Autopsy does not dispute Rowe's version, Defendants reference a factually similar case involving an *alleged chokehold*, along with video showing the officer wrapping his arm around the suspect's neck, where a suspect resisted arrest, officers restrained him on the ground, another officer who had arrived noticed he was not breathing, they administered CPR, but he was pronounced dead at the hospital and an autopsy confirmed a pre-existing heart condition and methamphetamine abuse contributed to his death, wherein the Fifth Circuit upheld qualified immunity on the excessive force claim based upon the objective reasonableness of their actions, and also stated, "choke-holds in themselves are not legally impermissible." *Stogner*, 515 F. App'x. at 281 n.1 (5th Cir. 2013); *see also Wagner*, 227 F.3d at 324 (agreeing that "nothing about the use of ... a choke-hold was objectively-unreasonable conduct where the suspect physically resisted arrest."). In *Williams v. City of Cleveland*, 736 F.3d 684, 688 (5th Cir. 2013), qualified immunity was sustained, as no clearly established right against excessive force was violated and their actions were reasonable, in a case involving multiple uses of a Taser and a *chokehold*, where the suspect plaintiff had, on July 23, 2010, used cocaine earlier that day, and fled the scene from officers with drugs in his hand, and was subsequently non-compliant, was warned about being tased, ignored the warning, remained unfazed after being tased and continuously struggled with both individual defendant officers, and after being handcuffed lapsed into unconsciousness and was pronounced dead at the hospital. The Fifth Circuit's "rule on qualified immunity is that '[u]se of deadly force is not unreasonable when an officer would have reason to believe that the suspect poses a threat of serious harm to the officer or others.'" *Id.* at 688 (*quoting Mace v. City of Palestine*, 333 F.3d 621, 624 (5th Cir. 2003)). *See also Gassner v. Garland*, 864 F.2d 394, 400 (5th Cir. 1989), overruled in part on other grounds, 543 U.S. 146, 154 (the court denied an excessive force claim where Plaintiff resisted arrest until the officer put him in a *chokehold*, wrestled him to the ground, and handcuffed him, as Plaintiff resisted arrest and the force used by the officer was reasonable.); *Kalma v. City of Socorro*, EP-06-CA-418-DB, 2008 U.S. Dist. Lexis 109441 (W. D. Tex. March 17, 2008)(officers entitled to qualified immunity because it was reasonable to use a *chokehold*, as the officers could have reasonably believed that when the suspect raised his hand in a defensive manner and pulled away from the officer, the officer on the scene could have reasonably, but mistakenly, believed that the suspect was going to fight back.). Therefore, qualified immunity clearly applies to Cherry and/or Rowe in this case.

when he was told he was under arrest, Manuel wrapped his arms around an officer and tried to remove his gun from his holster, hit the officers, took handcuffs, and despite being tased once, he still refused repeated commands to put his hands behind his back, and generally struggled and resisted handcuffing up until the time he was handcuffed. Plaintiffs have simply failed to produce evidence indicating force was not necessary, nor have Plaintiffs identified facts, nor produced evidence, indicating any one of the Defendant's actions were objectively unreasonable under the circumstances *and* caused any injury. Conversely, Defendants have established reasonable uses of force by Defendants under the circumstances they faced. Further, Plaintiffs have not produced any evidence tending to show any one of the Defendant's actions was unreasonable under then existing clearly established excessive force law, and caused any injury. Thus, all Officer Defendants herein are entitled to qualified immunity.

81. In short, Plaintiffs, seek to avoid qualified immunity and impose liability upon Defendants Cherry, Cater, Rowe, Meaux and Harper simply because they used some degree of force on Manuel, and/or based upon vicarious liability. However, no use of force has been shown to be either unreasonably excessive to the need, or to have caused any injury (and certainly not death), and 42 U.S.C. § 1983 claims do not allow for vicarious liability. Further, the undisputed material evidence above refutes intentional excessive force claims alleged and supports Defendants' qualified immunity.

## CONCLUSION

82. For the reasons above, summary judgment must be granted for Defendants based on the law and the undisputed evidence, or the lack of evidence in support of any claim. Defendants are also entitled to qualified immunity, as Plaintiffs have not refuted same. In sum, it would be objectively unreasonable to hold intentional excessive force was potentially used, when officers, at the family's insistence, tried to get Manuel the mental health care he immediately needed for over three hours, and despite being under arrest and combative to the extent where even deadly force was justified, the officers primarily used the lowest forms of physical force, and immediately requested medical care, once Manuel was handcuffed and his distress was noted, and he died of an unknown or natural cause.

WHEREFORE, PREMISES CONSIDERED, Defendants, LANE CHERRY, TERRY CATER, REID ROWE, SHANNON MEAUX, AND SHELBY HARPER, pray Plaintiffs take nothing from Defendants by reason of Plaintiffs' suit, that Defendants' Motions for Summary Judgment be granted, and that all of Plaintiffs claims against Defendants be dismissed with prejudice, and for such other relief, both general and special, at law or in equity, to which Defendants may be justly entitled.

Respectfully submitted,

CALVERT EAVES CLARKE & STELLY, L.L.P.
Beaumont Tower
2615 Calder Avenue, Suite 1070
Beaumont, Texas 77702
Phone: (409) 832-8885
Fax:     (409) 832-8886
E-Mail: fcalvert@calvert-eaves.com

By: _____
Frank D. Calvert
State Bar No. 03667700
F. Blair Clarke
State Bar No. 04316560

**ATTORNEYS FOR DEFENDANTS,
LANE CHERRY, TERRY CATER, REID ROWE,
SHANNON MEAUX, AND SHELBY HARPER**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the above and foregoing was furnished to all counsel of record by:

___XX___ Electronic Filing on this 16th day of May, 2019.

_____
Frank D. Calvert