# EXHIBIT "W"



1060 Skylight View
Colorado Springs, CO
80906

March 5, 2019

Mr. Frank Calvert
CALVERT EAVES CLARKE & STELLY, L.L.P.
Beaumont Tower
2615 Calder Avenue, Suite 1070
Beaumont, Texas
77702

RE: Civil Action No. 1:18-cv-11: Olga and Marco Delacruz v. The City of Port Arthur, et al; In the United States District Court of Texas – Beaumont Division.

Dear Mr. Calvert:

Per your request I have reviewed the following documents: 1. Plaintiffs' Second Amended Complaint, 2. Plaintiffs' Supplemental Disclosures, 3. Plaintiffs' Amended Complaint, 4. Plaintiffs' Supplemental Designation of Expert Witnesses including the Expert Report of Lee Ann Grossberg, MD, 5. Video-Plaintiff Bates Document DELACRUZ 0275, 6. Officer-Defendants, Cater, Rowe, Meaux, and Harper's Motion to Dismiss Second Amended Complaint, 7. Medical records from the Medical Center of Southeast Texas, 8. The Autopsy Report, 9. The Port Arthur Police Department's Offense Report and Supplemental Reports by officers, 10. The Attorney General of Texas's Custodial Death Report, 11. Expert Reports of Jeffrey J. Noble, and Lee Ann Grossberg, M.D., and 12. the depositions of Sergeant Rowe, Officer Cherry, Officer Cater, Chuck Burch, and Ana Ruth Buller, R.N. These documents and video as well as my medical training and over 30 years' experience as a board certified anatomical, clinical and forensic pathologist form the basis of my medical opinions.

I am a board certified forensic pathologist licensed to practice medicine in the States of Colorado and Texas. I have been licensed to practice in Texas since 1978 and Colorado since 1982. I obtained my B.S. in Zoology in 1971 from the University of Washington, Seattle, Washington. I attended the Universidad Autonoma de Guadalajara, Mexico graduating in 1974 and received an M.D. degree. I then performed an American Medical Association rotating internship at the Moncton Hospital, Moncton New Brunswick, Canada beginning July 1, 1974 and finishing on June 30, 1975. I performed a one year Servicio Social (Social Service) as required for licensure in the Republic of Mexico from August of 1975 to August of 1976 in Guadalajara, Mexico. I then entered active duty with the United State Army as a Captain in the Medical Corps and was assigned as a Brigade Surgeon to the 7th Infantry Division and was stationed at Fort Ord, California. In July of 1978 I began a four year residency in Anatomical and Clinical Pathology at Fort Sam Houston, Texas at Brooke Army Medical Center completing my residency at the end of June 1982. I completed a forensic pathology fellowship at the Bexar County Forensic Science Center in San Antonio, Texas, beginning in August of 1984 and finishing in August '985.

I have been board certified in Anatomical and Clinical pathology since June of 1982 and Forensic Pathology since May of 1985. I retired as the El Paso County Coroner in January of 2019 and was

appointed Coroner of El Paso County, Colorado in January of 2006 and elected to that position in November of 2006, 2010, and 2014. I was an Associate Coroner Medical Examiner, El Paso County, Colorado from July, 2002 to January of 2006. I was the Deputy Chief Medical Examiner at the Bexar County Forensics Science Center in San Antonio, Texas from June of 1992 through December of 2002. I was a staff Medical Examiner at the Bexar County Forensic Science Center from August of 1984 to June of 1992. I was Chief of the Department of Pathology for the U.S. Army Hospital, Fort Carson, Colorado between March 1984 and September of 1984, and I was the Assistant Chief of the Department of Pathology between July 1982 and March of 1984.

I practiced emergency medicine on a part time basis between 1978 and 1991. My military service and awards, medical society and other professional society memberships and appointments, as well as my international professional activities are further outlined in my attached curriculum vitae. My fee schedule and a list of courtroom cases other than when called upon by the State of Colorado where I have either given a deposition or testified at trial is also attached to this letter.

Manuel Delacruz was a 26 year old male diagnosed with schizophrenia for which he was prescribed olanzapine (Zyprexa). During the last few days of July 2016, Mr. Delacruz's condition became worse including not eating, no sleep for the previous 5 days, walking for long periods at night, refusing to shower, defecating on himself, refusing to take his medicine and had been uncooperative with his family members. A family member stated that on July 31st Manuel attempted to exit a vehicle traveling on the interstate at approximately 80 miles per hour. That same evening Manuel had gotten outside of their home and refused to come in. Manuel stayed outside under a large awning of a local store all night long. The family decided to take Manuel to the Medical Center of Southeast Texas for evaluation and treatment.

