# EXHIBIT

## "X"

## Report of Albert Rodriguez

**Re:**  Civil Action No. 1:18-CV-11; Olga Delacruz and Marco Delacruz, individually, and as Representatives of the Estate of Manuel Delacruz, *Plaintiffs*  v  City of Port Arthur, Port Arthur Police Department, Officer Lane Cherry, in his Individual and Official Capacity, Unknown Officers, The Medical Center of Southeast Texas, L.P. D/B/A Southeast Texas L.P., Defendants

### Introduction

1. My name is Albert Rodriguez.  I have been asked by the Law Firm of Calvert Eaves Clark & Stelly, LLP, specifically Attorney Frank D. Calvert, to review the above styled case and render independent professional opinions on law enforcement use of force, policies and procedures, training, and supervision.  My opinions are based on the documents provided to me in this case to date, as well as my training, education, experience and research in the field of law enforcement.

### Summary of Qualifications

2. I retired on September 31, 2009 from the Texas Department of Public Safety (DPS) with the rank of Commander of the Training Academy.  I held that position for approximately sixteen (16) years. After retiring, I was commissioned as a Special Ranger by the Texas Department of Public Safety.  In January of 2010, I was hired by the Texas Alcoholic Beverage Commission as a Lieutenant/Internal Affairs Investigator; in that position, I investigated allegations of police officer misconduct.  In May 2014, I was promoted to the Director of Training with the rank of Captain and presently hold that position.  I oversee all of the training for all of the State Police Officers commissioned by the TABC as well as instruct in the area of police tactics, law enforcement use of force, use of force in jail settings and related topic areas.  I also conduct investigations on reported or suspected law enforcement misconduct on the topic of use of force.  I have presented the topic of "Suing and Defending Governmental Entities" for the State Bar of Texas and conduct presentations for Grand Juries to assist them in understanding and evaluating police officer procedures and responses.

3. I was employed by the Texas Department of Public Safety (DPS) as a patrol officer in 1977.  I served in the Highway Patrol Service as a State Trooper and then promoted to the rank Training Officer at the Training Academy.  At the Training Academy, I was promoted to Staff Development Specialist I, Lieutenant and ultimately to the rank of Commander of the DPS Training Academy in Austin, Texas.  I held that position from 1993 to September 30, 2009.  I was employed by the DPS as a law enforcement officer and law enforcement trainer for over thirty- two (32) years and was and continue to be a licensed Texas Peace Officer.  While at the training academy, I served at different times as the Department's

Arrest and Control Tactics Instructor, Firearms Instructor, Use of Oleoresin Capsicum (pepper spray) Instructor, Straight and Expandable Baton Instructor, Taser Instructor, Use of Force Concepts and Theories Instructor.  I have instructed thousands of law enforcement and detention officers throughout the United States, Canada, and Mexico.  In addition, I met all of the standards for peace officer licensure set out by statute and by the Texas Commission on Law Enforcement Officer Standards and Education, now the Texas Commission on Law Enforcement.

4. I hold a Bachelor's Degree in Education from Texas A&I in Kingsville, Texas, now Texas A&M Kingsville.  I also hold Basic, Intermediate, Advanced, Instructors', Firearms' and Masters' certifications from the Texas Commission on Law Enforcement.  I am a graduate of the 147th FBI National Academy in Quantico, Virginia.  I have attended over six thousand (6,000) hours of various law enforcement seminars and schools throughout the United States.

5. I have attached a copy of my current CV to this report, which summarizes my education, training and experience. I have studied, attended seminars regarding, and instructed classes pertaining to the issues of law enforcement policies and procedures, use of force and deadly force, detention and arrest procedure, use of force in jail settings, reasonable suspicion, probable cause, police supervision, law enforcement training, patrol procedures, constitutional law and officer safety. I have been qualified in Federal and State courts as an expert witness in the areas of patrol procedures, use of force and deadly force, use of deadly force, policies and procedures, use of force in jail settings, reasonable suspicion, probable cause, arrest procedures, driving procedures, police supervision, firearms, officer safety, Texas criminal laws, Texas traffic laws, law enforcement training, and police investigations.

6. I am or have been a member of the FBI National Academy Graduates Association, Texas Police Association, Texas Sheriff's Association, and International Law Enforcement Educators and Trainers Association.  I have served on the Southwest Texas State University Criminal Justice Advisory Board, Texas Alcohol Beverage Commission, and the Austin Community College Law Enforcement Advisory Board.  I have instructed at the FBI Academy in Quantico, Virginia; Northwest University in Jacksonville, Florida; Texas Attorney General's Annual Law Enforcement Conferences in Austin, Texas; and various other locations throughout the United States, Canada, and Mexico.  I instruct and consult with the Texas Rangers' and law enforcement agencies throughout the United States on use of force and deadly force.

7. I have technical, professional, and other specialized knowledge that will assist in understanding the facts and issues in the above-captioned lawsuit.  My education, training, and experience provides me with technical, professional, and other specialized knowledge which will assist a

lay person in understanding how law enforcement officers are trained, why they are trained as they are, and why they should be so trained.  This knowledge is the key to reaching a reliable evaluation of law enforcement officers' conduct.  I have conferred with many other law enforcement experts regarding police supervision, law enforcement policies and procedures, police operations, arrest, search, and seizure training, arrest and control tactics, and evaluations thereof.  The facts and data on which I base my opinions are of a type reasonably relied upon by experts in the field of law enforcement in reaching reliable conclusions therefrom.

8. The attached resume contains a more complete listing of my training and qualifications and is provided for reference of my experience, education, training, and skills.

<u>Research and Assessment</u>

9. My opinions and observations in this report are based on having inspected the hospital area where the incident occurred (9/27/18) and reviewed and researched the following materials and documents: 1) Defendants, the City of Port Arthur, Texas and Lane Cherry's Motion to Dismiss, 2) Defendants, the City of Port Arthur, Texas and Lane Cherry's Initial Disclosures, 3) Port Arthur Police Department Offense Report, 4) Supplemental Report of Officer Cherry, 5) Supplemental report of Officer S. Meaux, 6) Supplemental Report of Sergeant R. Rowe, 7) Supplemental Report of Officer Abshire, 8) Supplemental Report of Officer K. Frank, 9) Supplemental of Officer J. Green, 10) Supplemental Report of Lieutenant Martin Blitch, 11) Supplemental Report of Major Dennis Odom, 12) Report of Investigator L. Nguyen (Cherry's Taser download), 13) Supplemental Report of Officer T. Carter, Report of Officer H. Whiting, 14) Supplemental Report of Officer S. Harper, 15) Port Arthur Police Department Forensic Specialist Report of Officer Jason Miles, 16) Port Arthur Police Department Identification Report of Forensic Specialist T. Lock, 17) Interim Chief Dunlap's assessment of Officer Cherry's actions, 18) Interim Chief Dunlap's assessment of Officer Carter's actions, 19) Interim Chief Dunlap's assessment of Lieutenant Rowe's actions, 20) Interim Chief Dunlap's assessment of Officer Meaux's actions, 21) Port Arthur Police Department Conducted Electrical Weapons' policy, 22) Letter from Jefferson District Attorney Bob Wortham informing Chief of Police Dunlap of the Jefferson Grand Jury "No Billing" of Officers Cherry, Carter, Meaux, and Lieutenant Rowe in relation to DelaCruz' death, 23) Calls for Service record, 24) Delacruz' driving and criminal record, 25) Custodial Death Report reference Delacruz, 26) News articles reference incident 27) Port Arthur Police Department Internal Affairs Report, 28) Port Arthur Police Department Use of Force Report completed by Officer Cherry, 29) Taser Use of Force Report completed by Officer Cherry, 30) Port Arthur Police Department Use of Force Report completed by Officer Meaux, 31) Port Arthur Police Department Use of Force

