**Fundamental Law Enforcement Training on Responding to Resistance/Threats**

70. In evaluating any law enforcement use of force incident, it is paramount to understand how law enforcement officers are trained in regards to the use of reasonable force.  It is correct to state generally that, all law enforcement officers are held accountable for complying with the Constitutional and Statutory Standards; therefore they are trained to conform their conduct to those standards.  Texas law enforcement officers are trained on the applicable Statutory and Constitutional Standards regarding the use of reasonable force.  More specifically, law enforcement officers receive in-depth instruction on the previously quoted Texas Penal Code Sections 9.31, 9.34 and 9.51 and the United States Supreme Court decision in *Graham v Connor* (paragraph #62).

71. One of the many goals for law enforcement trainers is the communication and understanding of the practical application of each of the aforementioned standards to law enforcement officers.  To accomplish said goal, trainers in part instruct law enforcement officers that the use of reasonable non-lethal force is justified and legal when an officer has a  **"Reasonable Belief"** that non-lethal force is **"Immediately Necessary,"** as outlined in Texas Penal Code Sections 9.31, 9.34, and 9.51.  Officers are trained to understand that, generally speaking, the standard "Reasonable Belief" is not one that is necessarily a confirmed, verified, one hundred (100) percent accurate proof.  In other words, officers do not have to wait until it is confirmed that a suspect is accessing a weapon or severely beats an officer or another before the officer is allowed to use force in defending himself and/or others.

72. The above mentioned instruction on the Texas Penal Code Sections 9.31, 9.34 and 9.51 provides law enforcement officers with a practical understanding as to "WHEN" non-lethal force is reasonable; an officer must have a "reasonable belief" that non-lethal force is "immediately necessary" to effectuate an arrest.   However, said instruction provides a practical understanding only as to **"WHEN"** force is reasonable, but does not address the issue of the type of force response(s) that are considered reasonable.

73. In Texas, law enforcement officers are required to complete the legislatively mandated State Training Standards established by TCOLE.  The State Training Standards outline the force responses available for law enforcement officers as the following:

   1) Professional Presence
   2) Verbal Communication
   3) Weaponless strategies
   4) Weapon strategies- Chemical/Electrical mean, Mace, Stun gun, Baton
   5) Deadly Force

*Report of Albert Rodriguez*                                        23

74. Law enforcement officers are also trained to recognize different resistance/threat levels.  The classifications of resistances/threat that are commonly recognized are:

    A)  Psychological Intimidation

    B)  Verbal and Physical Non-Compliance

    C)  Active Resistance

    D)  Assaultive Resistance

    E)  Threat of Serious bodily injury or death

75. The threat/resistance levels presented by an individual(s) and the circumstances surrounding the individual's threat/resistance determine the type of responses that are appropriate for the situation at hand.  Law enforcement officers are trained to understand that the use of force is not a 50/50 proposition; meaning that an officer does not have to use the same level of force that an individual may be presenting or using.  Law enforcement officers are expected to be able to control situations when a suspect's actions are viewed as threatening to officers and/or others, therefore generally speaking, it is unreasonable to require officers to use the same level of force that the suspect is using or presenting.  Said proposition, for example, would consist of an officer being required to use a knife when a suspect presents and/or attempts to use a knife against the officer or others.

76. Contemporary law enforcement use of force training involves the instruction of the "One Plus Concept."  The "One Plus Concept" prescribes for officers to use one level of force higher than what the suspect is presenting or using at the time.  The "One Plus Concept" reduces the gap of disadvantage for law enforcement officers and assists in accomplishing law enforcement objectives.  In addition, the "One Plus Concept" training provides an overall understanding of what constitutes reasonable force from a practical law enforcement perspective, and imparts an understanding of the type of force response(s) that may be appropriate for the resistance/threat that a subject is presenting or using.  In addition, the "One Plus Concept" provides an objective methodology in evaluating an officer's use of force.

77. The following is the resistance/threat levels (outlined in paragraph #74) relative to the force responses (outlined in paragraph #73) utilizing the "One Plus Concept:"

    A)  Psychological Intimidation = aggressive body language and/or verbal communication

        Officer Response: *Officer Presence, Verbal Communication*

    B)  Verbal and Physical Non-Compliance = suspect does not comply with the officer's instructions

> Officer Response: *Officer Presence, Verbal Communication, Weaponless Strategies, Weapon Strategies (Chemical irritants, Taser)*

C) Active Resistance = suspect tenses body, holds on to apparatus to avoid detention or arrest;

> Officer Response: *Officer Presence, Verbal Communication, Weaponless Strategies, Weapon Strategies (Chemical Irritants, Taser)*

D) Assaultive Resistance = an assault is imminent and/or the suspect is pushing, kicking, punching, spitting, striking, etcetera at the officer

> Officer Response: *Officer Presence, Verbal Communication, Weaponless Strategies, Weapon Strategies (Chemical irritants, Taser, Impact Weapons-Baton)*

E) Threat of Serious bodily injury or death – self explanatory

> Officer Response: *Officer Presence, Verbal Communication (when reasonable), and all possible defensive measures including Deadly Force*

78. Law enforcement officers are trained to understand that the force used in any given situation must be "reasonable" relative to the totality of the circumstances.  Having to evaluate the totality of the circumstances is not an easy task, and even more so when having to make split second decisions in tense and rapidly evolving circumstances.  Therefore, officers are trained to understand that their actions, pursuant to *Graham v Connor,* will be evaluated from the standpoint of the information known and perceived by an on-scene officer, and not from the comfort and safety of "Monday Morning Quarterbacking."  In conjunction with training received by officers on *Graham v Connor*, officers are trained that the use of the "One Plus Concept" in most force situations, pursuant to law enforcement training, is considered the use of reasonable force and more so since said training is required by TCOLE.

79. In some situations, officers may be required to use less force than prescribed by the "One Plus Concept," but by the same token, in some situations, officers may be required to resort to a higher level of force than imposed by the "One Plus Concept."  Generally speaking, in cases in which officers utilize the same or lesser force than presented or used by a suspect, the end result could be ineffective control of the situation and the subject, which could easily result in more law enforcement officers and innocent persons being killed or injured.

