## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## BEAUMONT DIVISION

| | | |
|---|---|---|
| **OLGA DELACRUZ AND MARCO DELACRUZ, INDIVIDUALLY, AND AS REPRESENTATIVES OF THE ESTATE OF MANUEL DELACRUZ** | § § § § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | **CIVIL ACTION NO. 1:18-CV-11** |
| **v.** | § | |
| | § | |
| **CITY OF PORT ARTHUR, PORT ARTHUR POLICE DEPARTMENT, OFFICER LANE CHERRY, IN HIS INDIVIDUAL AND OFFICIAL CAPACITY, UNKNOWN OFFICERS, THE MEDICAL CENTER OF SOUTHEAST TEXAS, L.P. D/B/A THE MEDICAL CENTER OF SOUTHEAST TEXAS L.P.,** | § § § § § § § § § § | |
| | § | |
| *Defendants.* | § | |

## DECLARATION OF JEFFREY J. NOBLE
## PURSUANT TO 28 U.S.C. § 1746

| | |
|---|---|
| **STATE OF CALIFORNIA** | § |
| | § |
| **COUNTY OF ORANGE** | § |

1.     "My name is Jeffrey J. Noble. I am over the age of 21, am of sound mind, capable of making this declaration, and personally acquainted with the facts herein stated.

2.     "Attached as **Exhibit A** to this Declaration is a true and correct copy of the *Expert Report of Jeffrey J. Noble*, dated December 28, 2018, which I have prepared in connection with the above-captioned action.

3.     "Moreover, I hereby attest that the matters set forth in the enclosed **Exhibit A** are matters to which I will testify at trial in this action.

# EXHIBIT 1

4.  "I declare under penalty of perjury that the foregoing is true and correct. Executed on JUNE 6, 2019."

_____

JEFFREY J. NOBLE

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

Olga Delacruz and Marco Delacruz,       )
Individually, and as Representative      )
of the Estate of Manual Delacruz,        )
                                         )
                 Plaintiffs,             )
                                         )
        v.                               )        No. 1:18-cv-11
                                         )
City of Port Arthur, Port Arthur Police  )
Department, Officer Lane Cherry, in his  )
Individual and Official Capacity, Unknown)
Officers, The Medical Center of          )
Southeast Texas, L.P. D/B/A The Medical  )
Center of Southeast Texas, L.P.,         )
                                         )
                 Defendants.             )

## EXPERT REPORT OF JEFFREY J. NOBLE

1.   My name is Jeffrey J. Noble, and I make this report at the request of plaintiffs' counsel.

2.   I was a police officer in the City of Irvine for 28 years rising to the position of Deputy Chief of Police prior to my retirement.  I served as an interim Deputy Chief of Police at the Westminster Police Department for nine months.

     a.   I was a police officer for 28 years and retired in July 2012 as the Deputy Chief of Police with the Irvine Police Department, located in southern California.  As a Deputy Chief, I was directly responsible for all police operations including Patrol, Traffic, Criminal Investigations, Emergency Management, Crime Prevention, DARE, K9s, Training, and SWAT.  The City of Irvine encompasses over 70 square miles with a population of over 218,000.  I served in a wide range of assignments as an Officer, Senior Officer, Sergeant, Lieutenant, Commander and Deputy Chief, including Patrol, Traffic, Detective, SWAT, Training, Internal Affairs, Emergency Management and Crime Prevention.  The Irvine Police Department had over 200 police officers and over 100 civilian employees during my employment with the department.



1

b.   In April 2014, I was hired by the Westminster, California Police Department as an interim Deputy Chief of Police.  My employment with the Westminster Police Department was by means of a temporary contract, and I was asked to review the department's Internal Affairs unit; department policies relating to Internal Affairs investigations, discipline and police officer conduct; conduct department audits and inspections; and act as a liaison with a civilian oversight monitor who was hired during the same period.  My employment was at the request of the Chief of Police, was ratified by the City Council and was sought due to the arrest of a police Officer for an off-duty criminal sexual assault, the arrest of an on-duty Officer for extortion and a lawsuit filed by three Latino officers alleging discrimination and retaliation.  I concluded this interim position in January 2015. The Westminster Police Department had 87 police officers and 40 civilian employees during my temporary contracted employment.

c.   As a police supervisor and manager, I have extensive experience conducting internal administrative investigations on a wide range of issues including use of force, vehicle pursuits, officer misconduct, criminal interrogations and interviews, harassment and sexual assaults.

4.   I have a Juris Doctor degree, with honors, from Western State University College of Law and I am admitted to practice law in the State of California.  I have a Bachelor's degree in Criminal Justice with an emphasis on Administration from California State University at Long Beach.

5.   As a police consultant and expert witness, I have extensive experience on matters involving police investigative procedures, misconduct and corruption.  For example:

a.   In 2014, I was part of a Carnegie Institute of Peace Think Tank for addressing police use of force in developing countries.

b.   I have consulted with other police organizations on a wide range of police practices, procedures, including criminal and administrative investigations.  For instance, I was retained in 2004 as an expert to review and evaluate the internal investigation conducted by the San Francisco, California, Office of Community Complaints of the case widely known as "Fajitagate" involving the indictment of seven command staff members and three officers of the San Francisco Police Department.  In 2007 and again in 2009, I was retained by the City of Austin, Texas to review the police department's internal homicide and Internal Affairs investigation of two Officer involved fatal shootings.

2

c.  I have been retained as both a defense and a plaintiff's expert in over 150 cases in the states of Washington, Missouri, California, Louisiana, Ohio, Texas, New York, Oklahoma, North Carolina, South Carolina, Illinois, Georgia, Arkansas, Minnesota, Virginia, Florida, New Mexico, Tennessee, Pennsylvania, Kentucky, Idaho, Connecticut, Colorado, Arizona and New Jersey.

d.  I have testified as an expert in the states of California, Washington, Tennessee, Connecticut, Minnesota, New Mexico, and Ohio.

e.  I have testified in federal courts in Illinois, Tennessee, Georgia, South Carolina, Virginia, Pennsylvania and California.

f.  I have been retained in criminal cases involving allegations of criminal uses of force by police officers in the states of New Mexico, Delaware, Minnesota, Pennsylvania and Florida including cases involving Tamir Rice and Philandro Castile.

f.  I served as an independent policy advisor to the Large City Internal Affairs Project, which was funded by the United States Department of Justice.  This group consists of the 12 largest police agencies in the United States as well as a select group of independent policy advisors and academics.  The project was an effort to develop national best practices in internal investigations for police agencies.  I was the chair of a sub-committee whose efforts were focused on the investigation of allegations of officer misconduct.  Because of this project the COPS Office published a document entitled, "Standards and Guidelines for Internal Affairs: Recommendations from a Community of Practice."

g.  I have given presentations at the International Association of Chiefs of Police conference in 2004, 2009, 2012, and 2014; the national COPS conference on Internal Affairs issues and the Academy of Criminal Justices Sciences annual meeting on tactical reckless decision making in 2009; the American Psychological Association annual conference in 2013; and National Tactical Officers' Association annual conference in 2004.

h.  In 2013, I gave a presentation in Mexico at the request of the Mexican government on preventing corruption in police institutions.

i.  I have published 21 articles on policing which discussed the subject matters of: Internal Affairs, personnel issues, pursuits, use of force issues and investigative procedures.  Those articles are listed in my attached resume.

j.  I have published two chapters for policing textbooks on tactical recklessness and the code of silence.