On arrival at the hospital in the late afternoon of August 1st, Mr. Delacruz refused to enter the emergency room. The family tried to obtain a court order but they were told the judge was not available. They then called the police so that they could fill out an emergency detention order in order to get Manuel treated. Meanwhile Manuel left the hospital and was being followed by a family member when police arrived. At the time of the first officer encounter, Manuel began walking away from the officer and told the officer that the officer wanted to kill him (Manuel). A short while later he told the officer something to the effect of getting raped and the officer assured him that nobody was going to rape him. After other officers arrived on scene Manuel turned toward the hospital and began walking in that direction. The officers attempted to place him in a patrol car but he refused. He allowed the police to handcuff him and one of the officers then escorted Manuel back to the hospital.

On arrival back to the hospital at 5:37 p.m., Mr. Delacruz was taken back into the emergency room and placed in a small treatment room. He was triaged and then seen by the emergency room physician but was uncooperative and refusing treatment. The nursing staff noted that he was obese, unkempt, anxious, and uncooperative, would not allow the medical staff or the police to approach him. He appeared frightened. He continued to refuse any treatment and would not allow the police or nursing staff to come near him stating that they were going to kill him and feared that the police were going to rape him.

Around 7 p.m. he was evaluated by a psychiatric nurse practitioner who noted that Manuel had persecutory delusions, was uncooperative, guarded and suspicious. These findings are indicative of paranoia.

A reassessment nursing note timed at 7:34 p.m. indicated that the patient was oriented, then confused, agreeable to medication then refusing, repeatedly. Manuel stated he was not afraid of a shot but does not want a shot. When he was questioned regarding auditory or visual hallucinations he did not respond to questioning and but appeared more anxious and fearful when asked about hallucinations/delusions, rubbing face, tearful and grimacing. Manuel was verbally reassured, informed that staff is here to help him and that staff and family are concerned. Manuel then said "I don't have any family" When the family was pointed out to Manuel stated "that is not my father, that is not my brother". He appeared to becoming more agitated.

His handcuffs were removed at 7:44 p.m. by a police officer, patient took off his shirt and put on a yellow gown over the rest of his clothing and vital signs were taken. The blood pressure was 111/98, respirations of 21 and the pulse was 129/minute. Unfortunately no one ever took his temperature. At 7:49 p.m. he removed his shoes on his own but was still refusing to remove his shorts.

At 8:06 pm Sergeant Rowe and Officer Cherry entered the treatment room in order to assist Manuel in removing his shorts so that he could be finally admitted and taken to the Psychiatric Ward of the hospital for treatment. At this point Mr. Delacruz backed away from the officers and against a wall, assumed a defensive position, and grabbed the left hand of Sergeant Rowe and attempted to push him back. Officer Cherry tried to hold Manuel against the wall but then Manuel grabbed the wrist of Officer Cherry with his left hand. Manuel then used his right elbow and struck Sergeant Rowe in the head. They attempted to calm Mr. Delacruz down and did not raise their voices or scream at him because they did not think that this would be effective. Office Cherry continued to talk to Manuel trying to calm him. Suddenly Manuel grabbed the can of mace and pointed it toward the face of Sergeant Rowe. Officer Cherry used his hands and was able to grab the mace from Delacruz and tossed the can away from the struggle.

Sergeant Rowe then told Mr. Delacruz that he we under arrest and to calm down. Manuel continued to ignore the commands of the two police officers. The officers attempted to put him in handcuffs by placing his hands behind his back but within seconds Officer Cherry realized that Mr. Delacruz was attempting to remove his service weapon from the holster and managed to pull away from Manuel and by using both hands secured his service weapon as Sergeant Rowe stepped back to draw his sidearm. Sergeant Rowe then approached Mr. Delacruz to calm him down and place him in Custody. Manuel was in a boxing stance with his hands up and in the closed fist position and punched him twice on the left side of the head. Sergeant Row then struck Manuel one time in the face or head without any effect.

Mr. Delacruz remained non-compliant and refused to obey commands. The two officers then tried to get Manuel on the ground. Eventually they were successful with Manuel on his back on the floor. The officers were unable to get his hands from under his back or roll him over on his stomach. Officer Cherry attempted to get Mr. Delacruz under control with the use of the CEW (conducted electrical device) for one cycle in the hope of controlling him. There was no effect on Manuel and he continued to struggle and resist the officers. Manuel was attempting to leave the room while holding onto the door. Additional units for backup were requested. At this point because of the confined space in the treatment room the officers then pulled Mr. Delacruz on his back into the hall and out of the room in order to have a larger open floor area.