Report completed by Lieutenant Rowe, 32) Defendants, the City of Port Arthur, Texas and Lane Cherry's Supplemental Disclosures, 33) Defendants Initial Disclosures, Plaintiffs' Initial Disclosures, 34) Officer Abshire's in car camera video recording, 35) Officer Green's in car camera video recording, 36) Officer Cherry's in car camera video recording, 37) Officer Meaux's in car camera video recordings (2), 38) 12(b)(6) Motion to Dismiss Plaintiffs' Complaint (Doc.1) of Defendants, 39) City of Port Arthur and Port Arthur Police Department, 40) Plaintiffs' Response in Opposition to Defendants' 12(b)(6) Motion to Dismiss, 41) Reply to Plaintiffs' Response in Opposition (Doc. 13) to 12(b)(6) Motions to Dismiss Plaintiffs' Complaint (Doc.1) of Defendants, City of Port Arthur and Port Arthur Police Department, 42) 12(b)(6) Motion to Dismiss Plaintiffs' Complaint (Doc.1) of Defendant, Lane Cherry, 43) Plaintiffs' Motion in Opposition to Defendant Officer Lane Cherry's Rule 12(b)(6) Motion to Dismiss, 44) Response/Reply to Plaintiffs' Motion/Response in Opposition (Doc. 17) to 12 (b)(6) Motion to Dismiss (Doc. 16) Plaintiffs' Complaint (Doc. 1) of Defendant, Lane Cherry, 45) Court's Memorandum and Order, 46) Court's Order, 47) 12(b)(6) Motions to Dismiss Plaintiffs' First Amended Complaint (Doc.25) of Defendants, City of Port Arthur and Lane Cherry, 48) Plaintiffs' Response in Opposition to Defendants' Rule 12(b)(6) Motion to Dismiss Plaintiffs' First Amended Complaint, 49) Second Amended Complaint, Joint Conference Report, 50) Texas Health and Safety Code, Title , Mental Health and Intellectual Disability Subtitle C. Texas Mental Health, Chapter 573, Subchapter A., Apprehension by Peace Officer or Transportation for Emergency  Detention by Guardian, Section 573.0001, Definitions and Apprehension by Peace Officer without Warrant, 51) Deposition of Lane Cherry, 52) Deposition of Shannon Meaux, 53) Deposition of Reid Rowe, 54) Deposition of Terry Cater, 55) Plaintiffs' Designation of Expert Witnesses, 56) Deposition of Ana Buller, 57) Deposition of Chuck Burch, 58)Jeffrey Noble's report, 59) Texas Commission on Law Enforcement Officer Standards and Education Basic Peace Officer Curriculum, 60) Texas Commission on Law Enforcement Officer Standards and Education Intermediate Use of Force Training Curriculum, 61) Texas Commission on Law Enforcement Officer Standards and Education Intermediate Arrest, Search, and Seizure, 62) Texas Penal Code, 63) Texas Code of Criminal Procedure, 64) Use Supreme Court Decisions in *Graham v Connor,* 65) United States Supreme Court decision in *Saucier v. Katz,* 66) United States Supreme Court Decision in *Mullenix v. Luna, Beatrice Luna, individually and as representative of the Estate of Israel Leija, Jr., et al., Police; and Dewayne Logan, Officer,* 67) Force Science Website and Information, 68) *Benavides v. County of Wilson*, 955 F. 2d 968 (5th Cir. 1992), 69) *Roberts v. City of Shreveport,* 397 F. 3d 287 (5th Cir. La., 2005), 70) *Huong v. City of Port Arthur,* 961 F. Supp. 10032 (E.D. Tex. 1997), and 71) the Fifth Circuits' decision in *Hainze v Richards,* 207 F. 3d 717 (5th Cir. 2000).

**Summary of Relevant Facts**

10. My understanding of the relevant facts of this case is that on Monday, August 1, 2016, at approximately 4:51 p.m., Chuck Burch called the Port Arthur Police Department Dispatcher and reported that family members and medical staff from Medical Center of Southeast Texas needed assistance with an uncooperative mental patient, later identified as Manuel Delacruz (hereinafter "Delacruz"); Mr. Burch was Delacruz sister's fiancé.  Officer Lane Cherry responded and was informed via police radio that Mr. Burch was having a disturbance with Delacruz due to suffering from paranoia and schizophrenia.  Several members of the Delacruz family were attempting to get Delacruz to seek medical treatment for mental health problems, but Delacruz was refusing treatment.  Delacruz' family members were at the Medical Center with Delacruz and Delacruz was refusing to enter the emergency room.

11. Officer Cherry arrived at the Medical Center's emergency room entrance in a marked Port Arthur Police Department patrol unit wearing a police uniform with patches and a badge that identified him as a police officer.  After exiting the patrol unit, Officer Cherry walked up to a male subject standing next to a brown Ford pickup truck parked at the emergency room entrance.  As Officer Cherry walked to the male subject, a female subject walked toward the truck from the parking lot area.  Officer Cherry began to converse with the male and female; Ruth, Delacruz' sister and Mr. Burch.

12. At the time, family members were watching Delacruz walking in a Northeasterly direction and away from the hospital.  Officer Cherry asked the family about Delacruz' behavior in an attempt to determine whether Delacruz presented a danger to himself or others, more specifically to identify whether he needed to obtain an emergency mental commitment.

13. Delacruz' family informed Officer Cherry that Delacruz, on the previous day, had attempted to jump out of a vehicle as they drove on the interstate at approximately 80 miles per hour.  Officer Cherry was also informed that Delacruz had been defecating on himself, refusing to eat or shower, refusing to take his medication, and had not slept in approximately five (5) days.  The family further informed Officer Cherry that Delacruz had gotten outside of their residence on the previous night and refused to come back in.  Delacruz stayed outdoors all night under a large awning outside of a local store.