**Appropriateness of Officers Cherry, Harper, Cater, Sergeant Meaux, and Lieutenant Rowe's Actions**

80. In order to accurately and objectively analyze the Defendant Officers' actions it is paramount to evaluate the totality of their actions.  The Defendant Officers' limited use of force and the

*Report of Albert Rodriguez*                                    25

appropriateness of such will be individually reviewed and analyzed throughout the section.  First and foremost, the information available revealed that Delacruz' medical emergency and the threat he presented to himself commenced a substantial amount of time prior to the Defendant Officers even responded to the Delacruz' family's request for assistance.  This incident in question did not start in Emergency Room #19.  However, the reasonableness of Defendant Officers' actions was not only demonstrated in the emergency room, but also exhibited prior to the incident in Emergency Room # 19.  As previously documented in the "Summary of Relevant Facts," of this report, Delacruz' had attempted to commit suicide by jumping out of a car traveling at approximately 80 miles per hour, had defecated on himself, refused to shower, refused to take his medication, refused to sleep, refused to eat, stayed and slept outdoors at night, and refused to abide by the families' pleas to get medical treatment once they got him to the hospital.  There should be no question to the fact that Delacruz presented imminent threat to his own life, the family needed help, Delacruz was seriously ill, and Delacruz could not be controlled before any of the Defendant Officers ever responded to hospital.

81.  The family could not get Delacruz to cooperate in getting the urgent medical treatment he needed and it was evident to the Defendant Officers that the family wanted them to assist in getting Delacruz medically treated.  The Delacruz' family informed Officer Cherry upon arriving at the hospital that Delacruz was afraid of police officers.  The information examined clearly shows that the Delacruz family was willing to forego Delacruz' fear of police officers for getting the medical treatment Delacruz needed in order to save his life.  It was obvious that Delacruz was critically ill.

82.  The materials reviewed revealed the Defendant Officers had extensive interaction with Delacruz prior to the incident that occurred in Emergency Room #19 and the hallway adjacent to it.  The documents examined show the Defendant Officers followed the Crisis Intervention training they received pursuant to TCOLE, that their actions were conducted in good faith, more specifically their actions were focused on obtaining the medical treatment Delacruz urgently needed; the Defendant Officers' actions from the onset were indisputably directed to assisting and accommodating the Delacruz family request and saving Delacruz' life as demonstrated in the following indisputable information.  The responding Defendant Officers upon arriving hospital and observing Delacruz took the following actions, but not limited to, which demonstrate the reasonableness of their efforts:

      a)  Officer Cherry and Lieutenant Rowe at different times obtained information about Delacruz and asked family members questions to determine whether Delacruz presented a danger to himself or others before making contact with Delacruz

b) Evaluated the information provided by the family and determined Delacruz presented a danger to himself and others

c) Determined that an emergency commitment was necessary and Delacruz was critically ill

d) Officer Cherry observed Delacruz walking on and near a roadway occupied by vehicular traffic and attempted to get Delacruz to stop

e) The Defendant Officers allowed family members to assist in getting Delacruz to cooperate with the idea of developing trust with Delacruz and ultimately getting him the medical treatment needed

f) Officer Cherry asked Delacruz to sit down on the street curb so they could talk; Delacruz did not allow that to happen

g) Officer Cherry continued to talk to Delacruz in an attempt to obtain some level of trust

h) Officer Cherry informed Delacruz that their concern was about him not taking his medication because of his attempt to jump out a moving vehicle the day before

i) Delacruz was informed that everyone just wanted him to get some help and for him to take his medication

j) Delacruz was initially given plenty of space to keep him from moving towards the highway upon Officer Cherry noticing that Delacruz appeared to be on the edge

k) Officer Cherry made numerous attempts to get Delacruz to sit down and speak about going back to the hospital, Delacruz stated he was leaving and began walking away from Officer Cherry

l) Officer Cherry believed Delacruz would become combative if he attempted to physically stop him, thus did not attempt to stop him

m) Delacruz mentioned something to the effect of Officer Cherry trying to kill him and Officer Cherry assured him that he did not want to kill him and that he was only trying to help him

n) Officer Cherry estimated Delacruz weighing approximately 300 pounds, which outweighed him by 100 pounds and determined that any physical struggle between them near the highway would increase the danger to both of them, therefore Officer Cherry avoided physical contact with Delacruz

o) Officer Cherry walked slowly behind Delacruz as Delacruz continued to walk East on Port Plaza Drive

p) Delacruz mentioned something to the effect of getting raped and Officer Cherry assured him nobody was going to rape him as Delacruz continued to tell Officer Cherry repeatedly to leave him alone and moved away from Officer Cherry

q) The Defendant Officers spoke in a calm tone of voice when speaking with Delacruz

r) Officer Cherry got between Delacruz and U.S. Highway 69 in an attempt to keep Delacruz from getting close to the highway

s) Officer Cater arrived at the scene and addressed Delacruz by his first name in a calm tone of voice

t) Officer Cater informed Delacruz numerous times that they were there to help him

u) The officers allowed Delacruz' family member to assist in calming down Delacruz

v) The officers decided to handcuff Delacruz because he continued to walk towards traffic and would not comply with the officers' request to stop

w) Did not place Delacruz in the patrol unit for transport because Delacruz protested, therefore Delacruz was allowed to walk back to the hospital with Officer Cater escorting him

83. The Plaintiffs' Expert's report prepared by Mr. Noble and the Plaintiffs' Complaint minimally mention the above listed efforts performed by the Defendant Officers in connection with Delacruz. The aforementioned actions conducted by the Defendant Officers clearly show there was no intent to cause any harm to Delacruz. To the contrary, the list demonstrates the reasonableness of the Defendant Officers' actions, the abundance of patience and concern for Delacruz' mental status and need of medical treatment. In fact, Mr. Burch in deposition testified (pgs.11, 30) that the officers were patient, polite and handled the situation in an excellent manner.