3

k.    I have co-authored, along with Geoffrey Alpert, Ph.D., a textbook on police Internal Affairs investigations titled, "Managing Accountability Systems for Police Conduct: Internal Affairs and External Oversight."

l.    As evidence that the opinions in our book are accepted by other experts of police administrative investigations, my book was cited extensively in the COPS 2009 publication, "Building Trust Between the Police and the Citizens They Serve: An Internal Affairs Promising Practice Guide for Local Law Enforcement."

6.    My experience, training and background are more fully described in my attached resume.

7.    My areas of expertise in policing include, but are not limited to: police use of force; pursuits; police administration; training; police operations; police explorers; interviews and interrogations; civil rights violations and investigations; internal/administrative investigations; criminal investigations; police discipline; citizen complaints; and police policies and procedures.

8.    I reviewed the following material in making my opinions:

- Second Amended Complaint
- Amended Scheduling Order
- Medical Records (Delacruz 0001-64)
- Autopsy Reports (Delacruz 0065-81)
- Photographs (Delacruz 0082-86)
- Notice of Defendants, the City of Port Partner and Officer Lane Cherry's Initial Disclosure
- Defendants, the City of Port Arthur, Texas and Lane Cherry's Supplemental Disclosures
- Defendants, the City of Port Arthur, Texas in Lane Cherry's Initial Disclosures
- Defendant, The City of Port Arthur, Texas' Objections and Responses to Plaintiffs' Request for Production
- Defendant, The City of Port Arthur, Texas' Responses to Plaintiffs' Request for Admission
- Defendant, The City of Port Arthur, Texas' Objections and Answers to Plaintiffs' Interrogatories
- Defendant, The City of Port Arthur, Texas and Lane Cherry's Second Supplemental Disclosures
- Depositions (rough drafts)
    - Shannon Meaux
    - Lane Cherry

4

      ○    Terry Cater

      ○    Reed Rowe

   •    Nurse Notes Timeline

9.     At this point in the development of this case, I do not know whether I will be using any demonstrative aids during my testimony.  Should I decide to use any such aid, I will ensure that they are made available for review, if requested, prior to their use.

10.    My professional charges for this litigation work is an hourly fee of $295 plus expenses including all travel time.  My fees for deposition and trial testimony are $2,950 per calendar day or any portion thereof, plus travel time and expenses.

11.    The opinions that follow are made within a reasonable degree of certainty within the field of police practices based on over 30 years of professional law enforcement experience and scholarship.

## Summary of Incident

12.    On August 1, 2016 at about 4:51 PM, officers were dispatched to the Medical Center hospital to assist with a mental health detention.  Officer Cherry spoke with Mr. Delacruz's family members who told him Mr. Delacruz had attempted to jump out of a moving vehicle a day prior, had been defecating on himself, had been refusing to eat or sleep, that he was paranoid and schizophrenic, and that he was not taking his medications.  The family said they brought Mr. Delacruz to the hospital for mental health treatment, but he was uncooperative and walked away from the hospital.  The family pointed out Mr. Delacruz who was still nearby the hospital.

13.    Officer Cherry said he, along with Officers Green and Cater, were able to handcuff Mr. Delacruz with minimal resistance. Mr. Delacruz refused to get into a patrol car, so the officers walked with him back to the emergency room.

14.    At the hospital, Officer Cherry completed the mental health commitment application form, formally titled "Application to Facility for Emergency Detention Without a Warrant and Acceptance for Preliminary Examination" at 5:15 p.m. and provided the detention application to hospital staff.

15.    Mr. Delacruz did not allow a blood draw or the staff to take his vital signs.  Hospital staff told Officer Cherry if Mr. Delacruz would not cooperate, they would not be able to admit him for treatment.  Officer Cherry contacted his supervisor, Sergeant Rowe, for assistance and Sergeant Rowe responded to the hospital.

16.    Eventually hospital staff relented and said they would admit Mr. Delacruz if he would put on a hospital gown. Officer Cherry removed the handcuffs on Mr. Delacruz. At this

5

point, it was Officer Cherry's understanding that Mr. Delacruz was not under arrest or being detained by officers any longer.  Mr. Delacruz voluntarily put on the gown but refused to remove his belt and short pants.  The hospital refused to admit Mr. Delacruz while he was wearing pants. The room was then cleared of all personnel except Sergeant Rowe, Officer Cherry and Mr. Delacruz. The door to the room was shut, and the curtains were drawn preventing view into the room. The officers, in attempt to placate the hospital and secure Mr. Delacruz's admission, approached and grabbed Mr. Delacruz to force him to remove his belt and pants. Mr. Delacruz pushed Sergeant Rowe away. When reengaged by Sergeant Rowe, a struggle ensued between Sergeant Rowe, Officer Cherry and Mr. Delacruz.

17.   A fight between the officers and Mr. Delacruz lasted several minutes until the officers with the aid of a security guard and additional police officers were able to handcuff Mr. Delacruz while he was prone on the floor.  After being handcuffed and while on his chest, Mr. Delacruz became unresponsive and later died in the emergency room.

### Background

18.   Officer Lane Cherry

    a.   Written Report

        1.)   Officer Cherry said he was dispatched to the hospital on a report of a family disturbance.  Officer Cherry said it was reported that Mr. Delacruz suffered from paranoia and schizophrenia and his family was attempting to get him treatment for his mental health problems, however Mr. Delacruz was refusing to seek any treatment.  Family members were at the Medical Center Emergency Room, but Mr. Delacruz was refusing to enter the Emergency Room.

        2.)   Officer Cherry said he was in uniform, driving a marked police vehicle, and when he arrived, he spoke with family members of Mr. Delacruz. The family members identified Mr. Delacruz who was walking away from the hospital and told him that Mr. Delacruz had attempted to jump out of their vehicle as they were traveling down the interstate at approximately 80 mph the previous day.  Officer Cherry said family members also told him that Mr. Delacruz had been defecating on himself, refusing to eat or shower, refusing to take his medication, and had not slept in approximately five days.

        3.)   Officer Cherry said after speaking with the family, that he believed it was clear that Mr. Delacruz was a danger to himself or others and needed to have an emergency committal issued, so Mr. Delacruz could receive the

needed medical treatment for his mental health problems.[1]

4.)  Officer Cherry said he was told by one of the family members that Mr. Delacruz was afraid of the police.

5.)  Officer Cherry said Mr. Delacruz's brother-in-law, Chuck Burch, told him that Mr. Delacruz had been a Olympic boxer when he was younger and that he is fine when he takes his medication, but he refused to take his medication for a few days.[2]

6.)  Officer Cherry said he entered his police vehicle to catch up to Mr. Delacruz and contacted Mr. Delacruz who was walking eastbound in the westbound lane of Port Plaza Drive next to the curb.  Officer Cherry said he told Mr. Delacruz his family was concerned about him because he was off his medication and had attempted to leap from a moving vehicle the day before, but Mr. Delacruz denied those statements and repeatedly said he did not want to go to the Emergency Room.  Officer Cherry said he followed Mr. Delacruz as he walked into the Marriott Hotel parking lot while waiting for additional officers to arrive.  During that time, Mr. Delacruz said something to the effect of getting raped.[3]

7.)  Officer Cherry said when Officers Green and Cater arrived they placed Mr. Delacruz into handcuffs.  Officer Cherry said Mr. Delacruz initially resisted and said there was a "minimal struggle."