At some point after entering the hall a security guard asked if the officers needed help. The two officers plus the security guard were able to roll Mr. Delacruz over onto his stomach. This took several attempts

due to his size and strength. Once on his stomach, Mr. Delacruz continued to resist by attempting to lift up into the pushup position which required the officers to pull the arms out and away from his body in order to handcuff his wrists. A headlock was applied by Sergeant Rowe. Additional officers then arrived to assist in getting Mr. Delacruz handcuffed. Eventually he was handcuffed utilizing four sets of handcuffs. He was then turned over and sat up when Sergeant Rowe noted that Manuel was not breathing. Sergeant Rowe yelled for medical assistance and the handcuffs were unlocked as Medical assistance arrived.

Mr. Delacruz was placed on a gurney with CPR in progress at 8:28 p.m. ACLS continued without any meaningful clinical response ad he was declared dead at 8:58 p.m. Unfortunately no temperature was recorded during resuscitation.

An autopsy was performed by Ami Murphy, D.O. of the Forensic Medical Management Services of Texas in Beaumont Texas on August 2, 2016. The body measured 69 inches in length and weighed 286 pounds. The body is described as obese with a BMI (body mean index) of 42.2. The injuries which were described on the surfaces of the body were few in number, small in size, and minor in nature. There were two curvilinear healing red abrasions located on the right temple. There were small horizontal linear red abrasions measuring 1/4- 3/4 inches is on the upper right back at the shoulder. Two small puncture marks were found on the abdomen were consistent with CEW (Conducted Electrical Weapon) and were located to the right and slightly below the umbilicus. There were two linear red abrasions measuring 2-4 inches in length extending obliquely along the anteromedial right forearm below the elbow. A red contusion encircled the right wrist (due to handcuff application). A 2 by 1 inch blue contusion was on the anteromedial left upper arm. A 1/2 inch red contusion was on the anteromedial forearm midway between the elbow and the left wrist. A 1/4 inch red contusion was on the posteromedial left wrist. A 1/8 inch red contusion was on the posterolateral left wrist. A 1 inch linear red abrasion extended horizontally along the anterior left ankle. There was also a subgaleal hemorrhage measuring 1 ½ x 1 ½ inches over the posterior left parietal bone. Pertinent negatives included the absence of any petechiae on the skin, conjunctiva and sclera. The heart was minimally enlarged without microscopic abnormalities. The liver was markedly enlarged weighing 3475 grams and microscopically extensive steatosis, predominantly macrovesicular was identified.

My medical opinions, based on reasonable medical probability, are as follows.

First, the physiologic mechanism of death is due to a sudden cardiac arrhythmia due to multiple factors including high levels of circulating adrenaline and nor-adrenaline occurring as a consequence of the exacerbation of the schizophrenia compounded by the prolonged struggle with the police officers. High circulating levels of adrenaline and nor-adrenaline can result in producing an elevated heart rate as well as a lethal cardiac arrhythmia. In addition the lack of response with immediate cardiopulmonary resuscitation with timely ACLS for a prolonged period of time supports this opinion. There was no way the officers could have recognized or determined that Mr. Delacruz was about to have a sudden cardiopulmonary arrest.

Second, there is no evidence of positional asphyxia or compression of the neck structures. The autopsy did not reveal any evidence of conjunctival, scleral or any petechial hemorrhages of the skin either on the neck or the head. There is no evidence of any bruising to the neck, neck organs or the back or shoulders that could support the notion of positional asphyxia. Finally there are no valid scientific studies

supporting positional asphyxia occurring in these types of cases person that I am aware of. The forensic pathology literature regarding positional asphyxia prior to 1997 has be proven to be incorrect based on several experiments involving prone restraint including the "hog tie" position.

Third, the application of the head lock had no effect on either blood flow to the brain, or any alteration in respirations. There is simply no traumatic evidence on the body to implicate the head lock as being improperly applied or causing any significant trauma to the head or obstruction of the mouth or nose. Mr. Delacruz continued to struggle throughout the encounter with the police officers and continued to shout while in the treatment room.

Fourth, rather than signing the cause of death as "undetermined", I believe it is better to sign the cause of death descriptively. I would phrase this as "sudden cardiovascular collapse due to an acute exacerbation of schizophrenia with probable excited delirium occurring during a prolonged struggle with police". For part two of the death certificate dealing with contributing factors I would list hepatomegaly (an enlarged liver) with extensive fatty metamorphosis (fatty liver) and obesity.

Fifth, I would assign the manner of death as "homicide". The reason for doing this is principally two fold. First to provide a way that forensic pathologists can retrieve these types of case for statistical purposes or for research. In addition, the assignment of homicide to these types of cases is not meant to imply that a crime occurred or implies that the officers intentionally wanted to harm Mr. Delacruz.

As more information becomes available, I reserved the right to offer additional opinions or modify my existing opinions.

Should you have any questions, please do not hesitate to contact me.

Sincerely,

*Robert C. Bux, MD*

Robert C. Bux, MD