14. After listening to Delacruz' family, it became clear to Officer Cherry that Delacruz was a danger to himself and others and needed to have an emergency commitment issued so that Delacruz could receive the medical treatment needed.  One of the family members informed Officer Cherry that

Delacruz was scared of police officers.  Delacruz continued to walk Eastbound on Port Plaza Drive as the Delacruz' family continued to inform Officer Cherry of Delacruz' behavior.

15.  Officer Cherry got back into his patrol unit to catch up with Delacruz and attempt to convince him to come back to the hospital.  One of Delacruz' family members, male subject, asked Officer Cherry if he could join him and Officer Cherry informed him that he could as long as he stayed out the way.  Officer Cherry informed the dispatcher that Delacruz was walking down Port Plaza Drive.  As Officer Cherry turned the patrol unit onto Port Plaza Drive, he observed Delacruz walking Eastbound in the westbound lane of traffic next to the curb of Port Plaza Drive.  Officer Cherry activated the patrol unit's overhead emergency lights and got out to speak with Delacruz.  Officer Cherry asked Delacruz to sit down on the curb with him so that they could speak, Delacruz continued to walk.  As Officer Cherry spoke with Delacruz, he noticed they were approximately 150 yards away from US Highway 69 feeder road, which contained a high volume of traffic at the time.  Officer Cherry became concerned that Delacruz would enter the traffic lane and be struck by a vehicle.

16.  Officer Cherry continued to talk to Delacruz in an attempt to gain some level of trust so that Delacruz would stop walking.  Delacruz did not seem to have any interest in speaking with Officer Cherry.  Officer Cherry informed Delacruz that he was concerned about him not taking his medication and attempt to jump out a moving vehicle the day before.  Delacruz stated those events had not occurred and repeatedly relayed that he did not want to go to the emergency room.  Delacruz asked Officer Cherry to leave him alone and go away.  Officer Cherry informed Delacruz that he could not leave, that everyone just wanted him to get some help, and for him to take his medicine.

17.  Officer Cherry perceived that Delacruz appeared to be on the edge, as he was speaking with him, thus he gave him plenty of space to keep him from moving towards the highway.  After Officer Cherry made numerous attempts to persuade Delacruz to sit down and speak with him about going back to the hospital, Delacruz stated he was leaving and began walking away from Officer Cherry.  At the time, Officer Cherry believed Delacruz would become combative if he attempted to physically stop him.

18.  Delacruz mentioned something to the effect that Officer Cherry was trying to kill him.  Officer Cherry assured him that he did not want to kill him and that he was only trying to help him.  Officer Cherry was aware that several officers were enroute to assist him and that he had some time before Delacruz reached US Highway 69.  Officer Cherry estimated Delacruz weighed approximately 300 pounds, which outweighed him by 100 pounds.  He determined that any physical struggle between he and Delacruz near the highway would increase the danger to both of them.

*Report of Albert Rodriguez*                                                     6

19. Officer Cherry walked slowly behind Delacruz as he continued East on Port Plaza Drive. They entered the parking lot of the Marriott Hotel on Port Plaza Drive. Delacruz mentioned something to the effect of getting raped and Officer Cherry assured him nobody was going to rape him. Delacruz continued to tell Officer Cherry repeatedly to leave him alone as he continued to move away from Officer Cherry. At one point, Officer Cherry informed Delacruz that if he did not stop he was going to tase him. As they neared the hotel entrance, Officer Cherry observed Officer Terry Cater arrive at his location. As Officer Cater was approaching the hotel, Officer Cherry got between Delacruz and US Highway 69 in an attempt to keep Delacruz from getting closer to the highway. Delacruz turned around and began walking in a Northwesterly direction back toward the hospital. Officer Cater approached Officer Cherry and Delacruz. Officer Cherry repeatedly asked Delacruz to stop. Officer Cater addressed Delacruz by his first name and informed him numerous times that they were there to help him. Delacruz moved away from the officers. Officers Cherry and Cater were able to catch up with Delacruz. Officer Green and Delacruz' brother arrived sometime during this time period and also attempted to calm Delacruz down. Officer Cherry held Delacruz' left arm and Officer Cater had his right. Because of Delacruz' behavior and non-compliance, the officers decided that it was best to handcuff him.

20. Officers Cherry and Cater asked Delacruz to place his hands behind his back and he would not comply. Delacruz would not comply with the officers' instructions even after numerous commands were issued to him. The officers then commenced to handcuff him. Officer Green noticed that Officers Cherry and Cater were having difficulties in handcuffing Delacruz. Delacruz minimally resisted and after a slight struggle, Officers Cherry, Cater, and Green were able to handcuff him with the help of Delacruz's brother. Because of Delacruz' size it took four (4) sets of handcuffs linked together to get Delacruz cuffed. Delacruz was handcuffed behind his back with his hands hanging to his side; the four (4) sets of handcuffs linked together made Delacruz' hands hanging to his side possible. Delacruz asked if he was going to jail and something to the effect of being raped. Officer Cherry again reassured Delacruz that he was not going to be raped and that he was not going to jail. Officer Cherry informed Delacruz that they were taking him to the hospital so that he could get some help.

21. Mr. Burch arrived at some point. Delacruz was calm. Mr. Burch thanked the officers for the way they had handled Delacruz and informed them that Delacruz was schizophrenic. Mr. Burch also informed the officers that Delacruz had been an Olympic boxer when he was younger. He relayed that Delacruz was fine when he took his medication, but had refused to take it for a few days. Officer Cherry asked Mr. Burch to go back to the hospital so that he could get the information from him and other family members reference Delacruz having attempted to jump out of the moving car the day before.

*Report of Albert Rodriguez*                                              7

Officer Cherry believed Delacruz presented a danger to himself and his family. He also thought there was enough information to get an emergency medical hold, formally titled, "Application to Facility for Emergency Detention Without a Warrant and Acceptance for Preliminary Examination." The officers began to escort Delacruz to the patrol unit to transport him back to the hospital for treatment.

22. As the officers attempted to place Delacruz in the patrol unit, he began to protest being placed in the patrol car. The officers perceived a physical struggle would ensue if they continued to attempt to place Delacruz in the patrol unit. To accommodate Delacruz' mental status, Officer Cherry asked Officer Cater if he would walk back to the hospital with Delacruz, since they were not far from it. Officer Cherry also mentioned to Officer Cater the information reference Delacruz' history of being an Olympic boxer. As Officer Cater walked back to the hospital with Delacruz, Officer Green followed in the patrol unit with Officer Cherry in his patrol unit following Officer Green. While walking Delacruz back to the hospital, Officer Cater asked him about his boxing career in attempt to create dialog for the purpose of keeping him calm and build rapport. The officers were able to get Delacruz back to the hospital without incident.