84. The Defendant Officers managed to persuade Delacruz to walk back to the medical center and Delacruz was placed in Emergency Room #19. Again the Defendant Officers' efforts and patience in convincing Delacruz to go back to the hospital, a task the family could not accomplish, shows there was no intent to cause any harm to Delacruz. The information reviewed revealed the Defendant Officers continued to accommodate Delacruz and diligently focused their efforts toward getting him medical treatment. The following subsequent actions taken by the Defendant Officers continued to exhibit the reasonableness of their efforts, most importantly their intent in getting Delacruz the mental health treatment he desperately needed badly:

*Report of Albert Rodriguez*                          28

1) After arriving back at hospital, Delacruz stated he was thirsty; Officer Cater provided Delacruz with some ice water for the purpose of attempting to develop rapport and trust, with the ultimate goal of convincing Delacruz to get mental health treatment

2) Officer Cherry provided the Emergency Mental Commitment documents to the hospital staff in attempt to get Delacruz treated

3) Officer Cherry sat with Delacruz as the hospital personnel began to complete the necessary procedures for admitting Delacruz for mental health treatment

4) Officer Cherry noticed that Delacruz appeared restless and would not sit down as they waited in the emergency room; Officer Cherry believed Delacruz was mentally on edge and attempted to get Delacruz to relax by asking him several times if there was anything he could get him and if he was okay

5) Officer Cherry spoke to the emergency room personnel about Delacruz' condition based on what he had personally observed, and the information provided by Delacruz' family reference Delacruz' recent life threatening actions all with the intent of getting him the mental health treatment he needed

6) Officer Cherry asked the medical staff to help Delacruz in any manner possible and the hospital staff continued to inform Officer Cherry there was nothing they could do unless Delacruz consented to a blood draw and vital examinations

7) Officer Cherry believed Delacruz could not be released on his own due to his mental instability and Delacruz' family did not want him released, more specifically they wanted him to get medical treatment;

8) Officer Cherry was concerned for Delacruz' safety and knew he needed urgent mental health treatment, therefore he called Lieutenant Rowe to his location in attempt to figure out what could be done to get Delacruz the mental health treatment needed

9) Lieutenant Rowe upon arriving spoke to Mr. Burch and Delacruz' brother; Delacruz' father was also present; Delacruz' family informed Lieutenant Rowe of their concern for Delacruz' safety and wanted him to be admitted to the hospital for mental health treatment

10) Lieutenant Rowe asked to speak with the charge nurse and was met by Michelle Johnson, the house supervisor and Nancy Hester with the "sprint team;" they explained that Delacruz would not allow anyone to touch him and without his consent, he could not be admitted

11) Officer Cherry continued to sit with Delacruz in Emergency Room #19

*Report of Albert Rodriguez*                29

12) Officer Cherry got Delacruz a soft drink and because Delacruz was handcuffed with hands to the back, Officer Cherry informed Delacruz that he was going to change the handcuffs to front so that it would be easier for him to drink the cold drink; Officer Cherry changed the handcuffs to the front without incident; all this done in attempting to get Delacruz to cooperate with medical treatment he needed

13) After lengthy discussions with the hospital staff, Lieutenant Rowe, Ms. Johnson, and Delacruz' father went inside Room #19 to speak with Delacruz about complying with the medical staff so that he could be treated, however Delacruz continued to refuse the blood draw; Delacruz' brother while standing on the doorway spoke to Delacruz in Spanish to no avail

14) At one point, Delacruz' father sat next to Delacruz and grabbed Delacruz' right arm and held it out and motioned for the nurse to do the blood draw; Delacruz pulled his arm away from his father's grip; Lieutenant Rowe asked Delacruz' father to leave the room so that they could try and calm Delacruz back down believing Delacruz was upset at his father

15) At one point, the hospital staff stated that if Delacruz would put on a hospital gown, he would be admitted and held for 48 hours observation period and Delacruz agreed to put on the hospital gown; Officer Cherry removed the handcuffs so that Delacruz could put on the gown.

16) Nurses Anna Platero and Michelle Johnson placed Delacruz in a yellow hospital gown over the clothes Delacruz was wearing; Nurses Platero and Johnson were able to talk Delacruz into taking off his shirt and shoes, however he refused to take off his shorts.  The medical staff pled with Delacruz to take his shorts off and he refused.  Lieutenant Rowe continued to talk to Delacruz in an attempt to explain that he would have to remove his shorts before he could receive treatment

17) Officer Cherry suspected that Delacruz was shy and/or embarrassed to remove his shorts with females in the room, closed the curtains for Delacruz' privacy, and Nurses Platero and Johnson left the room

85. The aforementioned list again emphasizes the reasonableness of the Defendant Officers' efforts and the fact they were focused in obtaining the mental health treatment that Delacruz urgently needed. Furthermore, the Defendant Officers' actions demonstrate their good faith efforts in preventing Delacruz from continuing to inflict serious bodily injury to himself by delaying the mental health treatment he desperately needed. The above listed information highlights the Defendant Officers'

*Report of Albert Rodriguez*                                                30

intentions of helping Delacruz obtain medical treatment as requested by his family.  There is nothing that indicates the Defendant Officers intended to cause any harm to Delacruz, rather the overwhelming information available validates the appropriateness of their actions.  Any reasonable law enforcement officer could have taken the same or similar actions, as did the Defendant Officers, when presented with the same or similar circumstances.

86.  It was obvious to Lieutenant Rowe and Officer Cherry that Delacruz was suffering from some type of serious mental disorder and needed to be treated for his own safety and well-being. Furthermore, Officer Cherry and Lieutenant Rowe believed Delacruz was not mentally capable of making a rational decision.  Nurse Ana Buller also believed the same pursuant to her deposition testimony (pg. 67).  Officers are instructed that when an injured/ill person cannot express his/her wishes, there is an assumption that they would ask for help, if they could.  Consent is also implied for persons who speak a language the officer and/or medical attendant do not understand.  Expressed consent must come from adults who are not impaired in any manner such as intoxication, being developmentally disabled, confused, or under aged.  With implied consent the assumption is that the injured/ill or mentally unbalanced person or their legal guardians would ask for help, if they were able to do so.

87.  Any reasonable law enforcement officer could have reasonably believed that because of Delacruz' mental status, he was unable to express his desire for medical treatment, therefore implied consent existed.  Furthermore, any reasonable law enforcement officer could have also believed that Delacruz' family, as guardians, were consenting for Delacruz to be treated.  There is not one shred of information available that indicates the Delacruz family did not want Delacruz to be treated.  To the contrary, the evidence clearly indicates the Delacruz family consented and so desperately wanted Delacruz to be treated to the extent that Delacruz' father at one point physically grabbed Delacruz' arm in attempt to force him to allow the medical staff to draw blood.

88.  Law enforcement officers are trained on the phenomena known as Excited Delirium, now referred to by law enforcement as Agitated Chaotic Event; the Plaintiffs' refer to Excited Delirium in their complaint.  A person experiencing Excited Delirium may initially present similar to a crisis intervention situation, like that here.  Law enforcement officers are trained to understand that an Agitated Chaotic Event is always a medical emergency, whereas the typical crisis intervention may or may not require medical treatment.  In this case, there is no dispute that Delacruz needed urgent mental health treatment.  Any reasonable law enforcement officer could have reasonably believed that Delacruz was seriously ill.  Pursuant to law enforcement training, an Agitated Chaotic Event may be caused by an overdose of drugs, mental illness, drug withdrawal, etcetera.  Due to an increased risk of the patient

dying, if not treated, when an Agitated Chaotic Event is suspected time is no longer on the person's side. Officers are trained that someone experiencing an Agitated Chaotic Event urgent medical intervention is needed.