8.)  Officer Cherry said Mr. Delacruz resisted going in the backseat of the patrol car, but because they were close to the hospital they simply walked Mr. Delacruz to the Emergency Room.

9.)  Officer Cherry said he completed the mental health commitment paperwork and gave the paperwork to the nurse as the hospital began completing the necessary steps to admit Mr. Delacruz.  Officer Cherry said Mr. Delacruz asked for something to drink and he changed his handcuffs, so he was handcuffed in front of his body to make it easier for him to drink.

10.)  Officer Cherry said Mr. Delacruz protested having his blood drawn and did not allow hospital staff to obtain his vital signs.  Nurse Cotton told Mr. Delacruz the hospital would not be able to offer any treatment unless he cooperated.  Officer Cherry said Mr. Delacruz "clearly was not in his right

---

[1] COPA 00002-3.
[2] COPA 0004.
[3] COPA 0003.

mind and could not make any rational decisions about his well-being."

11.)   Officer Cherry said Mr. Delacruz's family was frightened that if Mr.
Delacruz did not receive immediate treatment for his mental health
issues that he would hurt himself. Officer Cherry said he spoke with the
Emergency Room staff and was told there was nothing they could do
unless Mr. Delacruz agreed to a blood draw and check of his vital signs.[4]
Officer Cherry said he was very concerned, so he contacted Sergeant
Rowe who responded to the hospital.  The hospital staff told Sergeant
Rowe they could not treat Mr. Delacruz without his cooperation.

12.)   Eventually, the hospital staff stated if Mr. Delacruz would put on a
hospital gown, he would be admitted and held for 48 hours for
observation. Officer Cherry said he removed the handcuffs, so Mr.
Delacruz could put on the gown.[5]  Mr. Delacruz removed all his clothes,
but he refused to remove his shorts.  Officer Cherry said he asked the
hospital staff to leave the room as he believed Mr. Delacruz may be
embarrassed to remove his shorts with females present.  Officer Cherry
said he and Sergeant Rowe tried to explain to Mr. Delacruz that he would
have to remove his shorts to get treatment, but Mr. Delacruz continued
to refuse and backed against the wall of the room taking a defensive
position.

13.)   Officer Cherry said Sergeant Rowe spoke to Mr. Delacruz in a calm tone
and as Sergeant Rowe got close to Mr. Delacruz, Mr. Delacruz grabbed
Sergeant Rowe's left wrist with his right hand and pushed Sergeant Rowe
backwards. Officer Cherry said he grabbed Mr. Delacruz's left arm and
tried to keep Mr. Delacruz against the wall.  Due to Mr. Delacruz's size
and strength, Mr. Delacruz was able to free his left arm and Officer
Cherry said as he attempted to regain control of Mr. Delacruz's left arm,
he saw Mr. Delacruz had a can of mace pointed at Sergeant Rowe's face.
Officer Cherry said something to Sergeant Rowe, and he was able to
wrestle the can of mace away from Mr. Delacruz.

14.)   Sergeant Rowe told Mr. Delacruz he was under arrest, but Mr. Delacruz
continued to resist.  Officer Cherry said Mr. Delacruz lunged toward him
and wrapped his left hand along the right side of his waist.  Mr. Delacruz
then grabbed onto his firearm which was in his holster and he yelled to
Sergeant Rowe, "He's going for my gun, he's going for my gun."

15.)   Officer Cherry said Mr. Delacruz threw at least two closed fist punches at

---

[4] COPA 0005.
[5] COPA 0006.

Sergeant Rowe's face and made contact to his right temple area.  Officer Cherry said because Mr. Delacruz had grabbed his mace, attempted to take control of his gun, his continuing to struggle, and his aggressive boxing type stance, he was concerned for his safety.[6]

16.)   Officer Cherry said Sergeant Rowe punched Mr. Delacruz on his right temple area, but the punch had no effect.  Officer Cherry said he punched Mr. Delacruz on the left back portion of his head, but his punch had no effect.  Officer Cherry said he took a pair of handcuffs from his gun belt and Mr. Delacruz grabbed the cuffs from his hand and threw them across the room.  Officer Cherry said throughout the struggle both he and Sergeant Rowe were giving Mr. Delacruz commands to put his hands behind his back and quit resisting.

17.)   Officer Cherry said after the struggle had been going on for several minutes, he drew his Taser, removed the cartridge because he was so close, and applied a drive stun to Mr. Delacruz.  Officer Cherry said he deployed the Taser for approximately five seconds and Mr. Delacruz gave an indication that he was going to comply.  Officer Cherry said as soon as he removed the Taser, Mr. Delacruz began to struggle and resist.

18.)   Officer Cherry said they were able to drag Mr. Delacruz into the hallway and shortly after, a security guard and Officers Meaux, Cater and Harper arrived and they were able to handcuff Mr. Delacruz.[7]

19.)   After Mr. Delacruz was handcuffed, Officer Cherry said he noticed Mr. Delacruz breathing heavily, so they tried to sit him up.  Medical staff arrived and began checking on Mr. Delacruz and the handcuffs were removed.[8]

b.   Application to Facility for Emergency Detention Without a Warrant and Acceptance for Preliminary Examination

1.)   Officer Cherry completed the application for Emergency Detention of Mr. Delacruz because he believed Mr. Delacruz evidenced a risk of serious harm to himself as he attempted to jump out of a vehicle while traveling at 80 miles per hour.

2.)   Officer Cherry based his determination on statements from Ruth

---

[6] COPA 0007.
[7] COPA0008.
[8] COPA 0009.

9

Delacruz, Mr. Delacruz's sister.

3.) The Emergency Detention order was executed on August 1, 2016 at 5:15 PM.[9]

c.    Deposition (rough draft)

1.) Officer Cherry said it was common to deal with individuals with mental disorders.[10]  Officer Cherry said it was fairly common to make a mental health detention, complete the mental health form, and take the mental health detainee to one of two facilities, Baptist Behavioral or Medical Center Hospital.[11]

2.) Officer Cherry said it is generally a pretty straight forward transaction where the officer would hand off the paperwork and the hospital would take custody of the detainee in 15 to 20 minutes.[12]

3.) Officer Cherry said the handoff was not quick in the Delacruz matter, instead when he arrived at the hospital, he was told they would not accept Mr. Delacruz unless Mr. Delacruz consented to a blood draw, EKG and a gamut of medical procedures.[13]  Officer Cherry said he was not personally aware of Medical Center Hospital taking that stance in any circumstance other than with Mr. Delacruz.[14]

4.) Officer Cherry said he had taken 50-100 mental health detainees to Medical Center Hospital in the past.[15]