23. After arriving at the medical center, Delacruz was placed in Emergency Room #19. Delacruz stated he was thirsty and wanted a cold drink. Shortly thereafter, he stated he was still thirsty and was given some ice water by Officer Cater, which Delacruz poured out and filled the cup with tap water. Delacruz drank several cups of water. Officer Cherry asked Officer Green to stay with Delacruz while he obtained information from the family for the mental commitment. Officer Cherry spoke with Delacruz' sister and completed the Emergency Mental Commitment documents based on the information relayed to him by the family. As Officer Cherry completed the Emergency Mental Commitment paperwork, Mr. Burch approached him and again thanked him for handling Delacruz in the manner that they had.

24. Officer Cherry after completing the Emergency Mental Commitment form provided it to the hospital staff. Officer Cherry sat with Delacruz as the hospital personnel began to complete the necessary procedures for admitting Delacruz for mental health treatment. Officer Cherry reported that Delacruz appeared restless and would not sit down as they waited in the emergency room. Officer Cherry attempted to get Delacruz to relax and asked him several times if there was anything he could get him and if he was okay. Delacruz stated he was okay and did not need anything. Officers Green and Cater perceived, at the time, that their assistance was no longer needed and left the hospital to return back to service.

25. A short time later, a hospital staff member came into the room and requested to draw a blood sample from Delacruz, perform an EKG, and take other vital information from Delacruz. Delacruz strongly protested the blood draw or having hospital staff perform any vital examinations on him. A nurse identified as Anastasia Cotton entered the room and stated they would not be able to offer any type of treatment for Delacruz until they were able to draw a blood sample, perform an EKG, and conduct other vital examinations on him. Officer Cherry believed Delacruz was not capable of making a rational decision about his well-being. Delacruz' family began to plead with Officer Cherry to do something so that Delacruz could be admitted for treatment; the family was scared to take Delacruz home and informed Officer Cherry that they believed if Delacruz did not receive any treatment he would hurt himself or others.

26. Officer Cherry spoke to the emergency room personnel about Delacruz' condition, more specifically what he had observed and what Delacruz' family had relayed to him. Officer Cherry asked them to help Delacruz in any manner possible. The hospital staff continued to inform Officer Cherry there was nothing they could do unless Delacruz consented to a blood draw and examination of his vitals. Officer Cherry believed Delacruz could not be released on his own due to his mental instability. Delacruz' family did not want him released and wanted him to get medical treatment. Delacruz' family came into the emergency room and began to plead with Delacruz to allow the hospital staff to help him, but the pleas were unsuccessful. Officer Cherry asked Delacruz numerous times to allow the hospital staff to treat him, however Delacruz remained uncooperative with all present.

27. Officer Cherry was concerned about Delacruz' safety and knew he needed treatment and called Sergeant Reid Rowe to his location an attempt to figure out what could be done. When Lieutenant Rowe arrived, Officer Cherry informed him of the information Delacruz' family had provided reference Delacruz being a paranoid schizophrenic, attempted suicide, not sleeping for about five (5) days, refused to take his medication, refused to shower, and defecate and urinated on himself. Lieutenant Rowe also spoke to Mr. Burch and Delacruz' brother. Delacruz' father was also present. Delacruz' family informed Lieutenant Rowe of their concern for Delacruz' safety and wanted him to be admitted into hospital for mental health treatment. The family understood the hospital wanted to draw blood from Delacruz as a condition for admission to the hospital. The family asked the officers for their assistance in getting Delacruz admitted into the hospital.

28. Lieutenant Rowe asked to speak with the charge nurse and was meet by Michelle Johnson, the house supervisor and Nancy Hester with the "sprint team." They both explained that Delacruz

would not allow anyone to touch him and without his consent, he could not be admitted.  Lieutenant Rowe explained to Ms. Johnson that they had no other option, but the hospital.

29.  Officer Cherry continued to sit with Delacruz in Room #19.  At one point, Officer Cherry asked Delacruz if he was thirsty and Delacruz stated he wanted a coke.  Officer Cherry went to the Emergency Room Department's refrigerator and got himself and Delacruz a coke as Lieutenant Rowe kept Delacruz company.  Officer Cherry switched the handcuffs from Delacruz's back to the front so that he could have an easier time drinking the coke.  When Officer Cherry gave Delacruz the open can of coke, he refused to take it because it was open.  Officer Cherry then gave Delacruz his can of coke, which was unopened and Delacruz took and drank it.

30.  After lengthy discussions with the hospital staff, Lieutenant Rowe, Ms. Johnson, and Delacruz' father went inside Room #19 to speak with Delacruz about complying with the medical staff.  Delacruz continued to refuse the blood draw.  Delacruz' brother while standing on the doorway spoke to Delacruz in Spanish to no avail.  At the time, Delacruz was handcuffed in front.  During the discussions, Delacruz accused medical personnel, Ms. Johnson of wanting to poison, kill, and rape him, however despite these comments Delacruz seemed calm, but did not want anyone to touch him, including family members.  Delacruz kept mumbling, could not be understood, and did not seem to specifically be talking to anyone.  It was obvious to Lieutenant Rowe that Delacruz was suffering from some type of serious mental disorder and needed to be treated for his own safety and well-being.

31.  At one point, Delacruz' father sat next to Delacruz and grabbed Delacruz' right arm and held it out and motioned for the nurse to do the blood draw.  Delacruz pulled his arm away from his father's grip.  Lieutenant Rowe then asked Delacruz' father to leave the room so that they could try and calm Delacruz back down.  The nurses continued to talk to Delacruz and he calmed down.  Delacruz allowed one of the nurses to take his blood pressure and one of the nurses attempted to draw his blood.  When the nurse began the blood draw, Delacruz grabbed the surgical tube connected to the needle and refused to release it.  Officer Cherry was able to grab the tube and get it out of Delacruz' hand and in the process the tube broke.  The hospital staff stated that if Delacruz would put on a hospital gown, he would be admitted for a 48-hour observation time period.  Delacruz agreed to put on the hospital gown.  Officer Cherry removed the handcuffs so that Delacruz could put on the gown.  Nurses Anna Platero and Michelle Johnson placed Delacruz in a yellow hospital gown over the clothes Delacruz was wearing at the time.  Nurses Platero and Johnson were able to talk Delacruz into taking off his shirt and shoes, however he refused to take off the cut off jeans he was wearing.  The medical staff pleaded with Delacruz to take his shorts off and he refused. Nurses Platero and Johnson left the room and Lieutenant

*Report of Albert Rodriguez*

Rowe and Officer Cherry entered to attempt to convince Delacruz to take his shorts off. Officer Cherry suspected Delacruz was shy and/or embarrassed to remove his shorts with females in the room. The curtains were closed for Delacruz' privacy.