89.   In this case, Lieutenant Rowe and Officer Cherry noticed the immediate need to have Delacruz medically treated to avoid further deterioration of his mental crisis.  After the nurses left the room, Lieutenant Rowe and Officer Cherry verbally attempted to help Delacruz get his shorts off. Delacruz refused to cooperate with the Lieutenant Rowe's suggestions and at one point backed against the wall of the room and took what appeared to be a defensive posture.  Lieutenant Rowe moved toward Delacruz while continuing to talk to him in a calm tone.  Delacruz grabbed Lieutenant Rowe's left wrist with his right hand and pushed him backwards.  Delacruz was standing with his back to the wall and Lieutenant Rowe placed his arm against Delacruz' right shoulder in an attempt to keep Delacruz from struggling.  Officer Cherry grabbed Delacruz' left arm and tried to keep him against the wall and calm him down.  At one point, Delacruz swung his right elbow towards Lieutenant Rowe and struck him in the head.  Lieutenant Rowe and Officer Cherry continued to ask Delacruz to calm down in a normal tone of voice.  Delacruz continued to resist Lieutenant Rowe and Officer Cherry's efforts to control and calm him down for several minutes.

90.   The information available revealed that Lieutenant Rowe and Officer Cherry continued their verbal efforts in attempting to convince Delacruz to cooperate.  Any reasonable law enforcement officer armed with the information regarding Delacruz' suicidal attempt and related information could have believed Delacruz' mental status was deteriorating and there was a need of immediate physical control to avoid injury to Delacruz and anyone in the area.

91.   Lieutenant Rowe and Officer Cherry used the lowest level of physical control an officer has available when encountering resistance, an assault, or attempting to arrest a combative suspect (refer to paragraph #73.)  Delacruz struck Lieutenant Rowe in the head with his elbow, however Lieutenant Rowe did not believe it was intentional.  Lieutenant Rowe and Officer Cherry continued to use the lowest level of physical control, Weaponless Strategies along with verbal communication, in attempt to get Delacruz under control and get him medically treated.  It is true that Lieutenant Rowe and Officer Cherry could have backed away and even left, however that was not going to benefit Delacruz' mental status and get him the medical treatment needed.

92.   Delacruz was able to free his left arm from Officer Cherry's grasp.  Officer Cherry attempted to regain control of Delacruz's left arm and then observed that Delacruz had a canister of department issued pepper spray pointed directly at Lieutenant Rowe's face and was trying to get his thumb under

the safety cap to discharge the pepper spray.  Officer Cherry verbalized a warning to Lieutenant Rowe reference the pepper spray.  Lieutenant Rowe observed Delacruz point the pepper spray canister in his direction.

93. Any reasonable and well-trained law enforcement officer could have reasonably believed that Delacruz taking Officer Cherry's pepper spray presented a serious threat of bodily harm.  A well-trained law enforcement officer could have believed that if Delacruz managed to deploy the pepper spray, they would not be able to defend themselves because of the blindness and respiratory duress the pepper spray simulates.  Lieutenant Rowe and Officer Cherry did not resort to any higher degree of force, rather they continued to utilize Weaponless Strategies by wrestling the pepper spray canister out Delacruz's hand and subsequently throwing the canister to the other side of the room and out of Delacruz' reach.

94. Lieutenant Rowe and/or Officer Cherry, pursuant to law enforcement training, could have used a higher degree of force such as a baton to strike Delacruz's hand in attempting to have him drop the pepper spray, punched and kicked him in attempting to stun him enough to prevent him from deploying the pepper spray, or even resorting to the use of deadly force.  Lieutenant Rowe and Officer Cherry continuing to deploy Weaponless Strategies instead of increasing the degree of force demonstrates the reasonableness of their actions and the fact that their intentions were not to cause Delacruz any harm.  Lieutenant Rowe and Officer Cherry exhibited a tremendous amount of restraint in light of an extremely dangerous situation.  Delacruz deploying the pepper spray at Lieutenant Rowe and Officer Cherry allowed him to possibly disarm them of firearms, physically beat them in light of Delacruz's size and Olympic Boxer experience, or obtain an item, such as scalpel, from the emergency room and use it as a weapon.  Lieutenant Rowe and Officer Cherry did not escalate their use of force in light of the life threatening situation created by Delacruz, rather they continued to merely use Weaponless Control and Officer Cherry drive stunning him with the Taser.  Again, there is no factual evidence that indicates that any of the Defendant Officers wanted to cause Delacruz any harm.

95. After Officer Cherry threw the can to the other side of the room and out of Delacruz' reach, Lieutenant Rowe informed Delacruz that he was under arrest and to settle down.  Delacruz would not allow words and/or the Weaponless Control to be effective in the attempted de-escalation.  Delacruz continued to resist as the officers attempted to place his hands behind his back for handcuffing.  Delacruz' actions were in violation of Texas Penal Code Section:

> *38.03 Resisting Arrest, Search, or Transportation, "(a) A person commits an offense if he*
> *intentionally prevents or obstructs a person he knows is a peace officer or a person*
> *actions in a peace officer's presence and at his direction from effecting an arrest,*

*search, or transportation of the actor or another by using force against the peace*
*officer or another. (b) It is no defense to prosecution under this section that the arrest*
*or search was unlawful."* Resisting Arrest is a Class A misdemeanor.

96. At one point during the struggle, Officer Cherry turned around as Delacruz lunged toward him and wrapped his left hand along the right side of his waist. Delacruz grabbed Officer Cherry's handgun from the holster and had it halfway pulled out. Lieutenant Rowe heard Officer Cherry state something to the effect, "*watch it! Damit he is trying to get my gun.*" Lieutenant Rowe saw Delacruz' left hand on Officer Cherry's right side where the gun and gun holster are located. Lieutenant Rowe stepped back to draw his handgun.