5.) Officer Cherry said Mr. Delacruz's sister told him that Mr. Delacruz had attempted to jump out of their truck, he was not eating or sleeping and she believed he was paranoid and schizophrenic.[16]  Officer Cherry said when he spoke with Mr. Delacruz it was clear he was having a mental issue and he was a danger to himself and others.  Mr. Delacruz made statements to him that he felt Officer Cherry was a demon and was there to sexually assault him.[17]  Officer Cherry said Mr. Delacruz never told him

---

[9] Delacruz 0002.
[10] Cherry deposition at 9.
[11] Cherry deposition at 17-18.
[12] Cherry deposition at 19-20.
[13] Cherry deposition at 20-21.
[14] Cherry deposition at 21.
[15] Cherry deposition at 21.
[16] Cherry deposition at 23
[17] Cherry deposition at 24.

nor did his body language reflect that he no longer had those fears, or that those fears subsided.[18]

6.) Officer Cherry said he did not believe Mr. Delacruz could think clearly or make rational decisions on his own behalf.[19]

7.) Officer Cherry said any time the police can take someone into custody without having to struggle with them it is better for everyone involved.[20]

8.) Officer Cherry said once at the hospital he completed the necessary emergency committal paperwork and handed the paperwork to the nurses.[21]

9.) Officer Cherry said he waited for a long period of time for the hospital to accept Mr. Delacruz. Officer Cherry said the hospital told him they could not accept Mr. Delacruz without his consenting to medical treatment, so he called a supervisor because he believed if Mr. Delacruz was released, and the police had left, that Mr. Delacruz was obviously a danger to himself and others.[22]

10.) Officer Cherry said he is legally bound to ensure a mental health detainee receives the treatment that they need and he considers it a department policy to take the actions necessary to make sure that the patient, even when refusing care, receives treatment.[23]

11.) Officer Cherry said he believes Chief Dunlap would agree with his explanation of the Department's procedure with regard to mental health detainees who are refusing care.[24]

12.) Officer Cherry said it was his goal, along with policy of PAPD, to get Mr. Delacruz accepted for treatment.[25]

13.) Officer Cherry said he was told the hospital required Mr. Delacruz to be in a gown before they would accept him. Officer Cherry said Mr. Delacruz

---

[18] Cherry deposition at 36.
[19] Cherry deposition at 26.
[20] Cherry deposition at 32.
[21] Cherry deposition at 33.
[22] Cherry deposition at 45.
[23] Cherry deposition at 46-47.
[24] Cherry deposition at 47.
[25] Cherry deposition at 55.

11

put on a gown, but he was wearing some clothes under the gown.[26] Officer Cherry said he had already removed the handcuffs and was getting ready to leave when someone told Sergeant Rowe they could not accept Mr. Delacruz with the belt he was wearing.[27]  Officer Cherry said when he took the handcuffs off, he believed the custody of Mr. Delacruz had been transferred to the hospital. Officer Cherry stated that Mr. Delacruz was not under arrest at this point. [28] Officer Cherry stated that Mr. Delacruz was not being detained by law enforcement at this point. [29] The hospital staff then requested additional steps be taken prior to Mr. Delacruz's acceptance by them.[30]

14.)   Officer Cherry said he and Sergeant Rowe went into the room to try to remove Mr. Delacruz's belt.[31]  Officer Cherry said he assumed that Sergeant Rowe decided the belt could be forcibly removed and that was the plan when he entered the room.[32]

15.)   Officer Cherry said he cannot recall if Mr. Delacruz was asked just to remove his belt or if he was asked to remove his belt and pants, but whatever he was asked, he refused.[33]

16.)   Officer Cherry said he grabbed Mr. Delacruz's left hand and Sergeant Rowe grabbed Mr. Delacruz's right hand and tried to remove the belt and then a struggle ensued.[34]

17.)   Officer Cherry said the requirement for the belt or pant removal was at the hospital's request and there was no law enforcement purpose for removing the belt or pants.[35]  Officer Cherry said he does not recall searching Mr. Delacruz, but under general law enforcement standards and practices the officers would have conducted a patdown search and he was not concerned that Mr. Delacruz had a weapon.[36]

18.)   Officer Cherry said he did not know why the belt, or a description of the

---

[26] Cherry deposition at 65.
[27] Cherry deposition at 65.
[28] Cherry deposition at 87.
[29] Cherry deposition at 87.
[30] Cherry deposition at 83.
[31] Cherry deposition at 68.
[32] Cherry deposition at 69.
[33] Cherry deposition at 71.
[34] Cherry deposition at 72.
[35] Cherry deposition at 88.
[36] Cherry deposition at 88.

belt, was not in any of the police or medical reports.[37]

19.)   Officer Cherry acknowledged that when he told Mr. Delacruz they needed to take his belt or shorts off and he refused and backed against the wall, that both he and Sergeant Rowe had the ability to leave the room at that point.[38]

19.   Sergeant Rowe

a.   Written Report

1.)   Sergeant Rowe said Officer Cherry responded to the hospital on a mentally ill subject and when he arrived at the hospital he spoke with Mr. Delacruz's family members who told him Mr. Delacruz was "highly schizophrenic," had attempted to jump from a moving vehicle, was not taking his medication, and had not slept for five days. Sergeant Rowe said Officer Cherry took Mr. Delacruz into custody under an emergency order of detention and returned Mr. Delacruz the emergency room without incident.

2.)   Sergeant Rowe said Officer Cherry contacted him about 7 PM and told him that he had been at the hospital since 5 PM and the hospital was not going to admit Mr. Delacruz because Mr. Delacruz was refusing all medical treatment. Sergeant Rowe said the police department has had similar problems with the hospital in the past regarding the admission of patients, so he responded to the hospital to assist in getting Mr. Delacruz admitted to the hospital.[39]

3.)   Sergeant Rowe said Mr. Delacruz was in room 19 with his hands handcuffed in front. Mr. Delacruz accused Ms. Johnson of wanting to poison, kill and rape him, but despite these statements Mr. Delacruz seemed calm. Mr. Delacruz did not want anyone to touch him and he continually mumbled something. Sergeant Rowe said he believed Mr. Delacruz was obviously suffering from some type of mental disorder and needed treatment for his own safety and well-being.[40]

4.)   Sergeant Rowe said medical staff was able to take Mr. Delacruz's blood pressure, but when they attempted to take a blood sample, Mr. Delacruz struggled and he grabbed Mr. Delacruz's hand to prevent him from

---

[37] Cherry deposition at 101.
[38] Cherry deposition at 110.
[39] COPA 00012.
[40] COPA 00013.

13

gaining control of the needle.

5.)     Sergeant Rowe said Officer Cherry got Mr. Delacruz a drink and removed the handcuffs from Mr. Delacruz so it would be easier for him to drink.

6.)     Ms. Johnson was able to convince Mr. Delacruz to take off his shirt and shoes and put on a yellow gown.  Mr. Delacruz refused to take off his shorts and he and Officer Cherry believed Mr. Delacruz may have refused to remove the shorts out of embarrassment so they offered to hold up a large blanket for him to stand behind to remove his shorts, but Mr. Delacruz still refused.  The two nurses then left the room and closed the curtain for privacy, so Mr. Delacruz could remove his shorts.