32. Lieutenant Rowe continued to talk to Delacruz in an attempt to explain that he would have to remove his shorts before he could receive treatment. Delacruz refused to cooperate with Lieutenant Rowe's suggestions and at one point backed against the wall of the room and took what appeared to be an aggressive posture toward Officer Cherry. Lieutenant Rowe moved toward Delacruz while continuing to talk to him in a calm tone. Delacruz grabbed Lieutenant Rowe's left wrist with his right hand and pushed him backwards. Delacruz was standing with his back to the wall and Lieutenant Rowe placed his arm against Delacruz' right shoulder in an effort to keep Delacruz from continuing to resist. Officer Cherry grabbed Delacruz' left arm and tried to keep him against the wall and calm him down. At one point, Delacruz swung his right elbow toward Lieutenant Rowe and struck him in the head. Lieutenant Rowe believed Delacruz struck him accidentally. Lieutenant Rowe and Officer Cherry continued to ask Delacruz to calm down in a normal tone of voice. Delacruz continued to resist Lieutenant Rowe and Officer Cherry's efforts to control and calm him down for several minutes.

33. Delacruz was able to free his left arm from Officer Cherry's grasp. Officer Cherry attempted to regain control of Delacruz's left arm and then observed that Delacruz had a canister of department issued Oleoresin Capsicum (pepper spray) pointed directly at Lieutenant Rowe's face and trying to get his thumb under the safety cap to discharge the pepper spray. Officer Cherry verbalized a warning to Lieutenant Rowe reference the pepper spray in Delacruz' possession. Lieutenant Rowe observed Delacruz point the pepper spray canister in his direction. Officer Cherry released Delacruz' left arm and was able to physically force the pepper spray canister out of Delacruz' hand. Officer Cherry threw the pepper spray canister to the other side of the room and out of Delacruz' reach.

34. Lieutenant Rowe informed Delacruz that he was under arrest and to settle down. Delacruz continued to resist as the officers attempted to place his hands behind his back for handcuffing. At one point during the struggle, Officer Cherry turned around as Delacruz lunged toward him and wrapped his left hand along the right side of his waist. Delacruz grabbed Officer Cherry's handgun from the holster and had it halfway pulled out from the holster. Lieutenant Rowe heard Officer Cherry state something to the effect, *"watch it! Damit he is trying to get my gun."* Lieutenant Rowe saw Delacruz' left hand on Officer Cherry's right side where the gun and gun holster are located. Lieutenant Rowe stepped back to in preparation to draw his handgun.

35. Officer Cherry grabbed Delacruz' hand, which still held the gun, and with both hands pushed downward to keep the handgun in the holster.  Officer Cherry made a twisting motion with his body and was able to break Delacruz' grip on the handgun.  Lieutenant Rowe recognized that Delacruz was not successful in getting Officer Cherry's handgun, released his handgun, and approached Delacruz with the intent of calming him down.  Delacruz still had his back against the wall with both hands up, clenched fists, and was in a boxing/fighting stance.  Delacruz then punched at Lieutenant Rowe's face at least two times with a closed fist.  Lieutenant Rowe was able to see the punches coming and moved enough to where the punches were not direct hits to his face.  Lieutenant Rowe believed Delacruz was attempting to hurt him.  Lieutenant Rowe and Officer Cherry continued their concern for everyone's safety and believed Delacruz had the ability to seriously injure them or others.

36. Lieutenant Rowe in defending himself from Delacruz' assault responded by throwing closed fist punches at Delacruz, which Officer Cherry believed the punches might have struck Delacruz in the right temple area.  The punches seemed to have no effect on Delacruz.  Officer Cherry knew there was an urgent need to get Delacruz restrained for his safety and the safety of all persons in the area.  Officer Cherry in self-defense and for the safety of all involved threw a punch at Delacruz impacting the left back portion of his head.  The punch seemed to have no effect on Delacruz.  Delacruz continued to ignore and not comply with the officers' commands to calm down and stop resisting.

37. Officer Cherry took his handcuffs out of the handcuff case.  Delacruz grabbed Officer Cherry's handcuffs, pulled them away from him, and shortly thereafter threw them across the room.  Lieutenant Rowe and Officer Cherry tried to get Delacruz down to the floor and attempt to control and restrain him, but because of Delacruz' size and strength it was extremely difficult to accomplish such feat.  Eventually, Lieutenant Rowe and Officer Cherry were able to get Delacruz down to the floor.  Delacruz was on his back on the floor of the examination room between a large glass door and an examination bed.  The room was very small not allowing enough space for the officers to deploy any type of restraining technique and in addition, they were stumbling amongst each other because of the lack of space.  My visit to the hospital revealed that the examination room measured approximately 12 feet by 12 feet, containing an examination bed and cabinet along with other hospital equipment and supplies.

38. The struggle with Delacruz had been ongoing for several minutes and Lieutenant Rowe and Officer Cherry were getting fatigued and breathing heavily.  Officer Cherry unholstered his Taser and drive stunned Delacruz in the left ribcage area in an attempt to get him to stop resisting and get him restrained.  The Taser had no effect on Delacruz and he continued to be combative and resistant to

*Report of Albert Rodriguez*                                    12

Officer Cherry and Lieutenant Rowe's efforts to control him. Delacruz began to pull himself toward the exit of the examination room while on the floor. At one point, during the struggle, Lieutenant Rowe instructed Officer Cherry to radio for more officers.

39. Lieutenant Rowe and Officer Cherry during the struggle recognized they needed more space to control Delacruz and grabbed him by his hands, pulled him out of the room and onto the hallway floor. Delacruz was still on his back and continued to disregard the officers' instructions. A hospital security guard arrived and assisted Lieutenant Rowe and Officer Cherry in attempting to control Delacruz for handcuffing.

40. Officer Harper arrived and noticed Delacruz was partially on his side and stomach. Officers Cater and Meaux also arrived and assisted. Once Delacruz was on his stomach he continued to resist and attempt to get up. Lieutenant Rowe recognized there were other patients in the immediate area and believed that controlling and restraining Delacruz was immediately necessary. Lieutenant Rowe was positioned by Delacruz' upper torso applying a headlock to keep Delacruz from getting up while the hospital security guard was attempting to control Delacruz' legs.

41. Officer Harper assisted Officer Cherry in attempting to get Delacruz' right arm. At one point, handcuffs were placed on Delacruz' left wrist. Eventually, Delacruz' right wrist was controlled and maneuvered for handcuffing. Due to Delacruz' size and position of his right hand, Officers Cater and Meaux linked several sets of handcuffs together to accomplish the handcuffing technique. Delacruz' right arm was not behind his back, but in the upper right shoulder area. Delacruz's left hand was behind his back in the left waist area. The struggle with Delacruz lasted over twenty (20) minutes.