97. Any reasonable and well-trained law enforcement officer could have believed that Delacruz having Officer Cherry's handgun halfway out of the holster and in the process of obtaining full possession comprised a life-threatening situation. Lieutenant Rowe could have resorted to the use of deadly force against Delacruz as confirmed by the Plaintiffs' Expert. Mr. Noble in his report states, (pg. 24, paragraph #30), "*Whether or not the suspect poses an immediate threat to the safety of the officer or others is the most important of the Graham factors. There must be object factors to justify an immediate threat, as a simple statement by an officer that he fears for his safety or the safety of others is insufficient. There is no requirement that a police officer wait until a suspect shoots to confirm that serious threat of harm exists, but merely a subjective fear or a hunch will not justify the use of force by police.*" Delacruz having Officer Cherry's handgun halfway out and almost in full possession would be an objective fact to justify an immediate threat as stated by Mr. Noble. Furthermore, it is true that officers are trained to understand there is no requirement to wait until they are shot at or an officer gets disarmed of his firearm before deploying self-defense measures. Lieutenant Rowe and Officer Cherry, pursuant to law enforcement training, were justified in using deadly force to keep Delacruz from disarming Officer Cherry and escalating the threat he presented.

98. Lieutenant Rowe did not resort to the use of deadly force. Again, Lieutenant Rowe demonstrated a tremendous amount of restraint in the dangerous and rapidly evolving situation presented by Delacruz. Officer Cherry managed to push down on his handgun with both hands and kept the handgun in the holster. Officer Cherry made a twisting motion with his body and was able to break Delacruz' grip on the handgun. Officer Cherry could have resorted to striking Delacruz in the throat area or even gouging Delacruz' eyes in attempting to keep Delacruz from accessing his handgun. Officer Cherry did not resort to those deadly tactics, rather he again resorted to the use of Weaponless Control or physical strength to counter Delacruz' life threatening actions.

*Report of Albert Rodriguez*                                                34

99. Delacruz' actions in taking Officer Cherry's pepper spray and attempting to take his handgun were in violation of Texas Penal Code Section 38.14, Taking or Attempting to Take Weapon from Peace Officer, Federal Special Investigator, Employee or Official of Correctional Facility, Parole Officer, Community Supervision and Corrections Department Officer, or Commissioned Security Office:

> "(b) A person commits an offense if the person intentionally or knowingly and with force takes or attempts to take from a peace officer, federal investigator, employee or official of correctional facility, parole officer, community supervision and corrections department officer, or commissioned security officer the officer's, investigator's, employee's or official's firearm, nightstick, stun gun, or personal protection chemical dispensing device with the intention of harming the officer, investigator, employee, or official or third person."

100. Delacruz taking Officer Cherry's pepper spray was a third degree Felony and his attempt to take Officer Cherry's handgun was a State Jail Felony.   After Delacruz committed those particular offenses, he positioned himself with his back against the wall with both hands up, clenched fists, and was in a boxing/fighting stance after Officer Cherry disengaged from him.   Delacruz then punched at Lieutenant Rowe's face at least two times with a closed fist.   Lieutenant Rowe was able to redirect the punches to where the punches were not direct hits on his face.   Lieutenant Rowe and Officer Cherry were concerned for everyone's safety and believed Delacruz had the ability to seriously injure them or others.   Delacruz punching Lieutenant Rowe constituted the offense of Assault of a Peace Officer, a felony offense.

101. Lieutenant Rowe in defending himself from Delacruz' assault responded by throwing closed fist punches at Delacruz, which Officer Cherry believed the punches might have struck Delacruz in the right temple area.   The punches seemed to have no effect on Delacruz.   Lieutenant Rowe's defensive measures were in accordance with Texas Penal Code 9.31 (paragraph #62).   There is nothing that requires law enforcement officers to compromise their safety, or the safety of others, because a person in question is emotionally disturbed.   Officers are, instead, trained that mentally ill people have injured many officers and others, many without any rational basis for their aggression.   Most, if not all rational law enforcement officers could have and would have believed that following the prescribed training on Texas Penal Code 9.31, as did Lieutenant Rowe and Officer Cherry, would not and did not violate any established right or law enforcement procedure.   There is nothing that requires an officer to surrender their right to self-defense.

*Report of Albert Rodriguez*                                        35

102. Plaintiffs' expert, Mr. Noble in his report (pg. 27; paragraph #34), stated, *"There was no legitimate law enforcement objective in the attempted removal of Mr. Delacruz's belt/or pants."* It is incredulous that Mr. Noble would not understand that the objective of removing Delacruz's pants was to get him the medical help he badly needed, thus preventing Delacruz from continuing to cause serious bodily injury to himself by delaying and/or not getting the mental health treatment. Officer Cherry and Lieutenant Rowe's actions in that regard were performed based on the perception of Delacruz needing immediate mental health treatment for his own safety and health and the only way he was going to receive the treatment was for him to have his shorts removed. Officer Cherry and Lieutenant Rowe's actions in that respect were in accordance with Texas Penal Code Section 9.34, *"(a) A person is justified in using force, but not deadly force, against another when and to the degree he reasonably believes the force is immediately necessary to prevent another from committing suicide or inflicting serious bodily injury to himself."*

103. Law enforcement officers understand that persons experiencing a mental crisis, in some instances, their condition deteriorates with time, if not provided with medical treatment. Any reasonable and well-trained law enforcement officer could have reasonably believed, as did Lieutenant Rowe and Officer Cherry, that Delacruz needed immediate medical attention and that without it he would continue to present a threat to himself. In addition, any reasonable and well-trained law enforcement officer could have reasonably believed that Delacruz' actions or inactions were consistent with him inflicting serious bodily injury to himself by delaying or not receiving medical treatment he desperately needed.

104. Officer Cherry knew there was an urgent need to get Delacruz restrained for his safety and the safety of all persons in the area. Officer Cherry in self-defense and the defense of others threw a punch at Delacruz impacting the left back portion of his head. The punch seemed to have no impact on Delacruz. Delacruz continued to ignore and not comply with the officers' commands to calm down and stop resisting. Officer Cherry's defensive measures were in compliance with Texas Penal Code Sections 9.31 and 9.33. The objective of Officer Cherry's use of force was to defend himself and others in the immediate area, however Delacruz did not allow Verbal Commands and Weaponless Control Strategies utilized by Officer Cherry to be effective. Officer Cherry defensively punching at Delacruz was the use of Weaponless Control and to reiterate, Weaponless Control is the lowest level of physical control an officer has available for self-defense and to effectuate an arrest.