7.)     Sergeant Rowe said Mr. Delacruz then backed against the wall in a defensive position and he grabbed Mr. Delacruz by the left wrist with his right hand and tried to push him back.  Officer Cherry tried to hold Mr. Delacruz against the wall, but Mr. Delacruz grabbed Officer Cherry's wrist with his left hand.  Sergeant Rowe said they were trying to calm Mr. Delacruz down, but Mr. Delacruz slung his right elbow toward him and hit him in the head.[41]

8.)     Sergeant Rowe said he continued to ask Mr. Delacruz to calm down and said he spoke to Mr. Delacruz in a normal tone of voice.  Sergeant Rowe said he heard Officer Cherry say, "He got your mace" and he looked up and saw Mr. Delacruz was holding a mace can and pointing it in his direction.  Officer Cherry was able to take the can of mace out of Mr. Delacruz's grip and toss the can off to the side.

9.)     Sergeant Rowe said he told Mr. Delacruz something to the effect that he was under the arrest, but Mr. Delacruz did not comply with either his or Officer Cherry's commands.  Seconds later, Officer Cherry said, "Watch it! Dammit he is trying to get my gun."  Sergeant Rowe said he saw Mr. Delacruz's left hand on Officer Cherry's right side where he carries his pistol.  Officer Cherry put both of his hands on his gun and pulled away from Mr. Delacruz and he stepped back to draw his weapon in case Mr. Delacruz was able to obtain Officer Cherry's gun.

10.)    Sergeant Rowe said Mr. Delacruz now had his back against the wall with both hands up and both fists closed in a boxing or fighting stance.  Mr. Delacruz punched him twice on the left side with a closed fist, but he was able to dodge the punches so neither connected with his face.

---

[41] COPA 00014.

11.)   Sergeant Rowe said he punched Mr. Delacruz one time with a closed fist somewhere on his face or the side of his head, but the blow had no effect.[42]

12.)   Sergeant Rowe said the room was very small and he tried to get Mr. Delacruz on the ground, but it was difficult to due his size and strength. Officer Cherry administered a Taser drive stun for one cycle, but the Taser had no effect.

13.)   Because the room was so small, they tried to pull Mr. Delacruz into the hall and once in a hallway, a security guard assisted to roll Mr. Delacruz onto his stomach, so he could be handcuffed.[43]   Officer Meaux and other officers arrived and they were able to handcuff Mr. Delacruz.

14.)   After Mr. Delacruz was handcuffed, he told the officers to roll Mr. Delacruz onto his back and sit him up.   Sergeant Rowe said once Mr. Delacruz was rolled onto his back he saw Mr. Delacruz was nonresponsive and did not appear to be breathing.[44]

b.   Deposition (rough draft)

1.)   Lieutenant Rowe said at the time of the incident he was a sergeant, but he has since been promoted to the rank of lieutenant.[45]

2.)   Lieutenant Rowe said he spoke with his Union attorney prior to completing his report in this matter.[46]

3.)   Lieutenant Rowe said he received a telephone call from Officer Cherry who told him they were trying to get Mr. Delacruz admitted into the hospital on an emergency mental detention order and hospital did not want to accept him.[47]   Lieutenant Rowe said Officer Cherry told him Mr. Delacruz had attempted to jump out of a vehicle the day before, was schizophrenic, had possibly been medicating himself on illegal narcotics, had not taken a bath and had been defecating on himself.[48]

---

[42] COPA 00015.
[43] COPA 00016.
[44] COPA 00017.
[45] Rowe deposition at 7.
[46] Rowe deposition at 19.
[47] Rowe deposition at 21.
[48] Rowe deposition at 22.

4.)   Lieutenant Rowe said he drove to the hospital to assist Officer Cherry.[49]

5.)   Lieutenant Rowe said he had attended a meeting about a year ago with the hospital regarding the problems the police department was having in getting mental patients admitted to hospitals.[50]

6.)   Lieutenant Rowe said the policy and practice of the police department was that once a mental health detainee was transferred to the fifth floor, the police department would have completed their responsibilities.[51]

7.)   Lieutenant Rowe said he attended a course on Crisis Intervention Training.[52]  Lieutenant Rowe said that training was generally about communication skills. Lieutenant Rowe said there was no training that provides guidance if the nurse tells the officer they need a patient to take off their shorts and rather he would be within the judgment of the officer.[53]

8.)   Lieutenant Rowe said he spoke with Ms. Hester about how to deal with Mr. Delacruz.  Lieutenant Rowe said Ms. Hester wanted him to arrest Mr. Delacruz. Lieutenant Rowe explained to her he had not committed a crime and could not be arrested.[54]  Lieutenant Rowe said he also spoke with Ms. Johnson who just wanted the officers to stay there until hospital was able to get everything they needed.[55]

9.)   Lieutenant Rowe said he was probably told that Mr. Delacruz thought he was going to be raped before he attempted to remove his shorts.[56]

10.)  Lieutenant Rowe said Mr. Delacruz was calm, but he did not want anyone to touch him, including his family.[57]

11.)  Lieutenant Rowe said he does not recall which member of the hospital staff he was speaking to, but he explained that the police had already been there for several hours and if the hospital was not going to admit Mr. Delacruz to the fifth floor to get the help he needed that the police

---

[49] Rowe deposition at 23.
[50] Rowe deposition at 23-24.
[51] Rowe deposition at 32.
[52] Rowe deposition at 38.
[53] Rowe deposition at 39.
[54] Rowe deposition at 42-43.
[55] Rowe deposition at 43.
[56] Rowe deposition at 43.
[57] Rowe deposition at 45.

were likely going to leave.  The hospital staff member told him that they would have a "sitter" sit in the room and watch Mr. Delacruz and if he did something they would call the police back.[58]  Lieutenant Rowe said he was concerned with having a "sitter" due to the risk to other individuals in the emergency room.[59]

12.)   Lieutenant Rowe said during this time Officer Cherry got Mr. Delacruz a drink and took his handcuffs off.[60]  Lieutenant Rowe said the plan was for Officer Cherry to take off the handcuffs and they were going to leave.[61]

13.)   Lieutenant Rowe said there was a standstill between the police and the hospital supervisors where the police had completed the emergency mental commitment warrant, but the hospital would not admit Mr. Delacruz absent taking his blood pressure and getting a blood test. Lieutenant Rowe said it was his impression the hospital wanted the officers to wait until Mr. Delacruz had a lucid moment to consent to the medical tests but said that eventually they have to leave.[62]

14.)   Lieutenant Rowe said eventually the hospital was able to obtain a portion of what they needed and they decided to forgo the blood draw. Lieutenant Rowe said that he was under the assumption they needed Mr. Delacruz to put a gown on and when he was dressed he would be admitted to the fifth floor.  Lieutenant Rowe said they were able to get his shoes off, but his shorts were the last thing remaining before they would admit him.[63]

15.)   Lieutenant Rowe said he agrees the situation became escalated when they tried to remove Mr. Delacruz's shorts.[64]  Lieutenant Rowe said Mr. Delacruz had been sitting pretty calmly until the officers were trying to take off his shorts.[65]