42. After Delacruz was handcuffed, the officers stopped their physical contact with him and Lieutenant Rowe immediately instructed the officers to get Delacruz on his back and in a sitting position. Delacruz was rolled over on his back and Lieutenant Rowe immediately noticed Delacruz was unresponsive. Lieutenant Rowe placed his hand on Delacruz' chest and noticed he was not breathing and immediately called for doctors and hospital personnel. Lieutenant Rowe instructed the officers to remove the handcuffs from Delacruz. Hospital personnel arrived and began CPR. A bed/stretcher was brought out from a nearby room. Lieutenant Rowe and Officer Meaux assisted in placing Delacruz on the stretcher.

43. Hospital personnel took Delacruz to an emergency room for treatment. Lieutenant Rowe went out to the waiting area to speak with Delacruz' family and inform them that medical staff were treating Delacruz. Delacruz' brother asked Lieutenant Rowe if had used a choke hold on Delacruz and Lieutenant Rowe informed him that he had not. A short time later, Nurse Michelle Johnson informed

Lieutenant Rowe that Delacruz had passed.   Justice of the Peace Burnett arrived and pronounced Delacruz dead.

44. The data on the Taser used by Officer Cherry was downloaded.  It showed that on August 1, 2016, at 8:53:08, the Taser was deployed for seven (7) seconds.  The autopsy report reference the Taser drive stun marks stated, "*Two small puncture marks are on the abdomen to the right of and slightly distal to the umbilicus. The marks are arranged vertically and are located 1-1 /2 inch from each other. Red to brown skin discoloration encircles each mark circumferentially, measuring up to 2 mm, and the skin is slightly tan and blistered near the center.*

45. The autopsy report referenced Delacruz' physical size, "*The body is that of a normally developed, obese adult male who is nude. No personal items accompany the body. The body weighs 286 pounds, is 69 inches in length, and appears compatible with the reported age of 26 years.*"  The autopsy report also noted in part, "*The neck is symmetrical and without masses or evidence of injury,*" and "*NECK: A layer-wise dissection of the anterior muscles of the neck is performed and reveals no hemorrhage in the musculature. The tongue mucosa is intact, with no hemorrhage in musculature. The hyoid bone and thyroid and cricoid cartilages are intact. The laryngeal mucosa is tan and glistening, with no edema. The atlanto-occipital articulation is stable. No cervical factures are palpated.*"  The autopsy report indicated Delacruz had linear red abrasions, measuring ¼ to ¾ inches on the right upper back shoulder area, two linear abrasions on his right forearm measuring 2-4 inches in length immediately below the elbow, red contusion circles on the right wrist, and contusions to his upper left arm, left forearm, left wrist, and left ankle.  The report also stated, "*There is no definitive explanation for the underlying etiology of the cause of death. For this reason, based on the currently available information, the cause and manner of death in this case are best classified as undetermined. In the event that additional information becomes available, this report may be amended. In my opinion, the cause of death of Manuel Delacruz is undetermined. The manner of death is undetermined.*"

46. On October 5, 2016, Jefferson County Criminal District Attorney Bob Wortham addressed a letter to Port Arthur Police Chief Weldon Dunlap.  Mr. Wortham wrote, "*Dear Chief Dunlap:  You are hereby notified that today the Jefferson County Grand Jury returned a No Bill in the matter of the death of Manuel Delacruz. Sgt. R. Rowe, Officer L. Cherry, and Officer S. Meaux are officially cleared of any criminal charges involving the incident. Our office has therefore closed the investigation.*"

**Review Standard**

47. It is my customary practice to evaluate the appropriateness of police conduct on a case-by-case basis, from the standard of how law enforcement officers are generally trained.  My evaluation of

Officers Lane Cherry, Harper, and Terry Cater, Sergeant Shannon Meaux (officer at the time) and Lieutenant Reid Rowe's (Sergeant at the time) actions in connection with Delacruz were analyzed pursuant to how law enforcement officers are trained and, therefore, can reasonably be expected to respond in similar situations.  The objective analysis consisted of comparing the Defendant Officers' actions in relationship to training received by law enforcement officers.  More specifically, the objective analysis involves evaluating how any well-trained law enforcement officer, not just the Defendant Officers could reasonably be expected to respond when faced with the same or similar circumstances presented by Delacruz.

48. The analysis involves the evaluation of the totality of the circumstances, as could reasonably be perceived by any well-trained law enforcement officer, at the time the Defendant Officers exercised their duties and authorities as law enforcement officers.   The evaluation was conducted from the standpoint of what the investigative materials and evidence show the Defendant Officers knew and perceived at the time they were required to act and not from 20/20 hindsight.

49. All Texas Peace Officers are required to complete the Texas Commission on Law Enforcement (TCOLE) Basic Peace Officer Training Curriculum.  The Defendant Officers at the time of this incident in question were and continue to be licensed TCOLE peace officers in good standing.  Peace officers candidates are required to complete a standard law enforcement licensing/training curriculum, which the Defendant Officers successfully completed.   The Defendant Officers received extensive training in Use of Force and Crisis Intervention as a result of completing the TCOLE training curriculum.  TCOLE requires peace officers to receive training on the Texas Penal Code, Texas Code of Criminal Procedure, and the United States Constitution relative to the use of force and deadly force.

50. Officers are trained to understand that in 1989, the United States Supreme Court, in the decision of *Graham v Connor*, applied the objective standard to a force situation and further established how reasonable force must be judged objectively.   The Court's analysis began by considering the suspect's Fourth Amendment right to remain free from any unreasonable seizure against the government's interest in maintaining order through effective law enforcement.  The Court noted that in determining the objective reasonableness for the use of force, the determination must be fact specific and requires careful attention to the following components for determining reasonableness:

> ➢ Judged from the perspective of a reasonable law enforcement officer
>
> ➢ Examined through the eyes of a law enforcement officer on the scene, at the time the force was applied, with consideration given to the fact that at times officers are required to make split second decisions in tense, uncertain, and rapidly evolving circumstances

> ➢ Based on the facts and circumstances confronting the officer, without due regard to the officer's underlying intent or motivation
> ➢ Based on the knowledge that the officer acted properly under the established law at the time

51. I analyzed and evaluated the Defendant Officers' actions, in connection with Delacruz, pursuant to law enforcement training on the United States Supreme Court decisions in *Graham v Connor, Haize v Richards,* and other decisions listed in the "Research and Assessment" section of this report. I have consistently found that the general manner in which law enforcement officers are trained on the use of force provides a valid, objective, means for evaluating any officer's conduct because such training is based upon constitutional and statutory standards, and reflects that which a reasonable officer could have believed appropriate. Law enforcement training involves both legal and practical considerations pertaining to how officers may appropriately apply the 4th Amendment's constraints in real-life law enforcement situations, therefore, it is extremely useful for purposes of identifying how and why a reasonable officer may have appropriately responded, based on the totality of the circumstances, to a particular use of force or deadly force situation.