105. Officer Cherry accessed his handcuffs from the handcuff case. Delacruz grabbed Officer Cherry's handcuffs, pulled them away from him, and at one point threw them across the room. At the point in time that Delacruz had the handcuffs in his possession, he presented a threat of serious bodily

injury.  The handcuffs have been used countless times as a weapon, which have resulted in serious bodily injury.  Again, Officer Cherry and Lieutenant Rowe did not resort to the use of deadly force, even though Delacruz presented a threat of serious bodily injury.

106. Lieutenant Rowe and Officer Cherry tried to get Delacruz down to the floor in attempting to control and restrain him, but because of Delacruz' size and strength it was extremely difficult to accomplish, however they did eventually manage to get him down to the floor.  Delacruz was on his back on the floor of the examination room between a large glass door and examination bed.  The room was very small not allowing enough space for the officers to deploy any type of effective restraining technique.  My visit to the incident site revealed the room measured approximately 12 feet by 12 feet.

107. The struggle with Delacruz had been ongoing for several minutes and Lieutenant Rowe and Officer Cherry were getting fatigued and breathing heavily.  Officer Cherry unholstered his Taser and drive stunned Delacruz in the abdomen to the right of and slightly distal to the umbilicus in attempt to get him to stop resisting and get him restrained.  It is important to note that the probes of the Taser are not projected in the drive stun mode.  In summary, the drive stun mode consists of placing the front of the Taser to the person's body, which emits a short burst of electricity designed to distract a combative suspect.  The data on the Taser used by Officer Cherry was downloaded and indicated that the Taser was deployed for a mere seven (7) seconds in the drive stun mode.

108. The Taser had no effect on Delacruz and he continued his combativeness and resistance.  Delacruz began to thrash himself out of the examination room while on the floor.  At one point, during the struggle Lieutenant Rowe instructed Officer Cherry to radio for more officers.  Lieutenant Rowe and Officer Cherry recognized they needed more space and personnel to control Delacruz and they grabbed him by his hands and pulled him out of the room and onto the hallway.  Delacruz was still on his back and on the floor and continued to disregard the officers' instructions.  A hospital security guard arrived and assisted Lieutenant Rowe and Officer Cherry in attempting to control Delacruz for handcuffing.  The three (3) officers were not enough to control Delacruz.

109. Officers Harper, Cater, and Sergeant Meaux arrived and assisted.  Once Delacruz continued to resist and attempt to get up.  Lieutenant Rowe recognized there were other patients in the immediate area and believed that controlling and restraining Delacruz was immediately necessary.  Lieutenant Rowe managed to place a headlock on Delacruz to keep him from getting up while the hospital security guard was attempting to control Delacruz' legs.  Officer Harper commenced to assist Officer Cherry in attempting to get Delacruz' right arm.  Due to Delacruz' size and position of his right hand, Officers Cater and Sergeant Meaux linked several sets of handcuffs together to accomplish the handcuffing

*Report of Albert Rodriguez*

technique.  Delacruz left hand was behind his back and his right arm was over in the right shoulder area.
The struggle with Delacruz throughout the handcuffing procedure lasted for over twenty (20) minutes.

110.  There is no evidence available to indicate any of the officers kicked, struck Delacruz with a
baton, pepper sprayed him, shot him, and/or physically abused Delacruz as they attempted to restraint
him and no one reported such.  Officers Harper and Cater, and Sergeant Meaux's use of force consisted
merely assisting in controlling and handcuffing Delacruz by using physical strength; there is no
objective evidence to the contrary.  Officers Harper and Cater and Sergeant Meaux assisting in
restraining and handcuffing Delacruz was objectively reasonable and consistent with the actions of a
well-trained and reasonable law enforcement officer.  There is no question that Delacruz was combative
and resisting at the point in time Officers Harper and Cater, Sergeant Meaux arrived at the scene to
assist.  No reasonable law enforcement officer would have just stood around and not assisted in
controlling and restraining Delacruz.

111.  Nowhere in Mr. Noble's report does he opine or allege that the minimal forced used by by
Officers Harper, Cater, or Sergeant Meaux was unreasonable or excessive.  At the time Officers Harper,
Cater, and Sergeant Meaux arrived back at the hospital to assist, Delacruz was combative as verified by
Nurse Anastasia Cotton.  Nurse Cotton in the medical chart notes that Delacruz was on the floor fighting
with the officers and the hospital security guard.  She further reported that Delacruz was "*restrained by
PAPD in prone position, patient incontinent.*"  The medical chart further shows that a minute later
Delacruz was "*unresponsive, no respiratory effort*."  There is nothing to dispute that Delacruz was
combative during the handcuffing procedure and the fact any reasonable law enforcement officer could
have taken the same or similar actions as did Officers Harper, Cater, and Sergeant Meaux.

112.  Nurse Cotton's notes clearly revealed that Delacruz was combative until after he was
restrained.  To reiterate, the medical chart states, "*restrained by PAPD in prone position, patient
incontinent,*" and it further states that a minute later Delacruz was "*unresponsive, no respiratory effort.*"
Indisputably the information reveals that Delacruz became unresponsive after he was restrained by the
Defendant Officers and not while the officers were attempting to restrain him.

113.  The materials reviewed revealed that Lieutenant Rowe placed a headlock on Delacruz in the
process of attempting to control him.  A headlock is a Weaponless Control technique that involves an
officer wrapping his arm around the suspect's head for attempted control.  A headlock is not a "choke
hold" or a "neck restraint."  In my experience and pursuant to law enforcement training a "choke hold"
or a "neck restraint" causes bruising, and damage to the area of the throat therefore many agencies allow
those techniques only as a last resort.  The autopsy report unquestionably shows the lack of injury to

Delacruz' neck or throat area.  The use of the headlock was objectively reasonable in light of the totality of the circumstances including Delacruz' size, strength, and mental condition.  In many instances a person experiencing a mental crisis will exhibit a tremendous amount of strength and officers have to use restraint techniques designed for control and handcuffing.  There is no objective evidence that indicates that the technique utilized by Lieutenant Rowe caused Delacruz any injury or his death.  To reiterate, Weaponless Control (refer to paragraphs 71-75) is the lowest level of physical force an officer has available to control a combative suspect or effectuate an arrest; a headlock is categorized as a Weaponless Control technique.  Mr. Noble again does not make mention of the headlock being unreasonable or excessive.  In fact, Mr. Noble's report does not opine that any of the Defendant Officers' use of force was unreasonable or excessive, which is understandable in light of all of the minimal and reasonable force the Defendant Officers used.