16.)   Lieutenant Rowe said Mr. Delacruz refused to take his shorts off so the nurses held a blanket, so he could not be seen but he still did not take off his shorts.  Lieutenant Rowe said they then asked for the nurses to step out of the room hoping that Mr. Delacruz would remove his shorts if the

---

[58] Rowe deposition at 48-49.
[59] Rowe deposition at 49-50.
[60] Rowe deposition at 51.
[61] Rowe deposition at 52.
[62] Rowe deposition at 52-53.
[63] Rowe deposition at 56.
[64] Rowe deposition at 61.
[65] Rowe deposition at 75.

nurses were not present.[66]  Lieutenant Rowe said someone, he has no idea who, closed the privacy curtain and asked him to take off his pants and that point he backed up against the wall and began flailing around and grabbed his arm.[67]

17.)    Lieutenant Rowe said he reached down to pull Mr. Delacruz's shorts down when he heard Officer Cherry say that Mr. Delacruz had his pepper spray.  Lieutenant Rowe said he looked up and saw Mr. Delacruz was holding a pepper spray canister with his finger on top trying to spray him, but he did not know that he needed to put his finger under the lid to make the canister work.  Lieutenant Rowe said at that point he told Mr. Delacruz he was under arrest.[68]

18.)    Lieutenant Rowe said Officer Cherry was able to get the pepper spray canister away from Mr. Delacruz and while they were trying to handcuff him, Mr. Delacruz tried to remove Officer Cherry's handgun from his holster.[69]

19.)    Lieutenant Rowe said he and Officer Cherry struggled with Mr. Delacruz until a security guard and other officers were able to arrive and assist them in handcuffing Mr. Delacruz.[70]

20.)    Lieutenant Rowe said he is 6 ½ feet tall and weighs approximately 240 pounds.[71]

21.)    Lieutenant Rowe said at the point he made the decision he was going to either persuade Mr. Delacruz verbally to take off his shorts or he would take off Mr. Delacruz's shorts physically, Mr. Delacruz was not committing a crime[72] and not under arrest.[73]  Lieutenant Rowe said Mr. Delacruz had not made a specific threat to anyone, he was not actively resisting before he tried to take off his shorts,[74] and he was not trying to flee.[75]

22.)    Lieutenant Rowe said part of his CIT training is to avoid confrontation

---

[66] Rowe deposition at 65-66.
[67] Rowe deposition at 66.
[68] Rowe deposition at 67.
[69] Rowe deposition at 70.
[70] Rowe deposition at 71-73.
[71] Rowe deposition at 74.
[72] Rowe deposition at 76.
[73] Rowe deposition at 78.
[74] Rowe deposition at 77-78.
[75] Rowe deposition at 78.

with the person who is in crisis.  Lieutenant Rowe said taking somebody's shorts off could be perceived as being confrontational.[76]

23.)  Lieutenant Rowe said if there were two individuals on the street and one attempted to take the other's shorts off without consent he would be a committing a Class C misdemeanor.[77]

24.)  Lieutenant Rowe said he did not stop when Mr. Delacruz began backing up in the hospital room because they were "past that point."  Lieutenant Rowe said they were trying to get Mr. Delacruz to where the hospital could take him to the fifth floor so he could get the help he needed. Lieutenant Rowe said he was trained that if a person were backing up in these circumstances and they were in a mental health crisis it could lead to a fight.[78]

25.)  Lieutenant Rowe said he did not know that Mr. Delacruz had the right to refuse medical treatment while under an emergency mental health warrant.[79]

26.)  Lieutenant Rowe said he does not recall being told that the primary nurse and surrounding staff were instructed to not perform any procedures if patient refuses or to touch the patient if he does not wish to be touched as noted in the nurses' notes at 7:08 PM.[80]

27.)  Lieutenant Rowe said it was obvious that Mr. Delacruz was not going to take off his shorts and that the hospital was not going to admit him wearing shorts.  Lieutenant Rowe said he felt he had responsibility to remove Mr. Delacruz 's shorts so he would conform with the hospital's policies and be admitted.[81]  Lieutenant Rowe said he cannot explain the contradiction in the hospital's policies that required Mr. Delacruz to remove his shorts and at the same time allow him to refuse treatment.[82]

20.  **Officer Meaux**

   a.  **Written Report**

      1.)  Officer Meaux said he responded to the hospital in response to Sergeant

---

[76] Rowe deposition at 89.
[77] Rowe deposition at 93.
[78] Rowe deposition at 96-97.
[79] Rowe deposition at 104.
[80] Rowe deposition at 134.
[81] Rowe deposition at 139.
[82] Rowe deposition at 142.

19

Rowe's call for help.  Officer Meaux said when he arrived he saw Mr. Delacruz struggling with Officer Cherry and Sergeant Rowe on the ground in the hallway near Room 19.  There were several people including patients and hospital staff in the immediate vicinity watching the struggle and a security guard was assisting in controlling Mr. Delacruz's legs.

2.)    Officer Meaux said Mr. Delacruz was not compliant with repeated commands by officers to put his hands behind his back and calm down.[83]

3.)    Officer Meaux said he was able to get Mr. Delacruz's left arm from underneath his body and place it behind his back.  About that time, Officers Cater and Harper arrived, and they were able to handcuff Mr. Delacruz.  After Mr. Delacruz was restrained, Sergeant Rowe advised officers to turn him over onto his back and sit him up.  In the process of moving Mr. Delacruz, he became unresponsive and CPR was administered by Emergency Room personnel.[84]

b.    Deposition (rough draft)

1.)    Officer Meaux said the desirable outcome of verbal judo or de-escalation training is to keep the person as calm as you can for as long as you can until you reach a final disposition.[85]  Officer Meaux said if an officer knows there is something that will trigger an individual to become violent the officer should avoid that behavior.[86]

2.)    Officer Meaux said he heard the distinctive sound of a struggle on the police radio and the dispatcher said officers needed assistance at the hospital.  Officer Meaux said he was nearby and arrived within 20 to 30 seconds.[87]

3.)    Officer Meaux said it is his experience that if a mental health detainee is combative in the hospital they will remain in restraints and hospital staff would give them a sedative.[88]

4.)    Officer Meaux said it is the policy of the police department not to use force on someone who is not resisting and not being combative.[89]

---

[83] COPA 00010.

[84] COPA 00011.

[85] Meaux deposition at 7.

[86] Meaux deposition at 13.

[87] Meaux deposition at 10.

[88] Meaux deposition at 21.

[90] Cater deposition at 7.