52. The Defendant Officers were trained to understand that they may only use force in accordance with clearly established legal standards, including the Texas Penal Code. The Defendant Officers received this training when they successfully completed the TCOLE legislatively mandated training curriculum. The general content of law enforcement training regarding the use of force is primarily based upon decisions of the United States Courts interpreting the 4th Amendment. I study and use as a resource when providing instruction to officers, federal court decisions of the United States Supreme Court informed by, and consistent with, accepted research regarding law enforcement protocol. While I do not propose to offer expert opinion on the law, because my duties involve training law enforcement officers, I often read court decisions pertaining to law enforcement action, and I also use judicial decisions to assist me in providing training to law enforcement officers. Therefore, I can provide expert testimony on the standard utilized in training police officers as to both tactical considerations, as well as, the legal parameters officers are taught governs their conduct.

53. The objective analysis conducted considered the fact law enforcement officers, at times, are required to make split second decisions in tense, dangerous and rapidly evolving circumstances. Pursuant to law enforcement training on *Graham v Connor*, the analysis must also involve the evaluation of:

1) The offenses committed and being committed by Delacruz at the time non-lethal force was deployed as perceived by the Defendant Officers

2) Whether it objectively appeared Delacruz presented a danger to the Defendant Officers and/or others

3) Whether it objectively appeared Delacruz was resisting or evading arrest at the time the Defendant Officers used non-lethal force

54.  I am presently a police officer, law enforcement trainer, and supervisor, and I interact with and train police officers on a daily basis.  My opinions and observations are presented from the viewpoint of contemporary tactics and concepts currently being taught to law enforcement officers.  I visited the incident site at the hospital for the purposes of evaluating the totality of the circumstances from the vantage point of an on-scene police officer, pursuant to the dictates of *Graham v Connor*.

**Opinions and Observations**
**Course and Scope of Authority**

55.  The materials reviewed revealed that Delacruz' sister's fiancé, Mr. Burch called the Port Arthur Police Department and informed the dispatcher that the Delacruz family and medical staff from the Medical Center of Southeast Texas needed assistance with an uncooperative mental patient.  Officer Cherry responded and was informed via police radio that Mr. Burch was having a disturbance with Delacruz, Delacruz was suffering from paranoia and schizophrenia, and Delacruz' family was attempting to get him medical attention for mental health problems.  He was further informed that Delacruz was refusing treatment.

56.  Officer Cherry arrived at the Medical Center's Emergency area.  Officer Cherry was clearly identifiable as a police officer to Delacruz, family and hospital staff.  Officer Cherry contacted Delacruz's family and was informed that Delacruz had attempted to jump out the vehicle as they drove on the interstate at approximately 80 miles per hour on the previous day, Delacruz had been defecating on himself, refusing to eat or shower, refusing to take his medication, and had not slept in approximately five (5) days.  The family further informed Officer Cherry that Delacruz had gotten outside of their residence on the previous night and refused to come back.  Delacruz stayed outdoors all night under a large awning outside of a local store.  Officer Cherry observed Delacruz walking in a Northeasterly direction and away from the hospital.  Any reasonable and well-trained law enforcement officer with the knowledge provided by the Delacruz family could have reasonably believed Delacruz presented a danger to himself and others, as did Officer Cherry.  Officer Cherry further believed that an emergency

mental commitment was necessary to keep Delacruz from continuing to attempt to inflict serious injury to himself.

57. Officer Cherry made contact with Delacruz at Delacruz' family's request and because of the information provided to him reference the danger posed by Delacruz.  Officer Cherry observed Delacruz walking Eastbound in the Westbound lane next to the curb of Port Plaza Drive.  Officer Cherry activated the patrol unit's overhead emergency lights and got out to speak with Delacruz.  As Delacruz continued to walk, Officer Cherry asked Delacruz to sit down on the curb with him so that they could speak.  Officer Cherry noticed they were approximately 150 yards away from U. S. Highway 69 feeder road, which contained a high volume of traffic at the time.   Officer Cherry became concerned of Delacruz entering the traffic lane and being struck by a vehicle.

58. At one point, Delacruz asked Officer Cherry to leave him alone and to go away.   Officer Cherry informed Delacruz that he could not leave, that everyone just wanted him to get some help and for him to take his medicine.

59. The aforementioned information available clearly reveals that Officer Cherry detaining Delacruz was within the course and scope of his law enforcement authority pursuant to Texas Health and Safety Code, Title 7, Mental Health and Intellectual Disability Subtitle C. Texas Mental Health, Chapter 573, Subchapter A., 573.0001, Apprehension by Peace Officer without Warrant:

> "(a) A peace officer, without a warrant, may take a person into custody if the officer: (1) has reason to believe and does believe that:  (A) the person is a person with mental illness; and (B) because of that mental illness there is a substantial risk of serious harm to the person or to others unless the person is immediately restrained; and (2) believes that there is no sufficient time to obtain a warrant before taking the person into custody.
>
> (b) A substantial risk of serious harm to the person or others under Subsection (a)(1)(B) may be demonstrated by: (1) the person's behavior; or (2) evidence of severe emotional distress and deterioration in the person's mental condition to the extent that the person cannot remain at liberty.
>
> (c) The peace officer may form the belief that the person meets the criteria for apprehension: (1) from a representation of a credible person; or (2) on the basis of the conduct of the apprehended person or the circumstances under which the apprehended person is found."

60. In certain law enforcement situations, families request law enforcement assistance because of

difficulties they maybe having with a family member that is experiencing a mental crisis, presenting a threat to themselves or others, and/or the family has determined they cannot handle the situation, as was the case in this situation.   In some of these situations, law enforcement officers unfortunately are required to use of force to protect themselves, family members, and the person experiencing the mental crisis, and/or to effectuate an arrest.

61.   The materials reviewed indisputably revealed that shortly after Officer Cherry and Lieutenant Rowe arrived at scene, Delacruz continued to present a threat to himself and others. Delacruz became combative, assaultive, at one point presented a threat of serious bodily injury or death at the hospital as Officer Cherry and Lieutenant Rowe were attempting to get him medical assistance pursuant Delacruz' family request.