114.   Law enforcement officers understand that a person suffering from an Agitated Chaotic Event should be considered dangerous and requires a different approach than the typical crisis intervention situation.   Training protocol suggest five (5) to six (6) trained first responders when attempting to control someone suffering from an Agitated Chaotic Event.  Overwhelming force is needed to keep the physical struggle as short as possible and limit the risks to the first responders as well as the patient.

115. After an extended physical struggle, Delacruz was handcuffed and the officers stopped their physical contact with Delacruz.   Lieutenant Rowe immediately instructed the officers to get Delacruz on his back and in a sitting position.  Delacruz was rolled on his back and Lieutenant Rowe noticed Delacruz was unresponsive.  Lieutenant Rowe placed his hand on Delacruz' chest and noticed he was not breathing and immediately called for doctors and hospital personnel.  Lieutenant Rowe instructed the officers to remove the handcuffs from Delacruz.  Hospital personnel arrived and began CPR.  A bed/stretcher was brought out from a nearby room and Delacruz was loaded for continued medical treatment.  A short time later, Nurse Michelle Johnson informed Lieutenant Rowe that Delacruz had passed.

**Positioning and Handcuffing of Delacruz**

116. Officers are trained to place combative suspects on the ground for control and handcuffing. Placing combative suspects on the floor provides a better opportunity for control and deployment of restraint techniques.  Placing suspects in a prone position limits their use of the legs/feet as weapons by the combative suspect and minimizes the suspect's ability to move.  In addition, the prone position restricts the suspect's ability to bite, spit, or use his head as a weapon.  Officers are trained to handcuff

suspects behind their back and place them in a prone position, which allows for the handcuffing procedure. Placing a suspect in a supine position and then trying to place his hands behind his back for handcuffing is almost impossible. I don't know of a single reasonable and well-trained law enforcement officer that would not have attempted to take Delacruz down to the floor for control and handcuffing. Mr. Noble in his report has not specifically criticized Officer Cherry and Lieutenant Rowe for taking Delacruz to the ground and/or the prone position used for handcuffing.

117. The information available revealed the Defendant Officers placed Delacruz in a prone position only long enough to get him handcuffed. Lieutenant Rowe ordered his subordinate officers to turn Delacruz over onto his back immediately after he was handcuffed. The information examined revealed Delacruz was handcuffed in a very unorthodox style, more specifically with his left hand behind his back and his right hand over his right shoulder. Officers are instructed that when dealing with a combative suspect that they are to handcuff the person in any way possible and as soon as reasonably possible. The unconventional handcuffing technique used confirms that Delacruz was continuing to be combative throughout the handcuffing procedure. The unconventional handcuffing procedure is in direct contradiction of the allegation that Delacruz was not combative and/or had stopped being combative before handcuffing. If Delacruz had not been combative at the time of handcuffing the normal two hands behind the back handcuffing procedure would have been utilized, and more so because it is easier to accomplish.

118. In my experience and training, the abrasions and contusions sustained by Delacruz are consistent with attempting to control a combative suspect on a hard tile floor. It is unrealistic not to expect the minor abrasions and contusions that Delacruz sustained upon being taken to the floor, pulled out to the hallway for control, and physically struggled for over 20 minutes during handcuffing. It is truly amazing that only minor abrasions and contusions were sustained and more so considering Delacruz' weight of approximately 300 pounds.

119. Any reasonable law enforcement officer could have reasonably believed that delaying the mental health treatment Delacruz urgently needed equated to Delacruz continuing to inflict bodily injury to himself, more so due to the fact that he had not taken his medication, had defecated on himself, not showered, and had urinated on himself. Nurse Ana Buller testified in deposition (pg. 43) that Delacruz smelled like urine, (pg. 67) needed to be admitted in the hospital on the basis of a psychiatric-related admission, and that Delacruz did not appear to be exhibiting rational thinking when dealing with him. The information examined revealed the legitimate reason for attempting to get Delacruz to take off his shorts was so that he could get medical treatment. Delacruz at the time was wearing a hospital gown

and the hospital would not treat him while wearing his shorts.  Officer Cherry and Sergeant Rowe were not attempting to convince Delacruz to take off his shorts just because the hospital required it rather it was to get him the mental health treatment he so badly needed.

120. To reemphasize, a well-trained law enforcement officer could have recognized that delaying the medical treatment amounted to Delacruz continuing to inflict bodily injury to himself.  Officer Cherry and Lieutenant Rowe's efforts in attempting to get Delacruz' shorts off were in accordance with Texas Penal Code Section 9.34, Protection of Life or Health - (a) *A person is justified in using force, but not deadly force, against another when and to the degree he reasonably believes the force is immediately necessary to prevent the other from committing suicide or inflicting serious bodily injury to himself.  (b) A person is justified in using both force and deadly force against another when and to the degree he reasonably believes the force or deadly force is immediately necessary to preserve the other's life in an emergency.*"  Officer Cherry and Lieutenant Rowe followed the training they received on the Texas Penal Code.  No reasonable law enforcement officer could have known that following the TCOLE legislative mandated training would be a violation of any clearly established right or law enforcement protocol.

121. The Defendant Officers' actions were objectively reasonable pursuant to law enforcement training on the United States Supreme Court decision in *Graham vs Connor*.  The following analysis is based on the totality of the circumstances that existed, as known by the Defendant Officers, at the time and as could reasonably be perceived by any prudent and well-trained law enforcement officer:

1) The offenses committed and being committed by Delacruz as perceived by the Defendant Officers at the time the limited force was deployed

➤ Delacruz had committed the offenses of resisting arrest, two (2) counts of Taking or Attempting to Take Weapon from Peace Officer, and Assault on a Peace Officer

2) Whether Delacruz presented a danger to himself, the officers and/or others

➤ *The indisputable information overwhelmingly revealed that Delacruz needed urgent medical attention and because of his mental instability he presented a danger to himself;* Delacruz presented a danger to the officers and others because of his suicidal history, and the offenses he committed as listed

*Report of Albert Rodriguez*                 41

    3)   Whether Delacruz was resisting or evading arrest at the time

        &#10148;   *Delacruz without question was resisting at the time*

122. The *Graham vs Connor* factors support the reasonableness of the Defendant Officers actions, pursuant to law enforcement training, and more so considering that the Defendant Officers' ultimate goal was to obtain the mental health treatment Delacruz urgently needed. The Defendant Officers' goal of obtaining mental health treatment for Delacruz was reasonable as well the use of minimal force when attempting to control Delacruz and defend themselves. Any reasonable law enforcement officer could have reasonably believed that Delacruz needed urgent mental health treatment in order to save his life.