21.   Officer Cater – Deposition (rough draft)

   a.   Officer Cater said the purpose of Crisis Intervention Training (CIT) is to de-escalate situations and make sure you don't do anything provocative to make the situation worse.[90]

   b.   Officer Cater said he could tell when he first began interacting with Mr. Delacruz due to his behavior and the family statements that Mr. Delacruz needed psychiatric help.[91]

   c.   Officer Cater said Mr. Delacruz had not committed any crime, was not under arrest and the officers were not planning on taking him to jail.  Instead, it was his goal to get Mr. Delacruz admitted to a psychiatric hospital.[92]

   d.   Officer Cater said over the years he has been told by hospitals they would not accept the patient who was combative but said being combative is not a reason the hospital can refuse a psychiatric patient's admission.  Officer Cater said a lot of times the hospital will give the patient some medicine that will calm the patient down, so he will be admitted.[93]

   e.   Officer Cater said Mr. Delacruz told him he was afraid that the police were going to rape him and take him to jail.[94]  Officer Cater said he and Officer Cherry were able to calm Mr. Delacruz down, and handcuff him, but Mr. Delacruz did not want to get into the police car.  Officer Cater said the hospital was just two blocks away, so he walked with Mr. Delacruz to the hospital to avoid a confrontation.[95]

   f.   Officer Cater said he was not present when the officers tried to get Mr. Delacruz to remove his pants.[96]

   g.   Officer Cater said he left the hospital but returned when he heard officers at the hospital calling for help.[97]

---

[90] Cater deposition at 7.
[91] Cater deposition at 10.
[92] Cater deposition at 11.
[93] Cater deposition at 16.
[94] Cater deposition at 21.
[95] Cater deposition at 22-23.
[96] Cater deposition at 36.
[97] Cater deposition at 39-40.

22.     Autopsy Report

    a.    Mr. Delacruz was 26 years old, 5'9" and weighed approximately 286 pounds.[98]

    b.    Mr. Delacruz had linear red abrasions, measuring ¼ to ¾ inches, on the right upper back at the shoulder.  There were two small puncture marks on his abdomen to the right and slightly distal to the umbilicus.  The marks were arranged vertically and were located 1 ½ inches from each other. There were two linear red abrasions, measuring 2-4 inches in length, on his right forearm immediately below the elbow.  A red contusion in circles the right wrist.  There were contusions to his upper left arm, left forearm, left wrist, and left ankle.[99]

    c.    The forensic pathologist, Doctor Murphy, found the cause and manner of death of Mr. Delacruz to be undetermined.[100]

**The Port Arthur Police Department Had a Policy, Practice or Custom of Complying with the Requests of the Hospital to get a Mental Health Detainee Admitted to the Hospital Regardless if the request bore a Legitimate Law Enforcement Purpose**

23.     The Port Arthur Police Department had a policy, practice or custom of complying with requests of the admitting hospital in order to get a mental health detainee admitted to the hospital even if those requests violate the department's policies, practices and training.

    a.    Officer Cherry said he believes he is legally bound to ensure a mental health detainee receives the treatment that they need and he considers it a department policy to take the actions necessary to make sure that the patient, even when refusing care, receives treatment.[101]

    b.    Officer Cherry said he believes Chief Dunlap would agree with his explanation of the Department's procedure with regard to mental health detainees who are refusing care.[102]

    c.    Officer Cherry said according to his training and department policy if the hospital healthcare worker states that something has to occur that he would use force to make the detainee comply depending on the request.  Officer Cherry said, "for instance, he has to have article of clothing removed so they can perform their

---

[98] Delacruz 0067.
[99] Delacruz 0066.
[100] Delacruz 0069.
[101] Cherry deposition at 46-47.
[102] Cherry deposition at 47.

duties to treat him mentally, yes, I believe we're authorized to do whatever we need."[103]

d.   Lieutenant Rowe said it was obvious that Mr. Delacruz was not going to take off his shorts and that the hospital was not going to admit him wearing shorts. Lieutenant Rowe said he felt he had responsibility to remove Mr. Delacruz 's shorts so he would conform with the hospital's policies and be admitted.[104]

### The Port Arthur Police Department was Deliberately Indifferent to the Constitutional Rights of the Community Members of the Community it Serves

24.   The Port Arthur Police Department was deliberately indifferent to the constitutional rights of the community members of the community that it serves by allowing a policy, practice or custom of complying with requests of the admitting hospital in order to get a mental health detainee admitted to the hospital even if those requests violate the department's policies, practices and training, even if there is no legitimate law enforcement purpose in carrying out the request, and even if force must be used.

25.   Officer Cherry said he considers taking the actions necessary to get a mental health detainee admitted to the hospital was an actual policy and he believes that Chief Dunlap would agree.[105]

26.   Chief Dunlap signaled his agreement that Port Arthur Police Department officers should use force to enforce hospital policies in order to gain the admission of patients to the hospital's mental health facility regardless of a legitimate law enforcement purpose when he deemed the allegations against Officer Cherry and Sergeant Rowe to be exonerated.[106]  "Exonerated" is defined in the policies of the Port Arthur Police Department as "The incident occurred but was lawful and proper."[107]

### The Use of Force by the Officers Involved in this Matter was Contrary to Generally Accepted Police Practices

27.   The U.S. Supreme Court in its landmark decision *Graham v. Connor* held that to determine whether the force used to affect a particular seizure is reasonable, one must balance the nature and quality of the intrusion on the individual's rights against the countervailing government interests at stake.  This balancing test is achieved by the application of what the Court labeled the objective reasonableness test.  The factors to be considered include: 1.) The severity of the crime, 2.) Whether the suspect poses an

---

[103] Cherry deposition at 42-43.
[104] Rowe deposition at 139.
[105] Cherry deposition at 46-47.
[106] COPA 00040-42.
[107] COPA 000527.

immediate threat to the safety of the officers or others, and 3.) Whether the suspect is actively resisting or attempting to evade arrest by flight.

28. Whether one's actions were objectively reasonable cannot be considered in a vacuum, but must be considered in relation to the totality of the circumstances. The standard for evaluating the unreasonable use of force reflects deference to the fact that peace officers are often forced to make split-second judgments in tense circumstances concerning the amount of force required. The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.

29. Police officers are trained and prepared to assess dangerous situations and respond accordingly. Police officers are trained that for their force to be reasonable the level and manner of force must be proportional to the level of resistance and threat with which they are confronted. Proportionality is best understood as a range of permissible conduct based on the totality of the circumstances, rather than a set of specific, sequential, predefined force tactics arbitrarily paired to specified types or levels of resistance or threat.

30. Whether or not the suspect poses an immediate threat to the safety of the officer or others is the most important of the *Graham* factors. There must be objective factors to justify an immediate threat, as a simple statement by an officer that he fears for his safety or the safety of others is insufficient. There is no requirement that a police officer wait until a suspect shoots to confirm that a serious threat of harm exists, but merely a subjective fear or a hunch will not justify the use of force by police.