62. Law enforcement officers receive comprehensive training and education on the Use of Force and Civil Rights.   Officers are trained to understand that when Command Presence and Verbal directions are not effective they maybe required to use some reasonable degree of force in protecting their own lives, the lives of others, and/or to effectuate arrests.   Officers are also trained that in some instances force is necessary to keep persons from inflicting injury to themselves.   The materials indisputably revealed Delacruz committed numerous criminal offenses when he assaulted Lieutenant Rowe, disarmed Officer Cherry of his pepper spray, resisted arrest, and came extremely close to disarming Officer Cherry of his handgun.   Law enforcement officers are trained to understand that the use of force by law enforcement officers is within the course and scope of their authority and not a violation of civil rights when said force is within the parameters of the following Texas Penal Code Sections, and United States Supreme Court decision:

Texas Penal Code, Sections

> 9.31 Self-Defense - "(a) Except as provided in Subsection (b), a person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force. "

> 9.34 Protection of Life or Health - (a) A person is justified in using force, but not deadly force, against another when and to the degree he reasonably believes the force is immediately necessary to prevent the other from committing suicide or inflicting serious bodily injury to himself.  (b) A person is justified in using both force and deadly force against another when and to the degree he reasonably believes the force or deadly force is immediately necessary to preserve the other's

> *life in an emergency.*

> 9.51 Arrest and Search, *"(a) A peace officer or a person acting in a peace officer's presence and at his direction, is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to make or assist in making an arrest or search, or to prevent or assist in preventing escape after arrest, if: (1) the actor reasonably believes the arrest or search is lawful or, if the arrest or search is made under a warrant, he reasonably believes the warrant is valid, and (2) before using force, the actor manifests his purpose to arrest or search and identifies himself as a peace officer or as one acting at a peace officer direction, unless he reasonably believes his purpose and identity are already known by or cannot reasonably be made known to the person to be arrested......"*

> United States Supreme Court decisions in *Graham v Connor*

63. Texas Peace Officers are trained, as were Officers Cherry, Harper, and Cater and Sergeant Meaux and Lieutenant Rowe, to understand that the aforementioned United States Supreme Court decision and Texas Penal Code Statutes are the guiding law and principles on the use of force. I personally instruct law enforcement officers on the dictates of *Graham v Connor, Hainze v Richards* and as I previously mentioned, I analyzed the Defendant Officers' actions pursuant to training I have received, and training I routinely provide, regarding police application of those Constitutional and Statutory Standards during dynamic law enforcement situations, like that evidenced here.

64. Officer Cherry and Lieutenant Rowe were called upon to respond to assist in controlling Delacruz, get him medical treatment, and responded in accordance with accepted training and authority as law enforcement officers. The Defendant Officers' actions in attempting to control and seizing Delacruz while utilizing permissible force were within the parameters of their law enforcement authority. There should be no question that law enforcement officers assisting a family with a family member experiencing a mental crisis for the purposes of getting medical treatment is within the course and scope of law enforcement authority and protocol, more so considering the fact that the family requested assistance. Objective law enforcement trainers would undoubtedly concur that the Defendant Officers' actions were performed within the scope of their law enforcement authority.

**Discretionary Law Enforcement Functions**

65. In the law enforcement profession, there are an unlimited number of circumstances law enforcement officers may be confronted with when assisting a family with a family member experiencing a mental crisis. Because of the infinite number of circumstances that exists, law enforcement officers are trained to use their judgment and discretion in arriving at a reasonable course of action. Law enforcement officers are trained to evaluate the totality of the circumstances, as reasonably ascertainable, and to use their good judgment and appropriate discretion in arriving at a course of action that is within the range of permissible conduct for a law enforcement officer. If in fact, there were a finite number of circumstances that could be identified, law enforcement officers would not be required to use their judgment or discretion at all. Law enforcement officers would be trained on the specific number of circumstances, and would be instructed to respond with specific actions and/or sets of procedures. Unfortunately, no such list of specific circumstances exists in life, thus law enforcement officers are necessarily required to use their judgment and discretion.

66. There is seldom a "perfect" way for an officer to perform a discretionary law enforcement action. Law enforcement officers are thus trained to evaluate the totality of the circumstances, as practically ascertainable at the time, and to use their reasoned judgment and the appropriate use of discretion in arriving at a course of action that is within the range of permissible conduct for a law enforcement officer. There is no training manual and/or policy manual that can cover every single situation that a law enforcement officer may encounter in any given law enforcement situation, and more so when dealing with a person experiencing a mental crisis. Officers, therefore, are sent to police training academies and specialized training, which provides them with instruction intended to establish a firm foundation upon which to apply the knowledge he/she has been taught, and to utilize legitimate discretion in the performance of those duties he/she can reasonably be expected to confront in the performance of his/her duties.

67. Officers Cherry, Harper, Cater and Lieutenant Rowe and Sergeant Meaux were required to use their judgment and discretion in making decisions in tense, uncertain, and rapidly evolving circumstances, based upon accepted training and experience, on the following discretionary law enforcement functions, but not limited to:

    a. Evaluating the family's request for assistance in getting Delacruz medical treatment

    b. Evaluating the information provided to them reference Delacruz attempting to jump out of a car while traveling at 80 miles per hour, defecting on himself, refusing to eat,

*Report of Albert Rodriguez*

refusing to shower, not sleeping, and not taking his medication, and leaving the residence and sleeping outside under an awning

   c. Evaluating Delacruz' mental status and need for immediate medical treatment

   d. Assessing Delacruz walking toward traffic, weighed approximately 300 pounds, and the information of Delacruz having been an Olympic Boxer

   e. Assessing the danger posed by Delacruz to himself and others

   f. Assessing Delacruz' non-compliance and resistance to being medically treated

   g. Assessing Delacruz physical resistance

   h. Evaluating Delacruz' reactions to family members

   i. Evaluating Delacruz' assaultive and life threatening actions

   j. Assessing the fact there were other patients and persons in the immediate area

   k. Determining how to neutralize Delacruz's assaultive and out of control actions

68. There is no exact science or training that instructs law enforcement officers on how to precisely evaluate and respond to the aforementioned circumstances. Officers have to rely on their training and experience in evaluating the totality of the circumstances, and use their reasoned judgment and discretion. The Defendant Officers were required to apply their training and use their experience, judgment and discretion and, based on the totality of the circumstances, make split-second, practical, common sense decisions in evaluating the aforementioned law enforcement functions. The determinations made by the Defendant Officers required the evaluation of multiple probable scenarios and mandated creating rapid responsive reactions. Each situation is unique and requires law enforcement officers to use their judgment and discretion.

69. Contemporary law enforcement trainers understand that there is more than one reasonable way to handle a given law enforcement situation, therefore officers are trained to use their judgment and discretion when applying their training. The Defendant Officers, in this case, were appropriately conducting discretionary law enforcement functions in connection with Delacruz' family's request for assistance, Delacruz' mental crisis, resistance, and unlawful and assaultive actions. In short, the Defendant Officers responses to the uncertain and dangerous circumstances that Delacruz presented were within the range of acceptable law enforcement discretionary actions and consistent with law enforcement tactical and constitutional training. The conduct and actions of the Defendant Officers were consistent with the manner in which we customarily train law enforcement officers to apply the dictates of the United States Supreme Court in such decisions as *Graham v Conner, Haize v. Richards,* Texas Code of Criminal Procedure, and Texas Penal Code.

*Report of Albert Rodriguez*