123. Every day law enforcement officers place combative suspects in prone positions and some situations require numerous officers to control the suspects, as was the case in this situation. Furthermore, on a daily basis officers use Weaponless Strategies/Physical Strength on combative suspects, including the use of the Taser to drive stun and the suspects do not sustain serious injury nor do they die. The anomaly in this case was Delacruz' history of not taking his medication, defecating and urinating on himself, not showering, not sleeping, and exhibiting irrational behavior. The materials show that Delacruz was seriously ill and the family knew it and that is way they brought Delacruz to the hospital and pled with the Defendant Officers to help, even when knowing that that Delacruz was afraid of law enforcement personnel.

124. Again, the Defendant Officers' actions in this case were focused on accommodating the family's request for assistance and getting Delacruz the medical treatment he needed. The Defendant Officers' actions were objectively reasonable and conducted in good faith. There is nothing the Defendant Officers did in connection with Delacruz that is not done by law enforcement personnel on a daily basis. The information available revealed that Defendant Officers did not use unreasonable, unlawful, or excessive force.

**Alleged Enforcement of Hospital Requests**

125. There is no objective evidence to support the allegation of Officer Cherry and Lieutenant Rowe enforcing the Medical Center of Southeast Texas' policies and procedures. In fact, such allegation is absurd considering the fact that Officer Cherry and Lieutenant Rowe were doing everything possible, including placing themselves in danger, in attempting to keep Delacruz alive by getting him medical care. Delacruz needed urgent care because he was ill and said illness was present before Officer Cherry and Lieutenant Rowe's involvement. Any reasonable law enforcement officer could have believed Delacruz was in critical condition and could possibly die knowing that Delacruz had not eaten,

*Report of Albert Rodriguez*

not slept, not taken his medication, defecated and urinated on himself, and attempted to jump out of moving car.  Officer Cherry and Lieutenant Rowe's attempt to get him to take off his shorts for the medical personnel to treat him was not for the benefit of the hospital, rather it was intended to obtain the critical medical treatment Delacruz needed to keep him alive.

126. It belies common sense that the Defendant Officers spent in the vicinity of over three (3) hours in accommodating Delacruz' behavior and did not resort to the use of deadly force when it was reasonable to do so and then allege that the officers intended to cause Delacruz harm or that Officer Cherry and Lieutenant Rowe were merely enforcing the hospital's policies for no reason.  Officer Cherry and Lieutenant Rowe could have just left, however because of their dedication to saving lives, they wanted to assist in keeping Delacruz alive.  To reemphasize, it was the Delacruz' family that requested assistance, the officers' responded, and not once did the family and/or anyone inform the officers not to perform or stop the actions they were taking.  It is apparent that if the family believed that the officers' actions were inappropriate at the time they would have intervened, protested, or notified them of such.

127. Any reasonable law enforcement officer could have recognized, as did Officer Cherry and Lieutenant Rowe, that attempting to persuade and assist in removing Delacruz' shorts was a minimal intrusion in proportion to the urgent medical treatment he needed.  Law enforcement officers understand that the behavior of persons experiencing a mental crisis is unpredictable and can alter from one minute to next.  Officer Cherry and Lieutenant Rowe were aware of Delacruz' suicidal history, recent walking toward the traffic, irrational thoughts, and the fact that there were numerous persons in the immediate area of the emergency room.  Well-trained law enforcement officers armed with the information Officer Cherry and Lieutenant Rowe knew and perceived at the time could have recognized that timing, more specifically getting Delacruz treated as soon as possible, was essential not only for Delacruz' benefit, but also for the safety of the persons in the immediate area.

128. The materials reviewed show that Officer Cherry and Lieutenant Rowe were not enforcing any policy of the hospital rather they were just attempting to get Delacruz the mental health treatment he badly needed for his safety and those in the immediate area.  Again, it is true that Officer Cherry and Lieutenant Rowe could have just left the hospital after Delacruz was placed in the emergency room, however if Delacruz' mental condition had worsened and he would inflicted injury to himself or others, "Monday Morning Quarterbacks" would more than likely criticize the officers' decision to leave.  It is indisputable that Officer Cherry and Lieutenant Rowe's actions were all focused toward getting Delacruz medical treatment for his well-being and the safety of others.

*Report of Albert Rodriguez*                                   43

**Conclusion**

129.  There is not one shred of information that indicates that any of Delacruz' Family ever instructed, suggested, or recommended to Officer Cherry and Lieutenant Rowe not to get involved or not to assist with Delacruz.  To the contrary, the Delacruz family pleaded to the officers to assist in getting Delacruz medically treated.  There is also no information that the medical staff instructed, suggest, or recommended to Officer Cherry and Lieutenant Rowe not to assist with attempting to get Delacruz medically treated or what steps they should take in assisting.  Officer Cherry and Lieutenant Rowe were performing discretionary law enforcement functions in connection with Delacruz.  There is no training manual that outlines a step by step procedure that an officer should follow when presented with the totality of the circumstances that existed in this case.

130.  When analyzing Officers Cherry, Cater, Harper, and Sergeant Meaux, and Lieutenant Rowe's actions pursuant to law enforcement training on the United States Supreme Court decisions in *Graham v Connor* and the Texas Penal Code, the reasonableness of their actions is confirmed.  Officers Cherry, Cater, Harper, Sergeant Meaux, and Lieutenant Rowe's actions in defending the public and themselves were in compliance with accepted law enforcement training practices.  There is no accepted law enforcement officer standard that applies to the circumstances of this case, which could have reasonably put Officers Cherry, Cater, Harper, Sergeant Meaux, and Lieutenant Rowe on notice that their conduct in this matter would be deemed improper, and/or violated any clearly established law.  Likewise, from a law enforcement officer training perspective, Officers Cherry, Cater, Harper, Sergeant Meaux, and Lieutenant Rowe's actions were sound and in compliance with contemporary law enforcement training.

My opinions are based upon what I have been able to review.  I reserve the right to supplement and/or revise my opinions and conclusions should additional information be forthcoming.

My fees for work performed in connection with this case are at a rate of $175.00 per hour plus expenses and fees for deposition are at a rate of $2,600.00 per day (to be paid prior to deposition) plus travel time and expenses.

Attached is a listing of cases I testified in, by trial or deposition in the last four years.

*Albert Rodriguez*
_____
Albert Rodriguez
Date: 03/01/19