31. The officers knew that Mr. Delacruz was suffering from a mental health crisis.

   a.  Officer Cherry

      1. Officer Cherry said after speaking with the family, he believed it was clear that Mr. Delacruz was a danger to himself or others and needed to have an emergency committal issued, so Mr. Delacruz could receive the needed medical treatment for his mental health problems.[108]

      2. Officer Cherry said Mr. Delacruz's sister told him that Mr. Delacruz had attempted to jump out of their truck, he was not eating or sleeping and she believed he was paranoid and schizophrenic.[109] Officer Cherry said when he spoke with Mr. Delacruz it was clear he was having a mental

---

[108] COPA 00002-3.
[109] Cherry deposition at 23

24

issue and he was a danger to himself and others.  Mr. Delacruz made statements to him that he felt Officer Cherry was a demon and was there to sexually assault him.[110]  Officer Cherry said Mr. Delacruz never told him nor did his body language reflect that he no longer had those fears, or that those fears subsided.[111]

3.  Officer Cherry said he did not believe Mr. Delacruz could think clearly or make rational decisions on his own behalf.[112]

4.  Officer Cherry completed a mental health detention order regarding Mr. Delacruz.

b.  Officer Cater

1.  Officer Cater said he could tell when he first began interacting with Mr. Delacruz due to his behavior in the family statements that Mr. Delacruz needed psychiatric help.[113]

2.  Officer Cater said Mr. Delacruz had not committed any crime, was not under arrest and the officers were not planning on taking him to jail. Instead, it was his goal to get Mr. Delacruz admitted to a psychiatric hospital.[114]

c.  Sergeant Rowe

1.  Sergeant Rowe said he spoke with Officer Cherry who told him he spoke with Mr. Delacruz's family members who said Mr. Delacruz was "highly schizophrenic," had attempted to jump from a moving vehicle, was not taking his medication, and had not slept for five days.  Sergeant Rowe said Officer Cherry took Mr. Delacruz into custody under an emergency order of detention.

2.  Sergeant Rowe said when he arrived Mr. Delacruz was in room 19 with his hands handcuffed in front.  Mr. Delacruz accused his Michelle Johnson of wanting to poison, kill and rape him, but despite these statements Mr. Delacruz seemed calm.  Mr. Delacruz did not want anyone to touch him and he continually mumbled something.  Sergeant Rowe said he believed

---

[110] Cherry deposition at 24.
[111] Cherry deposition at 36.
[112] Cherry deposition at 26.
[113] Cater deposition at 10.
[114] Cater deposition at 11.

Mr. Delacruz was obviously suffering from some type of mental disorder and needed treatment for his own safety and well-being.[115]

32.   The officers knew that Mr. Delacruz was afraid of the police and believed that the police would attempt to rape him.

   a.   Officer Cherry said he was told by one of the family members that Mr. Delacruz was afraid of the police.[116] Officer Cherry said Mr. Delacruz told him he was afraid the police were going to kill him and the he feared being raped.  Officer Cherry said he assured Mr. Delacruz that he did not want to kill him and nobody was going to rape him.[117]

   b.   Officer Cater said Mr. Delacruz told him he was afraid that the police were going to rape him and take him to jail.[118]

   c.   Sergeant Rowe said he was probably told that Mr. Delacruz thought he was going to be raped before he attempted to remove his shorts.[119]

33.   The officers used force against Mr. Delacruz in an attempt to remove his belt and/or pants.

   a.   Officer Cherry said he and Sergeant Rowe went into the room to try to remove Mr. Delacruz's belt.[120] Officer Cherry said he assumed that Sergeant Rowe decided the belt could be forcibly removed and that was the plan when he entered the room.[121] Officer Cherry said he cannot recall if Mr. Delacruz was asked just to remove his belt or if he was asked to remove his belt and pants, but whatever he was asked, he refused.[122] Officer Cherry said he grabbed Mr. Delacruz's left hand and Sergeant Rowe grabbed Mr. Delacruz's right hand and tried to remove the belt and then a struggle ensued.[123]

   b.   Sergeant Rowe said Mr. Delacruz refused to take his shorts off so the nurses held a blanket, so he could not be seen but he still did not take off his shorts.

---

[115] COPA 00013.
[116] COPA 00003.
[117] COPA 00003.
[118] Cater deposition at 21.
[119] Rowe deposition at 43.
[120] Cherry deposition at 68.
[121] Cherry deposition at 69.
[122] Cherry deposition at 71.
[123] Cherry deposition at 72.

Sergeant Rowe said they then asked for the nurses to step out of the room hoping that Mr. Delacruz would remove his shorts if the nurses were not present.[124]  Sergeant Rowe said someone, though he did not know who, closed the privacy curtain and asked him to take off his pants and that point he backed up against the wall and began flailing around and grabbed his arm.[125]  Sergeant Rowe said he reached down to pull Mr. Delacruz's shorts down when he heard Officer Cherry say that Mr. Delacruz had his pepper spray.

34.   There was no legitimate law enforcement objective in the attempted removal of Mr. Delacruz's belt and/or pants.

   a.   Officer Cherry said the requirement for the belt or pant removal was at the hospital's request and there was no law enforcement purpose for removing the belt or pants.[126]  Officer Cherry said he does not recall searching Mr. Delacruz, but under general law enforcement standards and practices the officers would have conducted a patdown search and he was not concerned that Mr. Delacruz had a weapon.[127]  Officer Cherry acknowledged there must be a legitimate law enforcement objective to use force and the force must be objectively reasonable under the facts and circumstances.[128]

   b.   Lieutenant Rowe said at the point he made the decision he was going to either persuade Mr. Delacruz verbally to take off his shorts or he would take off Mr. Delacruz's shorts physically, Mr. Delacruz was not committing a crime[129] and not under arrest.[130]  Lieutenant Rowe said Mr. Delacruz had not made a specific threat to anyone, he was not actively resisting before he tried to take off his shorts,[131] and he was not trying to flee.[132]

35.   Here, the officers knew that Mr. Delacruz had not committed any crime, rather he was suffering from a mental health crisis.  The officers knew that Mr. Delacruz feared the officers would kill or rape him, yet they used force to try to take his pants off merely to comply with a request from the hospital to facilitate Mr. Delacruz's admission to the hospital.  The officers acknowledge they did not believe that Mr. Delacruz was armed or that there was any legitimate law enforcement purpose in removing his belt and/or

---

[124] Rowe deposition at 65-66.

[125] Rowe deposition at 66.

[126] Cherry deposition at 88.

[127] Cherry deposition at 88.

[128] Cherry deposition at 85-86.

[129] Rowe deposition at 76.

[130] Rowe deposition at 78.

[131] Rowe deposition at 77-78.

[132] Rowe deposition at 78.

pants.  The officers knew there were no circumstances that required haste and that they could have spent additional time attempting to de-escalate the situation by using their crisis intervention skills training, contrary to Sergeant Rowe's claim they were "past that point,"[133] or by consulting with hospital staff and explaining their inability to fulfill their request.

36.   Instead, the officers blindly complied with the request of hospital staff with the goal of getting Mr. Delacruz admitted so they could leave the hospital without regarding to the constitutional rights of Mr. Delacruz and without regard for generally accepted police practices.

37.   No reasonable police officer would have used force to attempt to remove Mr. Delacruz's pants in these circumstances in order to get Mr. Delacruz admitted to the hospital.

38.   The act of trying to force Mr. Delacruz to take off his belt and/or pants, when the officers knew Mr. Delacruz was in the midst of a mental health crisis, and where they knew Mr. Delacruz feared the police would try to kill or rape him, led to the struggle between the officers and Mr. Delacruz, the increasing levels of force used by the officers including strikes and Taser applications and ultimately the death of Mr. Delacruz.

### Conclusion

39.   I understand that discovery is ongoing in this matter and that additional depositions will be conducted.  If I receive additional information that amends, changes or adds to my opinions I will prepare a supplemental report.

Jeffrey J. Noble

12/28/18
Date

___

[133] Rowe deposition at 95-96.

28